JUDGE CASTEL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

16 CV 7698

D.H., N.H., K.H. f/k/a J.H., Natasha Martin,
Tiffaney Grissom, R.G., A.B. and Sarah
Marchando, individually and on behalf of a
class of all others similarly situated;

             Plaintiffs,

  -against-

THE CITY OF NEW YORK, SEAN
KINANE, JOSEPH MCKENNA, KAYAN
DAWKINS, THOMAS KEANE, MARIA
IMBURGIA, KEVIN MALONEY, JOEL
ALLEN, DAVE SIEV, BRYAN POCALYKO,
CHRISTOPHER SAVARESE, THOMAS
DIGGS, JOEL GOMEZ, KEITH BEDDOWS,
CHRISTIAN SALAZAR, HENRY
DAVERIN, JOSEPH NICOSIA, KELLY
QUINN, ALEXIS YANEZ, MICHAEL
DOYLE, JOHN/JANE DOE NYPD POLICE
OFFICERS #1-14;

             Defendants.

COMPLAINT AND
DEMAND FOR A JURY TRIAL



RECEIVED
SEP 3 0 2016
U.S.D.C. S.D. N.Y.
CASHIERS

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................. 1

JURISDICTION ............................................................................. 5

VENUE .................................................................................... 6

PARTIES .................................................................................. 6

    I.     PLAINTIFFS ...................................................................... 6

    II.    DEFENDANTS ..................................................................... 7

CLASS ACTION ALLEGATIONS ............................................................. 9

FACTUAL ALLEGATIONS .................................................................. 13

    I.     SECTION 240.37 IS UNCONSTITUTIONALLY VAGUE AND
          OVERBROAD, WHICH LEADS TO ARRESTS FOR
          CONSTITUTIONALLY PROTECTED BEHAVIOR ....................................... 13

          A.     Section 240.37 Is Void for Vagueness ................................. 13

                   1.     *Legislative History and Previous Legal Challenges to*
                          *Section 240.37* ................................................ 14

                   2.     *Constitutional Developments Since Section 240.37 Was*
                          *Last Challenged* ............................................... 16

                   3.     *New York Courts Have Been Unable to Remedy Violations*
                          *of Plaintiffs' Constitutional Rights Attributable to Section*
                          *240.37's Infirmities* .......................................... 17

          B.     Section 240.37 Is Unconstitutionally Overbroad ...................... 18

    II.    THE CITY HAS POLICIES, WIDESPREAD PRACTICES, AND/OR
          CUSTOMS OF DISCRIMINATORY AND ARBITRARY
          ENFORCEMENT OF SECTION 240.37 ........................................... 21

          A.     The City Engages in Discriminatory Enforcement Practices
                   Against Transgender Women of Color, Including by Using
                   "Sweeps," Performance Goals and Arrest Quotas to Unlawfully
                   Target Transgender Women of Color for Arrest Under Section
                   240.37 ............................................................ 22

          B.     The City Has a Policy, Widespread Practice and/or Custom of
                   Unlawfully Arresting Plaintiffs Under Section 240.37 Without
                   Probable Cause ..................................................... 25

          C.     The City Has a Policy, Widespread Practice and/or Custom of
                   Discriminating Against Women of Color .............................. 28

## TABLE OF CONTENTS
### (continued)

Page

D. The City Knew or Should Have Known of the Need for Corrective Action to Prevent Constitutional Violations of Plaintiffs' Rights to Free Speech, Equal Protection of the Laws and Freedom from Unreasonable Seizures and False Arrests, and Failed to Take Corrective Action to Prevent Such Violations, Including by Failing to Adequately Train, Monitor, Supervise or Discipline Responsible Officers ............ 31

III. NAMED PLAINTIFFS HAVE BEEN TARGETED FOR UNLAWFUL SURVEILLANCE, STOPS, QUESTIONING, FRISKS, SEARCHES, SEIZURES, AND/OR ARREST AND DETENTION UNDER SECTION 240.37 ............ 34

    A. Named Plaintiffs Arrested During Sweeps Targeting Transgender Women of Color ............ 34

        1. Named Plaintiff D.H. ............ 34

        2. Named Plaintiff N.H. ............ 37

        3. Named Plaintiff K.H. ............ 41

        4. Named Plaintiff Natasha Martin ............ 44

    B. Named Plaintiffs Targeted for Arrest Under Other Circumstances ............ 47

        5. Named Plaintiff Tiffaney Grissom ............ 47

        6. Named Plaintiff R.G. ............ 50

        7. Named Plaintiff A.B. ............ 54

        8. Named Plaintiff Sarah Marchando ............ 56

CLAIMS FOR RELIEF ............ 62

I. CLASS CLAIMS ............ 62

    First Claim for Relief ............ 62

    Second Claim for Relief ............ 63

    Third Claim for Relief ............ 64

    Fourth Claim for Relief ............ 65

    Fifth Claim for Relief ............ 66

    Sixth Claim for Relief ............ 67

    Seventh Claim for Relief ............ 68

    Eighth Claim for Relief ............ 69

    Ninth Claim for Relief ............ 70

**TABLE OF CONTENTS**
(continued)

Tenth Claim for Relief ................................................................................. 70

Eleventh Claim for Relief ............................................................................ 71

Twelfth Claim for Relief .............................................................................. 73

Thirteenth Claim for Relief ......................................................................... 75

II.     CLAIMS BY NAMED PLAINTIFFS ......................................................... 76

Fourteenth Claim for Relief ........................................................................ 77

Fifteenth Claim for Relief ............................................................................ 77

Sixteenth Claim for Relief ........................................................................... 78

Seventeenth Claim for Relief ....................................................................... 79

Eighteenth Claim for Relief ......................................................................... 79

Nineteenth Claim for Relief ......................................................................... 80

Twentieth Claim for Relief .......................................................................... 83

REQUEST FOR RELIEF .......................................................................................... 84

## PRELIMINARY STATEMENT

1.      Plaintiffs D.H., N.H., K.H. f/k/a J.H.,[1] Natasha Martin, Tiffaney Grissom, R.G.,

A.B. and Sarah Marchando ("Named Plaintiffs") bring this civil rights action on behalf of

themselves and a class of similarly situated women of color, some of whom are transgender, who

have been and may in the future be subjected to surveillance, stopped, questioned, frisked,

searched, seized and/or arrested and detained under New York Penal Law Section 240.37

("Section 240.37") (the "Plaintiff Class," and together with Named Plaintiffs, "Plaintiffs"), and

allege the following on information and belief:

2.      This is a civil rights class action that challenges the constitutionality of Section

240.37, Loitering for the Purpose of Engaging in a Prostitution Offense, under which New York

City Police Department ("NYPD") officers target and arrest women—primarily women of color,

including transgender women—engaged in wholly innocent conduct based on their race, color,

ethnicity, gender, gender identity and/or appearance.

3.      Since 1976, New York has criminalized loitering in a public place by persons

whom the police selectively and subjectively determine are present for the purpose of

prostitution.

4.      New York enacted Section 240.37, along with several other anti-loitering laws, at

a time when street crime was rampant, in order to provide police officers with a "tool to curtail

the proliferation of prostitution" and other "maladies" throughout New York.[2]

---

[1] K.H. is in the process of legally changing her name from J.H.

[2] Letter from N.Y.C. Office of the Mayor to Hon. Hugh L. Carey (June 10, 1976) [hereinafter Letter from N.Y.C. Office of the Mayor to Hon. Hugh L. Carey]; see Murray Schumach, Major Drive on Illicit Sex is Being Drafted by City, N.Y. Times (Sept. 1, 1975), http://www.nytimes.com/1975/09/01/archives/major-drive-on-illicit-sex-is-being-drafted-by-city-city-is.html; see also Tom Goldstein, Experts Say 2 Laws Proposed to Clean Up Times Square Face Constitutional Problems, N.Y. Times (Nov. 3, 1975), http://www.nytimes.com/1975/11/03/archives/experts-say-2-laws-proposed-to-clean-up-times-square-face.html.

5.      Many of these loitering statutes have since been struck down as unconstitutional.
Section 240.37 remains in force, and the pattern of unlawful arrests under this statute
demonstrates that the fears and doubts expressed at the time of its passage about its
unconstitutionality and potential for abuse were entirely warranted.[3]

6.      Section 240.37 provides in relevant part:

> Any person who remains or wanders about in a public place and repeatedly
> beckons to, or repeatedly stops, or repeatedly attempts to stop, or repeatedly
> attempts to engage passers-by in conversation, or repeatedly stops or attempts to
> stop motor vehicles, or repeatedly interferes with the free passage of other persons,
> for the purpose of prostitution, or of patronizing a prostitute as those terms are
> defined in article two hundred thirty of the penal law, shall be guilty of a violation.

7.      On its face, Section 240.37 is unconstitutionally overbroad.  It criminalizes many
forms of constitutionally protected expressive activity, such as attempting "to engage passers-by
in conversation," based solely on a police officer's subjective determination that the activity was
"for the purpose" of prostitution.

8.      The statute is also void for vagueness because it lacks objective criteria and
guidelines for determining what conduct is "for the purpose of prostitution."  It therefore fails to
provide adequate notice of the conduct that will be deemed criminal and gives police officers
unfettered discretion to arrest individuals based on subjective determinations of an individual's
"purpose," leading to inconsistent and arbitrary enforcement.  Consequently, a person of

---

[3] See, e.g., Letter from Harold Baer, Jr. to Hon. Judah Gribetz, Counsel to the Governor (June 15, 1976) [hereinafter Letter from Harold Baer, Jr. to Hon. Judah Gribetz] (writing on behalf of the State Legislation Committee of the New York State Bar Association and the New York County Lawyers' Association, and noting that although the "prostitution problem . . . has reached critical proportions," Section 240.37 is "unconstitutional" and would invite arbitrary and discriminatory enforcement); N.Y. State Bar Ass'n, Legislation Report, No. 84 (1976) [hereinafter N.Y. State Bar Legislation Report] (demonstrating that Section 240.37 has "deficiencies . . . so glaring as to require our disapproval without regard to questions of the efficacy and underlying policy," and declaring that the law provides a "shortcut" for police, whereby the "standards of probable cause" are "dropp[ed]" and "[w]omen who are suspected of being prostitutes are arrested on sight, not because they are committing any unlawful act but because they are considered 'undesirable'").

ordinary intelligence cannot know if, for example, by speaking to acquaintances on the street or engaging in similarly innocent activity, she risks arrest under Section 240.37.

9.     Further, the City of New York (or the "City," and together with all other named individual and Doe defendants ("Individual Defendants"), "Defendants"), through the NYPD, enforces Section 240.37 in a way that impermissibly targets Plaintiffs because of their race, color, ethnicity, gender, gender identity and/or appearance.  Specifically, the City has adopted numerous policies, widespread practices and/or customs that result in arbitrary and discriminatory enforcement of Section 240.37 in violation of Plaintiffs' rights under the First, Fourth and Fourteenth Amendments to the United States Constitution and Article I, §§ 8, 11 and 12 of the New York Constitution, including by:

- Deploying groups of NYPD officers to arrest multiple Plaintiffs under Section 240.37 in "sweeps" that target certain public areas where women of color, and in particular transgender women, are known to gather and socialize;

- Arresting Plaintiffs under Section 240.37 without probable cause, including based merely on the fact that a Plaintiff has been arrested in the past for a prostitution-related offense (even if the charge was dismissed) or that the Plaintiff was present in an area that the NYPD has designated as "prostitution-prone";

- Arresting women of color under Section 240.37 at a higher rate than men or white women because of their race, color, ethnicity, gender, gender identity and/or appearance; and

- Failing to adequately train, monitor, supervise or discipline NYPD officers involved in the enforcement of Section 240.37 to prevent or mitigate these abuses and constitutional violations.

10.    Defendants' conduct results in a pattern and widespread practice of unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrests and detention of women of color, including transgender women, engaged in wholly innocent conduct, such as walking in public spaces or speaking with other pedestrians.

3

11.     The overwhelming majority of arrests under Section 240.37 are of women of color, including significant numbers of transgender women.  In many instances, charges are eventually dismissed, but the injurious legal, financial, emotional and physical effects of the arrests on Plaintiffs' lives remain.

12.     Defendants implement the NYPD's policies, widespread practices and/or customs in an intentionally discriminatory and race-based manner by focusing their enforcement efforts on communities of color.  Defendants also discriminatorily acquiesce in, ratify and fail to monitor or rectify these unlawful practices because the victims are transgender and/or women of color.

13.     The enforcement of Section 240.37 intimidates, threatens and interferes with Named Plaintiffs' enjoyment of their homes and neighborhoods and their right to associate freely with others.  The enforcement is so arbitrary and discriminatory that many Named Plaintiffs are afraid to leave their homes, particularly at night.

14.     As examples, on June 6, 2015, Named Plaintiff D.H., an African-American woman who is transgender, was arrested walking in her neighborhood in the Bronx while trying to hail a cab to get home.  D.H. is deaf and communicates primarily through typing and sign language.  During her walk, she did not interact with anyone or engage in any behavior related to the solicitation of prostitution or other unlawful conduct.  She was nevertheless stopped, harassed, arrested and detained by the police as part of a "sweep" of transgender women in the area, and eventually charged with loitering for the purpose of prostitution.

15.     Similarly, on June 6, 2015, Named Plaintiff N.H., an African-American woman who is transgender, was arrested in her neighborhood on her way home from buying food and cigarettes at a nearby store.  Like D.H., N.H. was arrested as part of a sweep of transgender

4

women, and one of the arresting officers told those women that if they saw "girls like them"—meaning transgender women—outside after midnight, they would arrest them.

16.     On June 13, 2015, Named Plaintiff K.H., an African-American woman who is transgender, was walking home to her apartment when she met another transgender woman. As they walked together, NYPD officers jumped out of an unmarked police car and accosted them. The officers arrested both women on the spot without probable cause.

17.     Section 240.37 is unconstitutional, and, as evidenced by the experience of these and the other Named Plaintiffs, including as set forth more fully below, Defendants' policies, widespread practices and/or customs in enforcing it have violated and continue to violate Plaintiffs' rights secured by the constitutions and laws of the United States and the State and City of New York.

18.     Plaintiffs seek declaratory relief striking Section 240.37 as unconstitutionally vague and overbroad and declaring that the City's policies, widespread practices and customs in enforcing Section 240.37 in an arbitrary and discriminatory manner violate Plaintiffs' constitutional and statutory rights under federal, state and local law. Plaintiffs also seek injunctive relief prohibiting future enforcement of Section 240.37. In addition, Named Plaintiffs seek compensatory and punitive damages, an award of attorneys' fees and costs and such other relief as this Court deems equitable and just.

## JURISDICTION

19.     Jurisdiction is conferred upon this Court under 28 U.S.C. §§ 1331, 1343(a)(3) and 1343(a)(4), as this is a civil action arising under 42 U.S.C. § 1983 and the United States Constitution.

20.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202.

21.     This Court has jurisdiction over the supplemental claims arising under the laws of the State and City of New York pursuant to 28 U.S.C. § 1367(a), as they are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

22.     This case is brought to vindicate the public interest, and the resolution of this case will directly affect the rights of all New Yorkers, particularly women of color. Therefore, to the extent that the notice of claim requirement of N.Y. Gen. Mun. Law §§ 50-e and 50-i would otherwise apply to any of the claims stated below, no such notice is required because this case falls within the public interest exception to that requirement.

## VENUE

23.     Venue is proper in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events that gave rise to the claims alleged in this complaint occurred in the Counties of Bronx and New York. In addition, Defendants conduct business and maintain their principal place of business in the Counties of Bronx and New York. The NYPD maintains its headquarters at 1 Police Plaza, New York, NY 10007, where many of its policies are created.

## PARTIES

### I.   PLAINTIFFS

24.     The Plaintiff Class comprises women of color, some of whom are transgender, who have been or will be subjected to surveillance, stopped, questioned, frisked, searched, seized and/or arrested and detained pursuant to Section 240.37, including based on their race, color, ethnicity, gender, gender identity and/or appearance.

6

25.     Named Plaintiff D.H. is a 26-year-old deaf African-American woman who is transgender and at all relevant times was a resident of Bronx, New York.

26.     Named Plaintiff N.H. is a 36-year-old African-American woman who is transgender and at all relevant times was a resident of Bronx, New York.

27.     Named Plaintiff K.H. is a 32-year-old African-American woman who is transgender and at all relevant times was a resident of Bronx, New York.

28.     Named Plaintiff Natasha Martin is a 38-year-old African-American woman who is transgender and at all relevant times was a resident of Brooklyn, New York.

29.     Named Plaintiff Tiffaney Grissom is a 30-year-old African-American woman who is transgender and at all relevant times was a resident of Bronx, New York.

30.     Named Plaintiff R.G. is a 59-year-old Latina woman and at all relevant times was a resident of Bronx, New York.

31.     Named Plaintiff A.B. is a 44-year-old African-American woman and at all relevant times was a resident of Brooklyn, New York.

32.     Named Plaintiff Sarah Marchando is a 28-year-old Latina woman and at all relevant times was a resident of Queens, New York.

## II.     DEFENDANTS

33.     The City is a municipal entity created and authorized under the laws of the State of New York to maintain, operate and govern a police department, the NYPD, which acts as its agent in the area of law enforcement and for which the City is ultimately responsible.  The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.  The law enforcement activities of the NYPD are supported, in part, by federal funds.

34.     At all relevant times, all Individual Defendants were members of the NYPD, acting in the capacity of agents, servants and employees of the City, and within the scope of their employment as such.  At all relevant times, Defendants JOSEPH MCKENNA, KEVIN MALONEY, DAVE SIEV, BRYAN POCALYKO, HENRY DAVERIN, KEITH BEDDOWS, MICHAEL DOYLE and Doe NYPD Officer #13, and potentially one or more of Defendants Doe NYPD Officers #1-12, were sergeants, lieutenants, captains and other high-ranking officials of the NYPD with training, supervisory and policy-making roles.

35.     Defendants JOSEPH MCKENNA, KEVIN MALONEY and DAVE SIEV (collectively, the "Sweep Supervisor Defendants") participated in planning, ordering, staffing, supervising and/or approving[4] the sweeps described below which resulted in the unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrests and detentions of D.H., N.H, K.H. and/or Natasha Martin, and failed to monitor or reprimand officers involved in those sweeps.  Defendants SEAN KINANE, KAYAN DAWKINS, THOMAS KEANE, MARIA IMBURGIA, JOEL ALLEN, DAVE SIEV and Doe NYPD Officers #1-7 (collectively, the "Sweep Officer Defendants") were involved in the unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrests and detentions of D.H., N.H, K.H. and/or Natasha Martin as part of a sanctioned sweep, as described in greater detail below.  The Sweep Supervisor Defendants and Sweep Officer Defendants are sued in their individual, official and supervisory capacities.

36.     Defendants BRYAN POCALYKO, HENRY DAVERIN, KEITH BEDDOWS, MICHAEL DOYLE and Doe NYPD Officer #13 (collectively, the "Non-Sweep Supervisor

---

[4] Per the 2015 edition of the NYPD Patrol Guide, to approve an arrest, the arrest paperwork and supporting deposition must be reviewed for completeness and accuracy by the desk officer.  NYPD Patrol Guide, Arrests – General Processing, Desk Officer, PG 208-03, ¶¶ 26-34 (2015-A Ed.) [hereinafter NYPD Patrol Guide].

Defendants") participated in planning, ordering, staffing, supervising and/or approving the unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrests and detentions of Tiffaney Grissom, R.G, A.B. and Sarah Marchando, and failed to monitor or reprimand the officers involved.  Defendants CHRISTOPHER SAVARESE, THOMAS DIGGS, JOEL GOMEZ, BRYAN POCALYKO, CHRISTIAN SALAZAR, JOSEPH NICOSIA, KELLY QUINN, MICHAEL DOYLE, ALEXIS YANEZ, and Doe NYPD Officers #8-13 (collectively, the "Non-Sweep Officer Defendants") were involved in the unlawful surveillance stops, questioning, frisks, searches, seizures and/or arrests and detentions of Tiffaney Grissom, R.G, A.B. and Sarah Marchando.  The Non-Sweep Supervisor Defendants and Non-Sweep Officer Defendants are sued in their individual, official and supervisory capacities.

37.     At all relevant times, Defendant Doe NYPD Officer #14 was an officer in the 52nd precinct.  Defendant Doe NYPD Officer #14 was involved in the refusal to provide D.H. with a sign language interpreter in violation of her rights under the Americans with Disabilities Act, New York State Human Rights Law and New York City Human Rights Law.

38.     At all relevant times, Individual Defendants were acting under color of state law, including under color of the statutes, ordinances, regulations, policies, customs and/or usages of the City and State of New York.

## CLASS ACTION ALLEGATIONS

39.     Named Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23.

40.     Named Plaintiffs are D.H., N.H., K.H., Natasha Martin, Tiffaney Grissom, R.G., A.B. and Sarah Marchando.

41.     This action is properly maintainable as a class action because the requirements of Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure are satisfied, as shown below.

42.     The class is so numerous that joinder of all members is impracticable.  From 2012 through 2015, nearly 1,300 individuals were arrested in New York City under Section 240.37.[5] During those same years, nearly 400 of those arrests did not lead to convictions.  In some cases, charges were never filed; in others, charges were dismissed; and in others, the accused was acquitted.

43.     Joinder is also impracticable because many members of the Plaintiff Class are not aware that their constitutional and statutory rights have been violated and that they have the right to seek redress in court.  Further, many Plaintiff Class members cannot be joined individually because they have been unlawfully surveilled, stopped, questioned, frisked, searched and/or seized by NYPD officers but ultimately were not arrested and detained, and are therefore unknown.  There is no appropriate avenue for the protection of these Plaintiff Class members' constitutional and statutory rights other than by means of a class action.

44.     The claims alleged on behalf of Named Plaintiffs as Plaintiff Class representatives raise questions of law or fact common to all Plaintiffs, and these questions predominate over individual questions.  These common questions include, but are not limited to:

- Whether Section 240.37 is void for vagueness as a result of its failure to provide adequate notice to individuals of objective conduct that would subject them to arrest under the statute and/or guidance to officers;

- Whether Section 240.37 is unconstitutionally overbroad, impermissibly infringing Plaintiffs' rights under the First, Fourth and Fourteenth Amendments to the United States Constitution, and Article I, §§ 8, 11 and 12 of the New York Constitution;

---

[5] See N.Y. State Div. of Criminal Justice Servs., New York City Arrests by Precinct for Loitering for Prostitution: PL 240.37 (2012-2015) (unpublished spreadsheet) [hereinafter DCJS Arrest Statistics 2012-2015].

- Whether the City engages in arbitrary and discriminatory enforcement of Section 240.37 in violation of Plaintiffs' rights under the First, Fourth and Fourteenth Amendments to the United States Constitution, and Article I, §§ 8, 11 and 12 of the New York Constitution;

- Whether the City has violated Plaintiffs' rights to free speech by consciously choosing to enforce Section 240.37 based in large part on protected conduct, including conversations in public and/or Plaintiffs' expression of gender or gender identity;

- Whether the City has consciously chosen to enforce Section 240.37 in violation of Plaintiffs' right to be free from unreasonable searches and seizures by unlawfully surveilling, stopping, questioning, frisking, searching, seizing, and/or arresting and detaining Plaintiffs without reasonable suspicion or probable cause;

- Whether the City has consciously chosen to enforce Section 240.37 in a discriminatory manner based on the race, color, ethnicity, gender, gender identity and/or appearance of Plaintiffs in violation of the New York State Civil Rights Law, the New York State Human Rights Law (the "NYHRL"), the New York City Bias-Based Profiling Law and the New York City Human Rights Law (the "NYCHRL");

- Whether the City knew or should have known that, as a direct and proximate result of such policies, widespread practices and/or customs, the constitutional rights of Plaintiffs would be violated; and

- Whether the City acted with deliberate indifference to Plaintiffs' constitutional rights in failing to rectify such arbitrary and discriminatory enforcement policies, widespread practices and/or customs, including by failing to adequately train, monitor, supervise or discipline officers engaged in the enforcement of Section 240.37.

45.     The claims of Named Plaintiffs are typical of the Plaintiff Class they seek to represent, as each Named Plaintiff alleges violations of her federal and state constitutional and statutory rights in connection with law enforcement actions undertaken by NYPD officers pursuant to Section 240.37.

46.     The Named Plaintiffs are adequate Plaintiff Class representatives.  The violations of law that Named Plaintiffs allege stem from the same course of conduct by Defendants that violated and continues to violate the rights of Plaintiff Class members, and the legal theories under which Named Plaintiffs seek relief are the same as or similar to those on which the

11

Plaintiff Class will rely. In addition, the harm suffered by Named Plaintiffs is typical of the

harm suffered by absent Plaintiff Class members.

47.     Named Plaintiffs have the requisite personal interest in the outcome of this action

and will fairly and adequately protect the interests of other Plaintiff Class members. Counsel for

Named Plaintiffs includes attorneys from The Legal Aid Society and the law firm Cleary

Gottlieb Steen & Hamilton LLP who are experienced in federal class action litigation, including

constitutional and civil rights litigation, and have the resources necessary to pursue this litigation.

Counsel for Named Plaintiffs knows of no conflicts among Plaintiff Class members.

48.     This action is properly maintainable as a class action under Rule 23(b)(1) of the

Federal Rules of Civil Procedure because prosecuting separate actions by individual Plaintiff

Class members would create a risk of adjudications with respect to individual Plaintiff Class

members that (a) would be inconsistent or varying, and thus establish incompatible standards of

conduct for the parties opposing the Plaintiff Class, and/or (b) as a practical matter, would be

dispositive of the interests of non-parties or would substantially impair or impede non-parties'

ability to protect their interests.

49.     This action is properly maintainable as a class action under Rule 23(b)(2) of the

Federal Rules of Civil Procedure because Defendants have acted and/or refused to act on

grounds generally applicable to the Plaintiff Class, thereby rendering final declaratory relief and

corresponding injunctive relief appropriate with respect to Named Plaintiffs and the Plaintiff

Class as a whole. Plaintiffs are entitled to injunctive relief to end Defendants' policies,

widespread practices and/or customs of surveiling, stopping, questioning, frisking, searching,

seizing and/or arresting and detaining Plaintiffs for loitering for the purpose of prostitution under

Section 240.37, including, and especially, based on impermissible and/or insufficient grounds.

## FACTUAL ALLEGATIONS

I.   **SECTION 240.37 IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD, WHICH LEADS TO ARRESTS FOR CONSTITUTIONALLY PROTECTED BEHAVIOR**

   A.   **Section 240.37 Is Void for Vagueness**

   50.   Section 240.37 is unconstitutionally vague under the Due Process clause of the Fourteenth Amendment because it is a criminal statute that fails to give citizens notice of the specific conduct it prohibits.  Furthermore, Section 240.37 fails to provide law enforcement with clear guidelines or standards to prevent arbitrary policing.

   51.   Section 240.37 fails to provide any objective criteria to determine what conduct is for the "purpose" of prostitution.  Absent objective criteria, such determinations are based entirely on a police officer's subjective views, making it all but impossible for an individual to know when "beckon[ing] to" or "engag[ing] passersby in conversation," or other commonplace, innocent conduct enumerated in the statute, may be deemed for the "purpose" of prostitution, and to conform her behavior accordingly.

   52.   Section 240.37 also gives police officers unfettered discretion in determining whether conduct—otherwise innocent and/or constitutionally protected—is carried out for the "purpose" of prostitution.  "Purpose," unlike "criminal intent," is not defined in New York's Penal Law, affording the NYPD immense discretion to assume an individual's "purpose" without ever having to prove a *mens rea* element.  Thus, Plaintiffs are subjected to the whims of police officers who may determine that their conduct is for the "purpose" of prostitution for any of a substantial number of reasons not enumerated in the statute and unascertainable by Plaintiffs.

   53.   By allowing officers' subjective views to be determinative of whether a person's actions demonstrate a specific intent to engage in prostitution, Section 240.37 fails to provide

individuals with the notice required under the Due Process Clause to tailor their conduct to the confines of the law and avoid arrest.

54.     Furthermore, the purported guidance provided in the NYPD Patrol Guide is equally vague and otherwise flawed, thereby increasing arbitrary enforcement.  For instance, the NYPD Patrol Guide instructs officers that an arrestee's "clothing" is "pertinent" to the probable cause inquiry.  At the same time, the NYPD Patrol Guide does not provide any objective criteria regarding what types of attire may or may not have probative value for purposes of establishing probable cause, thus encouraging officers to make arrests based on individual, subjective opinions regarding what clothing someone who might be "loitering for the purpose of prostitution" would wear.  In pre-printed affidavits provided by prosecutors (also referred to as supporting depositions), which prompt the arresting officer to describe "revealing" or "provocative" clothing, officers often respond by citing a wide range of innocuous attire, such as "jeans," a "black pea coat" or a pair of leggings.

1.     *Legislative History and Previous Legal Challenges to Section 240.37*

55.     The broad discretion afforded to police officers in effecting arrests under Section 240.37 has given rise to substantial constitutional concerns and controversy since the law's adoption.  Section 240.37 was enacted by the New York Legislature in 1976 as a means of eradicating what were then high rates of prostitution by making it easier for police to arrest potential prostitutes.[6]

56.     At the time Section 240.37 was first proposed, numerous commentators, including politicians, bar and other legal associations and advocacy groups expressed grave concerns that

---

[6]Letter from N.Y.C. Office of the Mayor to Hon. Hugh L. Carey, supra note 2; Schumach, supra note 2; Goldstein, supra note 2.

the statute would be unconstitutional. See, e.g., Thomas Poster, Fears About Police Abuses Keep Prostie Bill on Hook, N.Y. Daily News, Mar. 18, 1976, at 41 (reporting that New York senators "have raised serious civil liberty questions" about a proposed draft of Section 240.37 and expressed concerns that the law "contains police powers that are too sweeping"); Schumach, supra note 2 (quoting executive director of NYCLU's concern that Section 240.37 would enable police to "set up a dragnet of the streets"); N.Y. Civil Liberties Union, 1976 Legislative Memorandum 20-A (arguing Section 240.37 is "far too vague and thus susceptible of arbitrary and selective enforcement"); N.Y. State Bar Legislation Report, supra note 3 ("By giving the police discretion to arrest anyone whom they think manifests such intent [to engage in prostitution] the bill attempts to make it a crime to be 'undesirable'. . . . It thus oversteps several constitutional bounds at once."); Letter from Harold Baer, Jr. to Hon. Judah Gribetz, supra note 3 (writing on behalf of the State Legislation Committee of the New York State Bar Association and the New York County Lawyers' Association that Section 240.37 is "unconstitutional" and would be "difficult to enforce"); see also Hechtman, Practice Commentaries, N.Y. Penal Law § 240.37 (McKinney Supp. 1978) ("Critics have argued that the proscribed conduct, such as beckoning to, stopping or engaging passersby in conversation, is a trap into which unwary innocent persons, particularly women, may fall."); Letter from Michael R. Juviler, New York Office of Court Administration, to Hon. Judah Gribetz, Counsel to the Governor (May 20, 1976) (expressing concern that the term "for the purpose of" in Section 240.37 is "not a defined culpable mental state").

57.     Shortly after Section 240.37 was enacted, its constitutionality was challenged on the limited grounds that it "encourag[ed] police to use unfettered discretion in making arrests based solely on circumstantial evidence [and] require[ed] them to infer criminality from wholly

15

innocent or ambiguous activity in which free citizens must necessarily engage to lead normal lives." People v. Smith, 44 N.Y.2d 613, 619 (1978) (internal quotation marks omitted).  While the New York Court of Appeals ultimately rejected that challenge, it made clear that it was not addressing a due process claim for lack of notice.  Nor was it possible for the Court of Appeals to evaluate the subsequent four decades of evidence demonstrating arbitrary and discriminatory enforcement of the statute.

        2.     *Constitutional Developments Since Section 240.37 Was Last Challenged*

58.     In the intervening four decades since Smith, several of New York's "loitering-plus" statutes,[7] even those purporting to "detail[ ] the prohibited conduct and limit[ ] [themselves] to one crime," id. at 620, have been declared unconstitutional.  See, e.g., Davis v. City of New York, 902 F. Supp. 2d 405, 421-22 (S.D.N.Y. 2012) (striking down as unconstitutionally vague a public housing rule prohibiting loitering by residents in the lobby, roof, hallway or stairs because it "prohibits a vast swath of 'conduct that is inherently innocent,' it fails to give [public housing] residents notice of what precise conduct is prohibited, and it 'places complete discretion in the hands of the police to determine whom they will arrest'" (quoting People v. Bright, 71 N.Y.2d 376, 383 (1988))); Loper v. N.Y.C. Police Dep't, 802 F. Supp. 1029, 1048 (S.D.N.Y. 1992) (holding that a statute that prohibited loitering, remaining or wandering in public for the purpose of begging impermissibly chills a person's First Amendment rights); Bright, 71 N.Y.2d at 382 (striking down as unconstitutionally vague a statute prohibiting

---

[7] In 1972, the Supreme Court struck down as unconstitutionally vague a law prohibiting loitering, holding that the ordinance "makes criminal activities which by modern standards are normally innocent," such as "[n]ightwalking," "loafing," or "wandering or strolling from place to place." Papachristou v. Jacksonville, 405 U.S. 156, 162-64 (1972).  Shortly thereafter, the New York State Legislature passed a series of "loitering-plus" laws, including Section 240.37, nicknamed as such because they included additional elements beyond simple loitering in order to avoid the constitutional deficiencies identified in Papachristou.

loitering "in any transportation facility, or . . . sleeping therein" for failure to provide notice or sufficient police enforcement guidelines).

59.     Further, courts in six other states (Florida, Nevada, Alaska, Oklahoma, Missouri and Virginia) have held that statutes nearly identical to Section 240.37, proscribing loitering for the purpose of prostitution, are unconstitutionally vague and/or overbroad.  For example, in striking Alaska's loitering-plus statute, the Supreme Court of Alaska wrote that, given the statute's "excessive discretion, inviting by its inexactitude arbitrary enforcement and uneven application," the court could "think of no construction which will save the statute from this infirmity."  Brown v. Municipality of Anchorage, 584 P.2d 35, 38 (Alaska 1978).  See also Silvar v. Eighth Jud. Dist. Ct. ex rel. Cty. of Clark, 129 P.3d 682, 684 (Nev. 2006); Wyche v. State, 619 So.2d 231, 234 (Fla. 1993); West Palm Beach v. Chatman, 112 So.3d 723, 725 (Fla. Dist. Ct. App. 2013); Coleman v. City of Richmond, 364 S.E.2d 239 (Va. Ct. App. 1988); Christian v. Kansas City, 710 S.W.2d 11 (Mo. Ct. App. 1986); Profit v. City of Tulsa, 617 P.2d 250 (Okla. Crim. App. 1980).

3.     *New York Courts Have Been Unable to Remedy Violations of Plaintiffs' Constitutional Rights Attributable to Section 240.37's Infirmities*

60.     When processing Section 240.37 arrests, officers and prosecutors rely on a pre-printed affidavit in which officers simply "check the boxes" that apply, indicating whether:  the arrest location is known for prostitution; the defendant was on the street; the defendant was in close proximity to stores or restaurants (either open or closed); the defendant stopped motorists who were not livery, taxi or bus drivers; the defendant was standing somewhere other than a bus stop or taxi stand; the officer has previously seen the defendant in the same location engaged in the same conduct; and/or the officer has previously arrested the defendant for prostitution-related offenses.

17

61.     The pre-printed affidavits filled out by arresting officers typically fail to articulate allegations sufficient to conclude that a female defendant was in fact loitering for the purpose of prostitution.  None of the choices on the pre-printed affidavit from which an arresting officer can select reflects any criminal activity, much less activity that is indicative of prostitution.  New York courts have expressed exasperation at the NYPD's "slavish reliance" on this "pre-printed, check-off-type supporting deposition to expedite the processing" of a Section 240.37 accusatory instrument, which often "render[s] the accusatory instrument a legal nullity." People v. Perry, Dkt. No. 2014CN003368, at *1 (N.Y. Crim. Ct. 2014) (quoting People v. McGinnis, 972 N.Y.S.2d 882 (N.Y. Crim. Ct. 2013)).[8]

62.     Courts have also emphasized that the government's reliance on the fact that a defendant has previously been arrested for loitering for prostitution amounts to "emblazon[ing]" a "scarlet letter" on the defendant, thus violating core principles of a "free society."

63.     Despite these decisions by courts expressing concern about the NYPD's arrests under Section 240.37, the NYPD has not reformed its policing practices with respect to Section 240.37, and the statute continues to give rise to improper and unconstitutional policing of women of color.

**B.     Section 240.37 Is Unconstitutionally Overbroad**

64.     The right to speak freely with others—whether the speaker be wealthy or poor, the listener a man or woman, and the conversation in a classroom or on a street corner—is a fundamental freedom in this country.  So too is the freedom to express one's gender identity

---

[8] Additionally, check-box forms "[facilitate] post-hoc justifications for stops where none may have existed at the time of the stop . . . . '[T]he overwhelming belief of experts [is] that a narrative field in which the officers describe the circumstances for each stop would be the best way to gather information that will be used to analyze reasonable suspicion' and, relatedly, 'prevent[] racially biased policing.'" Floyd v. City of New York, 959 F. Supp. 2d 668, 681 (S.D.N.Y. 2013) (quoting Susan Hutson, Independent Police Monitor, Review of the New Orleans Police Department's Field Interview Policies, Practices and Data: Final Report 45 (Mar. 12, 2013)).

through her attire, without fear of police surveillance or arrest. Section 240.37 interferes with Plaintiffs' exercise of these fundamental freedoms through the statute's overbroad criminalization of constitutionally protected expression.

65. By its plain terms, Section 240.37 criminalizes protected expressive activity by prohibiting individuals from repeatedly "attempt[ing] to engage passers-by in conversation." While courts have interpreted the prohibitions on "conversation" to be limited to those conversations that are "for the purpose of prostitution," the vagueness of that phrase, see supra Section I.A., renders it meaningless and ineffective as a limiting construction. The lack of objective criteria as to what constitutes activity "for the purpose of prostitution" effectively sweeps *all* conversations that occur in a public place as falling within the ambit of the statute. Because an officer may determine that a conversation is "for the purpose of prostitution" for any one of countless reasons having nothing to do with the content of the conversation—such as the neighborhood in which it takes place or the speaker's attire or gender, among others—merely talking to others in public becomes an activity in which Plaintiffs no longer feel free to engage, fearing that doing so may put them at risk of being unlawfully surveilled, stopped, questioned, frisked, searched, seized and/or arrested and detained.

66. A sampling of supporting depositions filled out by NYPD officers following arrests of Named Plaintiffs under Section 240.37 validates these concerns. As grounds justifying the arrests, many of the supporting depositions include allegations that the defendant engaged in conversation with male passersby—yet *none* lists any information regarding the content of those conversations. Plainly then, *any* conversation may be used to justify an arrest, making it all but certain that a substantial number of arrests involve conversations wholly unrelated to prostitution. Moreover, the simple fact that Plaintiffs *can* be arrested under Section 240.37 for

19

conversations unrelated to prostitution based on other attendant circumstances, including those over which Plaintiffs have no control (such as the neighborhood or time of day), serves to chill protected expressive activity by Plaintiffs.

67.     The expression of Plaintiffs' gender identity through their choice of dress and hair style is similarly chilled by Section 240.37.  Plaintiffs have a liberty interest in their personal appearance, including in deciding what clothes to wear and how to style their hair, nails and other physical attributes.  Yet, Plaintiffs' clothing choices, and officers' subjective interpretation of those choices, have been and continue to be the basis for arrests under Section 240.37. Transgender Plaintiffs in particular have a constitutionally protected interest in communicating their gender identity to the public, including through grooming and clothing decisions that send a message to the world that they are female regardless of the sex they were assigned at birth.  By choosing to dress and present themselves in a manner that expresses their gender identity as women, transgender Plaintiffs are engaging in expressive conduct protected by the First Amendment.  The NYPD's decision to enforce Section 240.37 by arresting transgender Plaintiffs on the basis of these choices impermissibly infringes on and chills transgender Plaintiffs' protected First Amendment conduct.  As the New York Times succinctly put it: "If you are a 35-year-old biological woman wearing the $715 metallic platform peep-toe pumps you just bought at Barneys to lunch at Café Boulud, you are well-dressed; if you were born Joaquin, have changed your name to Marisol and put yourself together with a similar verve, you are a prostitute."[9]

---

[9] Ginia Bellafante, Arrests by the Fashion Police, N.Y. Times (Apr. 5, 2013), http://www.nytimes.com/2013/04/07/nyregion/arrests-by-the-fashion-police.html.

68.     Further, Section 240.37 is overbroad for the additional reason that any legitimate application of the statute is merely duplicative of preexisting criminal prohibitions. New York separately prohibits prostitution and, under various provisions of New York Penal Law, officers may arrest individuals for solicitation of prostitution (P.L. § 230.00) and for attempted prostitution (P.L. § 110.00). Rather than addressing independent, additional criminal activity, Section 240.37 serves only to chill constitutionally protected expressive conduct.

## II.     THE CITY HAS POLICIES, WIDESPREAD PRACTICES, AND/OR CUSTOMS OF DISCRIMINATORY AND ARBITRARY ENFORCEMENT OF SECTION 240.37

69.     The City consciously chooses to enforce Section 240.37 and to do so in an unconstitutional manner by using it to police expressions of gender identity and sexuality based on outdated and paternalistic notions of what clothing NYPD officers deem "revealing" or "provocative," with a disproportionate impact on women of color. The City's unconstitutional enforcement of Section 240.37 in this manner takes many forms. For example, the City uses unconstitutional sweeps to enforce Section 240.37; unlawfully surveils, stops, questions, frisks, searches, seizes and/or arrests and detains Plaintiffs for constitutionally protected conduct; routinely engages in unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrests and detention of Plaintiffs without reasonable suspicion or probable cause and discriminates against protected classes in its enforcement of Section 240.37.

70.     Furthermore, the City has failed to curtail policies, widespread practices and/or customs that contribute to the constitutional violations, such as maintaining performance goals and arrest quotas for officers and sanctioning arrest sweeps in minority neighborhoods. It has also failed to take corrective action in the hiring, retention or supervision of its officers despite notice of their routine violations of individuals' constitutional rights. The City has also failed to

21

adequately train, audit, monitor, supervise and discipline police officers engaged in law enforcement actions pursuant to Section 240.37 to prevent constitutional violations and discriminatory enforcement.

> **A.    The City Engages in Discriminatory Enforcement Practices Against Transgender Women of Color, Including by Using "Sweeps," Performance Goals and Arrest Quotas to Unlawfully Target Transgender Women of Color for Arrest Under Section 240.37**

71.    Transgender individuals experience high levels of discrimination in places of public accommodation.  Studies show that over half of transgender individuals nationwide report being verbally harassed and disrespected in public, with 22% of African-American respondents reporting having been a victim of physical assault.[10]  Transgender women of color are often unlawfully subjected to surveillance, stopped, questioned, frisked, searched, seized and/or arrested and detained pursuant to Section 240.37 under circumstances in which men, white women and cis-gender women are not subjected to such law enforcement actions.

72.    As a result of this ongoing discrimination, many transgender individuals live, work and/or socialize near one another.  The communities they create are safe spaces in which they can socialize with minimal harassment and discrimination.  One such community exists in the catchment of the 52nd precinct in the Bronx, in the neighborhood surrounding the intersection of 192nd Street and Davidson Avenue, which borders Monroe College.  The NYPD is aware that this area is inhabited and/or frequented by many transgender individuals.

73.    The City has a policy, widespread practice and/or custom whereby its officers conduct "sweeps" in which a particular precinct deploys a group of officers to a particular

---

[10] Jaime M. Grant et al., Injustice at Every Turn: A Report of the National Transgender Discrimination Survey 5, 124 (2011).

location to arrest as many women as possible—in particular, women of color and transgender women—for Section 240.37 offenses.

74.     Two such sweeps were conducted in the 52nd precinct on June 6-7 and 13-14, 2015.  In a span of just over two hours on June 6, 2015, Defendants Keane, Dawkins, Kinane and Doe NYPD Officers #1-3 arrested at least eight transgender women, including D.H. and N.H. Defendant McKenna approved the arrests of D.H. and N.H.  At the precinct, one of the arresting officers told the women that they had been conducting a sweep to let "girls like them" and their friends know that if the police saw them outside after midnight, they would arrest them.

75.     One week later, in the same location, on the night of June 13, 2015, Defendants Imburgia, Doe NYPD Officer #4, Doe NYPD Officer #5 and non-party Officer Monge arrested at least six transgender women in a span of 25 minutes, including Plaintiff K.H.  At least seven similar sweeps—and potentially many more—have been conducted by NYPD officers in the past three years in Brooklyn, the Bronx and Queens as a result of the City's policies, widespread practices and/or customs.

76.     The City further has a policy, widespread practice and/or custom of enforcing performance goals and arrest quotas that cause officers to arrest Plaintiffs under Section 240.37 without probable cause.

77.     The use of performance goals and quotas pushes officers to aggressively, and often unlawfully, undertake law enforcement activity in order to be considered for promotions and other career incentives.  Indeed, the City imposes requirements that officers issue, make or fill out a certain number of summons, arrests and stop forms within specified time periods.[11]

---

[11] See Floyd, 959 F. Supp. 2d at 599-600.

78.     These policies lead to disproportionate enforcement of Section 240.37 against

marginalized groups such as Plaintiffs.  As described by a former NYPD officer, these policies

impact "the most vulnerable . . . [members of the] LGBT community, . . . the black community,

. . . those people that have no vote, that have no power."[12]  As another officer explained, "when

you put pressure on cops to come up with numbers . . . it's the black, it's the Hispanic, it's the

LGBT community.  We go for the most vulnerable."[13]

79.     Officers are warned that failure to comply with numerical activity standards will

result in adverse employment actions.[14]

80.     Once arrested, transgender women of color endure further discriminatory and

unlawful treatment at the hands of the NYPD, including verbal abuse by officers and other

detainees.  Moreover, once these women have been arrested under Section 240.37, they are

subject to a higher risk of re-arrest, as shown below.

81.     Plaintiffs have repeatedly been victims of this practice.  They experience

heightened police surveillance and activity, false arrests and discrimination.  Many transgender

Plaintiffs fear leaving their homes, particularly at night, due to the City's policy, widespread

practice and/or custom of targeting them for arrest under Section 240.37.

---

[12] Sarah Wallace, I-Team: NYPD Lieutenant Latest Cop to Say Department Enforces Quota, NBC News (Apr. 1, 2016), second video at 2:16-2:24, http://www.nbcnewyork.com/investigations/NYPD-Lieutenant-Says-There-Are-Quotas-I-Team-Wallace-374307721.html. See also Am. Compl., Raymond v. City of New York, No. 15-CV-6885(LTS) (S.D.N.Y. filed Aug. 31, 2015), ECF No. 31.

[13] Alison Fox, Edwin Raymond, NYPD officer: Department quotas dangerous, AM N.Y. (Mar. 1, 2016), http://www.amny.com/news/edwin-raymond-nypd-officer-department-quotas-dangerous-1.11527625.

[14] Floyd, 959 F. Supp. 2d at 599-600.

24

**B.      The City Has a Policy, Widespread Practice and/or Custom of Unlawfully Arresting Plaintiffs Under Section 240.37 Without Probable Cause**

82.     In addition to targeting transgender Plaintiffs for arrest under Section 240.37 without probable cause in sweeps, the City has a policy, widespread practice and/or custom whereby its officers unlawfully arrest Plaintiffs without probable cause by, inter alia, (1) arresting individuals based on a prior arrest under Section 240.37 and P.L. § 230.00 (prostitution), regardless of the outcome of the prior charge; (2) arresting individuals for being present in areas the police arbitrarily designate as "prostitution-prone"; and (3) arresting Plaintiffs after observing them for short periods of time and while Plaintiffs are engaged in innocent conduct.

83.     The NYPD Patrol Guide instructs officers effecting arrests under Section 240.37 to "[i]nform [the] assistant district attorney of actions or any additional pertinent information," including whether the defendant is a "known prostitute" or "[c]onsorts with known prostitutes or pimps."[15]  By including an arrestee's status as a "known prostitute" among the categories of "pertinent information" showing an intent to engage in prostitution, the NYPD has unlawfully created a policy, widespread practice and/or custom of arresting individuals for loitering for the purpose of prostitution merely because they have previously been arrested for the same offense or another prostitution-related offense, *even if charges were ultimately dismissed*.  As a result of this perverse practice, Plaintiffs who have been wrongfully arrested under Section 240.37 in the past are more vulnerable to additional unlawful arrests in the future, despite the fact that "all official records and papers . . . relating to the arrest" in connection with a dismissed charge are to

---

[15] NYPD Patrol Guide, supra note 4, at PG 208-45, ¶ 3.

be "sealed and not made available to any person or public or private agency" under Criminal Procedure Law § 160.50.

84.     NYPD officers recognize Plaintiffs whom they have previously arrested for prostitution-related charges and arrest those women again without probable cause based merely on the prior arrest, in violation of Plaintiffs' right to be free of unreasonable seizures.

85.     Additionally, NYPD officers typically approach women, and in particular women of color, including transgender women, while they are lawfully present in public and request their identification.  The officers then use the NYPD database to determine if a woman has previously been arrested for a prostitution-related offense.  If she has, the officer will arrest the woman based on the arrest history alone, without any facts suggesting that she was loitering with the intent to engage in prostitution.  This self-perpetuating cycle unlawfully prejudices any woman who has ever been arrested, even if the charges underlying her original arrest were dismissed.

86.     NYPD officers also make unlawful arrests under Section 240.37 based on Plaintiffs' appearance.  For example, when filling out pre-printed affidavits after arrests, officers frequently check the box that the arrestee was "dressed in provocative or revealing clothing . . . ."  But often, officers' reliance on a woman's clothing for probable cause is entirely pretextual.  NYPD officers cite countless types of clothing in their supporting depositions to justify arrests, many of which are far from "provocative" or "revealing."  For instance, descriptions of such "provocative" or "revealing" clothing have included jeans, a black pea coat, a white jacket and a blue and white jump suit.

87.     Moreover, in today's cultural and legal landscape, which has changed significantly from that in which the New York Court of Appeals decided Smith, and in which

26

people freely and frequently express their identity through clothing and appearance, so-called "revealing" clothing has little, if any, probative value. The NYPD's enforcement practices with respect to Section 240.37 highlight this fact: even if an arrestee's clothing actually were "revealing," this type of "dress code" is not policed against men or white women. Only women of color are systematically arrested for wearing clothing that emphasizes their femininity, making clear that "revealing" clothing is used simply as a pretextual justification for arrests without probable cause based on race, color, ethnicity, gender, gender identity and/or appearance. See infra Section II.C.

88.    NYPD officers similarly make unlawful arrests under Section 240.37 on the basis of arbitrary designations that an area is "prostitution-prone," even though that designation is based on the NYPD's own dedication of resources to make high numbers of arrests in that area, not how much crime or prostitution actually occurs in that area as compared to another.

89.    As a result, the areas where police have previously made prostitution arrests become the same areas that police then characterize as "prostitution-prone" to justify future arrests.

90.    Finally, NYPD officers frequently make arrests after observing Plaintiffs engage in lawful conduct for very brief periods of time. For example, Defendant Keane observed N.H. for only five minutes before arresting her. During such brief observation periods, officers cannot establish probable cause to conclude that an individual is loitering, much less to determine whether that individual's conduct is "for the purpose" of engaging in prostitution.

C.     **The City Has a Policy, Widespread Practice and/or Custom of Discriminating Against Women of Color**

91.     The City has a policy, widespread practice and/or custom whereby women of color are arrested under Section 240.37 at a much higher rate than men or white women.[16] Women of color are commonly unlawfully surveilled, stopped, questioned, frisked, searched, seized and/or arrested and detained under Section 240.37 under circumstances in which men and white women are not subjected to such law enforcement activity, such as for merely engaging in conversation with individuals of the opposite gender.  Moreover, the unconstitutional policing practices described above occur almost exclusively in low income communities of color.

92.     Defendants utilize Section 240.37 to unlawfully effect arrests based on gender. While Section 240.37 is gender- and race-neutral on its face, the discriminatory manner in which it is enforced leads to a significantly disproportionate impact on women of color.  Even more telling, women of color are commonly arrested under Section 240.37 based on allegations that they were repeatedly beckoning to, stopping or attempting to stop or engaging in conversation with male passersby.  Men engaged in similar behavior are not arrested under the statute.  Men commonly attempt to speak to women passing by, attempt to engage those women in conversation and even make comments related to sexual conduct.  However, NYPD officers discriminate based on gender by concluding that women engaged in such conduct are seeking to offer sex in exchange for money, and therefore are subject to arrest, while men doing so are merely paying a compliment.

93.     Women's liberty interest in making choices about their personal appearance is also disproportionately impacted by the NYPD's enforcement of Section 240.37 as compared to

---

[16] NYPD identified 85% of the arrestees under Section 240.37 as Black or Latina.  DCJS Arrest Statistics 2012-2015, supra note 5.

that of men.  While the NYPD commonly arrests women under Section 240.37 for wearing clothing that highlights their femininity, no arrests are made of men for wearing clothing that highlights their masculinity, or based on any aspects of their personal appearance at all.

94.     Women of color are disproportionately subject to arrests based on so-called "revealing" clothing as compared to white women who are similarly attired.  Indeed, disproportionately arresting women of color for wearing "revealing" clothing is merely one of a number of discriminatory practices by the NYPD, along with labeling heavily minority neighborhoods as "prostitution-prone," that causes Section 240.37 to be used to unlawfully effect arrests based on race.

95.     The NYPD's disproportionate targeting of people of color was thoroughly documented in the court's findings in <u>Floyd v. City of New York</u>.[17]  In <u>Floyd</u>, the court made numerous findings demonstrating the NYPD's practice of discriminating on the basis of race when implementing its stop-and-frisk policy.  First, the court found that the NYPD carried out more stops in areas with a higher percentage of African-American and Hispanic residents.[18]  Second, even controlling for the racial composition of the area, African-Americans and Hispanics were more likely to be stopped than whites.[19]  Third, African-Americans were more likely to be arrested after a stop for the same suspected crime.[20]  Fourth, African-Americans and Hispanics were more likely than whites to be subjected to the use of force.[21]

---

[17] <u>Floyd</u>, 959 F. Supp. 2d 540.

[18] <u>Id.</u> at 589.

[19] <u>Id.</u>

[20] <u>Id.</u>

[21] <u>Id.</u>

96.     In addition to these findings, the court in <u>Floyd</u> also found that the most common reason given for a stop was that it was in a "high crime area."[22] The court recognized that this was a weak indicator of criminal activity, noting that stops were *more* likely to result in arrest where "high crime area" was *not* given as a reason for the stop.[23] As shown above, the City employs substantially the same tactic in designating areas as "prostitution-prone." This practice contributes to the discriminatory enforcement of Section 240.37 in communities of color which have traditionally experienced higher concentrations of law enforcement than other communities.

97.     Further illustrating this point, Section 240.37 arrests in New York City are clustered in several particular neighborhoods whose residents are largely people of color. For example, the five NYPD precincts with the most Section 240.37 arrests between 2012 and 2015, accounting for 68.5% of all Section 240.37 arrests during that period, are Bushwick, Brooklyn; Belmont/Fordham Heights, Bronx; East New York, Brooklyn; Hunts Point, Bronx; and Brownsville, Brooklyn, neighborhoods where residents are predominantly people of color.[24]

98.     The result of this unlawful enforcement of Section 240.37 is that women of color are subject to arrest for innocent conduct in a manner and with a frequency that others not belonging to this group are not. Specifically, men engaging in the same conduct are much less likely to face unlawful arrest and prosecution under Section 240.37, as are white women. This unequal and discriminatory enforcement violates Plaintiffs' right to equal protection of the laws under the Fourteenth Amendment.

---

[22] <u>Id.</u> at 574-75.

[23] <u>Id.</u> at 575.

[24] The 41st, 52nd, 73rd, 75th, and 83rd precincts largely encompass the above-mentioned neighborhoods. DCJS Arrest Statistics 2012-2015, <u>supra</u> note 5. <u>Cf. Sharing NYC Police Precinct Data</u>, johnkeefe.net (Apr. 29, 2011), http://johnkeefe.net/nyc-police-precinct-and-census-data.

**D.    The City Knew or Should Have Known of the Need for Corrective Action to Prevent Constitutional Violations of Plaintiffs' Rights to Free Speech, Equal Protection of the Laws and Freedom from Unreasonable Seizures and False Arrests, and Failed to Take Corrective Action to Prevent Such Violations, Including by Failing to Adequately Train, Monitor, Supervise or Discipline Responsible Officers**

99.    The City has a policy, widespread practice and/or custom whereby it provides guidance that lacks any objective basis for determining whether conduct is "for the purpose" of prostitution.  It affords officers extraordinary discretion in making such determinations that unconstitutionally infringe on Plaintiffs' First, Fourth and Fourteenth Amendment rights without sufficient training, guidelines, monitoring, supervision and accountability to ensure that officers do not abuse their discretion.  Further, it is obvious that the failure to take such action will result in such violations of Plaintiffs' rights, especially in light of the "performance goal" and quota policies encouraging aggressive law enforcement activities.

100.    As to certain Individual Defendants, prior to the unlawful conduct alleged in the present action, the City had notice that many of these Individual Defendants had engaged in misconduct while carrying out surveillance, stops, questioning, frisks, searches, seizures and/or arrests and detention of various individuals.  For example, Defendants Imburgia, Diggs, Gomez, Nicosia and Yanez, allegedly abused their discretion while carrying out surveillance, stops, questioning, frisks, searches, seizures and/or arrests and detention of other individuals, prior to the unlawful surveillance, stops, questioning, frisks, searches, seizures, and/or arrests and detention of Named Plaintiffs K.H., R.G. and Sarah Marchando in the present action.[25]

---

[25]For example, Defendant Imburgia is a named defendant in Cruz v. City of New York, No. 0302146-2015, 2015 WL 3383188 (Sup. Ct. Bronx Cty. May 13, 2015) (false arrest and assault); Defendants Diggs and Gomez are named defendants in Annunziata v. City of New York, No.13-cv-05610-RMB-GWG, at 16-32 (S.D.N.Y. Aug. 12, 2013) (unlawful stop, search, harassment and assault) and a class action, Quinonez v. City of New York, No. 16-cv-04275-KBF (S.D.N.Y. June 8, 2016) (false arrest and imprisonment, malicious prosecution, fabrication of evidence, conspiracy to violate civil rights and failure to intercede); Defendant Diggs is additionally a named defendant in Paniagua v. City of New York , No. 0309159-2011, 2011 WL 5186247 (Sup. Ct. Bronx Cty. 2011) (Trial Pleading)

101.    Additionally, the City was aware through multiple lawsuits filed against it that NYPD officers falsely arrested and maliciously prosecuted multiple persons for loitering for the purpose of prostitution with less than probable cause.[26]

102.    The City nonetheless failed to adequately train, monitor and supervise NYPD officers making arrests under Section 240.37 or to discipline officers enforcing Section 240.37 in an arbitrary and/or discriminatory manner in violation of Plaintiffs' rights.  Instead, the City allowed, and continues to allow, officers to abuse their discretion, resulting in the unlawful and discriminatory targeting of Plaintiffs for law enforcement action on the basis of Plaintiffs' speech or other protected conduct or Plaintiffs' race, color, ethnicity, gender, gender identity and/or appearance, and unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrests and detention of Plaintiffs without reasonable suspicion or probable cause under Section 240.37 in violation of Plaintiffs' rights.

103.    For instance, Defendant Imburgia's paperwork regarding the arrests she made in connection with the sweeps conducted by the 52nd precinct on June 13-14, 2015 places her at

---

(false arrest, settled in exchange for the payment of $40,000); Defendant Gomez is additionally a named defendant in Haynes v. City of New York, No. 11-CV-4347 (DLC) (S.D.N.Y. June 27, 2011) (false arrest, settled in exchange for the payment of $7,500) and Rodriguez v. City of New York, No. 0302229-2013, 2013 WL 1655517 (Sup. Ct. Bronx, Cty. 2013) (false arrest), and a criminal court judge also granted suppression when Defendant Gomez unlawfully stopped and seized the accused in People v. Pinckney, 32 Misc. 3d 1240(A) (Sup. Ct. Bronx Cty. 2011) (crediting Defendant Gomez's testimony only on cross-examination); Defendant Nicosia is a named defendant in Chavez v. City of New York, No.15-cv-01232-SJ-VMS (S.D.N.Y. Mar. 10, 2015) (unlawful force, search and false arrest), Lebron v. City of New York, 15CV 05008(MKB)(PK) (S.D.N.Y. Feb. 26, 2016) (unlawful seizure and false arrest), and Anderson v. City of New York, 16-cv-00150-ERK-LB (unlawful seizure and entry); and Defendant Yanez is also a named defendant in Anderson.

[26] See Jones v. City of New York, No.11-cv-05735-PGG (S.D.N.Y. Feb. 3, 2012) (transgender woman falsely arrested under Section 240.37 on November 4, 2010 by 52nd precinct officers after leaving a restaurant); Gonzalez v. City of New York, 08-CV 2699 (JBW)(CLP) (E.D.N.Y. Dec. 4, 2008) (woman falsely arrested under Section 240.37 on November 18, 2007 by 72nd precinct while walking to the hospital by officers who falsely stated plaintiff had previous loitering arrest); Gonney v. City of New York, No. 11-cv-00298-RRM-MDG (E.D.N.Y. Jan. 20, 2011) (woman falsely arrested under Section 240.37 on August 29, 2010 while walking in the vicinity of her home in the 73rd precinct).

different locations at the same time. By her own accounts, Defendant Imburgia was arresting an individual at one location at a certain time while simultaneously observing K.H. in a wholly separate location. Nonetheless, Defendant Maloney approved K.H.'s arrest. Similarly, non-party Officer Monge's sworn statement in one case from the same sweep indicates he observed an individual he believed to be loitering from 2:40 a.m. through 3:10 a.m., while arrest paperwork from another case shows that during that same time period, he effectuated the arrests of two other women. With appropriate monitoring and supervision, such abuses could be identified and discouraged by means of appropriate discipline for the officers responsible.

104.    The City is also aware—because, among other reasons, it maintains law enforcement activity statistics and records—that transgender women of color are targeted for arrest under Section 240.37 and are systematically discriminated against and mistreated by NYPD officers.

105.    Indeed, the City amended the NYPD Patrol Guide in June 2012 "follow[ing] years of complaints about police mistreatment [of transgender women]."[27] However, these amendments have proven insufficient and, in the years since, widespread police abuse and mistreatment of transgender women has continued largely unabated. Plaintiffs have suffered, and continue to suffer, from the deprivation of rights that flows from being unlawfully surveilled, stopped, questioned, frisked, searched, seized and/or arrested and detained under Section 240.37.

106.    Despite its own knowledge of unlawful law enforcement actions under, and discriminatory enforcement of, Section 240.37, the City has failed to take sufficient corrective action to rectify these violations of Plaintiffs' rights, including by: failing to sufficiently train

---

[27] Noah Remnick, Activists Say Police Abuse of Transgender People Persists Despite Reforms, N.Y. Times (Sep. 6, 2015), http://www.nytimes.com/2015/09/07/nyregion/activists-say-police-abuse-of-transgender-people-persists-despite-reforms.htm.

officers in enforcing Section 240.37 in a non-discriminatory manner and in making arrests under Section 240.37 only where there is probable cause; failing to monitor, supervise and, when appropriate, take disciplinary and/or remedial action against officers who make arrests under Section 240.37 without probable cause on the basis of past arrests or after insufficient periods of observation, or who disproportionately arrest women of color, including transgender women of color engaging in protected First Amendment activity under Section 240.37 or otherwise violate Plaintiffs' rights to free speech, free association or equal protection of the laws; failing to audit arrests under Section 240.37 to determine whether they are made in violation of Plaintiffs' rights to free speech, free association, equal protection of the laws or freedom from unreasonable searches and seizures; and failing to adequately monitor officers who are the subject of multiple civilian complaints.

107.    The City's deliberate indifference in failing to take such corrective action was and continues to be a direct and proximate cause of past and ongoing violations of Plaintiffs' rights to free speech, free association and equal protection of the laws, and freedom from unreasonable searches and seizures.

## III.   NAMED PLAINTIFFS HAVE BEEN TARGETED FOR UNLAWFUL SURVEILLANCE, STOPS, QUESTIONING, FRISKS, SEARCHES, SEIZURES, AND/OR ARREST AND DETENTION UNDER SECTION 240.37

### A.    Named Plaintiffs Arrested During Sweeps Targeting Transgender Women of Color

#### 1.    Named Plaintiff D.H.

108.    D.H. is a 26-year-old African-American woman who currently resides in the Bronx. D.H. is deaf and communicates through sign language, writing or texting on her phone.

109.    D.H. is a transgender woman. D.H. communicates and expresses her femininity through, among other means, her choices in hair, makeup, clothing and general appearance.

110.    In the early morning on June 6, 2015, D.H. was walking near the corner of Fordham Road and Jerome Avenue and trying to hail a cab to get home. At the time, she was living with her sister in the neighborhood. She was walking with her phone in her hand when she saw an unmarked police car pull up next to her.

111.    At no time on June 6, 2015 did D.H. solicit or attempt to solicit money in exchange for sex, trespass onto private property or otherwise engage in any unlawful or criminal conduct related to prostitution.

112.    Defendants Kinane, Doe NYPD Officer #1 and Doe NYPD Officer #2 exited the vehicle and approached D.H. She pointed to her ear to indicate that she was deaf and tried to also tell the officers by typing in her phone that she was deaf. Without reading what D.H. had typed on her phone, the officers grabbed her bag and began searching its contents. D.H. could not understand what the officers were saying to her and did not consent to the search.

113.    As they took her bag, the officers also took D.H.'s phone and cuffed her hands behind her back. In so doing, the officers made it impossible for D.H. to communicate with them. She did not understand why she was being arrested. D.H.'s arresting officers did not appear to care that D.H. was unable to communicate, and laughed at her.

114.    D.H. was placed in the unmarked police car and driven a few blocks to a police van. There were three other transgender women in the van who had already been arrested. D.H. had seen the women in the community and recognized them as transgender women.

115.    During this ordeal, D.H. began to experience very sharp pain in her shoulder due to the manner in which her hands were cuffed behind her back. D.H. was screaming in pain, but without any means of communication, she was unable to articulate what was wrong. The officers ignored her screams.

35

116.    D.H. and the three other transgender women were taken to the 52nd precinct, where D.H. spent the remainder of the night in a holding cell with the other women. D.H. attempted to get the attention of numerous officers to obtain a sign language interpreter, but was repeatedly ignored. At one point, Defendant Doe NYPD Officer #14 gave D.H. a pen and paper and she wrote that she needed a sign language interpreter. Despite receiving D.H.'s request for an interpreter in writing, Defendant Doe NYPD Officer #14 and the other officers in the 52nd precinct failed to provide a sign language interpreter to communicate with D.H. as they processed her arrest.

117.    In the morning, D.H. was transferred to central booking to await arraignment. D.H. was finally provided with a sign language interpreter and only then did she learn the reason for her arrest and the nature of the charges against her. She was arraigned in the evening on June 6, 2015, and then released.

118.    D.H. was devastated by her arrest. After her arrest, she worried about being unlawfully arrested again so she stopped going out at night. D.H. moved out of her neighborhood in July 2015. Since she moved, D.H. has started going out again, but she avoids returning to the area of her arrest, which means she is rarely able to visit her sister or friends.

119.    After her arrest, D.H. feels that she can no longer contact the police if she is in need of help because she will be unable to communicate with them and because she fears that they will be hostile toward her. D.H. was shocked by the acts of Defendants Kinane, Doe NYPD Officer #1, Doe NYPD Officer #2, Doe NYPD Officer #14 and McKenna, and felt violated by their actions.

120.    D.H. continued to experience pain in her shoulder for weeks after her arrest.

36

121.     In the supporting deposition accompanying the criminal court complaint charging D.H. with violating Section 240.37, Defendant Kinane falsely alleged that on June 6, 2015, he observed D.H. for 15 minutes "during which time [D.H.] beckoned to passing traffic and stopped or attempted to stop 2 male passersby and 1 male motorist" from "the middle of the street." He also alleged that D.H.'s purpose was prostitution based on her presence at a location "frequented by people engaged in prostitution" and because she was wearing a "short skirt."

122.     Defendant McKenna failed to properly review, monitor and supervise Defendant Kinane's, Defendant Doe NYPD Officer #1's and Defendant Doe NYPD Officer #2's unlawful stop, questioning, search and seizure of D.H., and approved D.H.'s arrest.

123.     After her initial court appearance, D.H. was forced to return to court three additional times, under the threat of having the judge issue a bench warrant for her arrest. All criminal charges against D.H. were adjourned in contemplation of dismissal pursuant to C.P.L. § 170.55 on October 29, 2015. The charges were dismissed and sealed on April 28, 2016.

124.     By the actions described above, Defendants Kinane, Doe NYPD Officer #1, Doe NYPD Officer #2 and McKenna targeted and/or sanctioned the targeting of D.H. for unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrest and detention under Section 240.37 based on her race, color, ethnicity, gender, gender identity and/or appearance.

125.     The actions of Defendants Kinane, Doe NYPD Officer #1, Doe NYPD Officer #2, Doe NYPD Officer #14 and McKenna deprived D.H. of her liberty and caused her pain and suffering, as well as psychological and emotional harm.

        2.      **Named Plaintiff N.H.**

126.     N.H. is a 36-year-old African-American woman who currently resides in the Bronx.

127.    N.H. is a transgender woman.  N.H. communicates and expresses her femininity through, among other means, her choices in hair, makeup, clothing and general appearance.

128.    In the early morning of June 6, 2015, N.H. went to a store on Davidson Avenue near her apartment.  After purchasing food and cigarettes, N.H. began to walk home.  She had walked only a few blocks when Defendants Dawkins, Keane and Doe NYPD Officer #3 pulled up in a marked police patrol car, jumped out and approached her.  They ordered N.H. to put her hands behind her back and then handcuffed her.

129.    At no time on June 6, 2015 did N.H. solicit or attempt to solicit money in exchange for sex, trespass onto private property or otherwise engage in any unlawful or criminal conduct related to prostitution.

130.    When N.H. asked why she was being arrested, the officers refused to explain and simply said, "you know."  Defendants Dawkins, Keane, and Doe NYPD Officer #3 placed her in the patrol car and drove around with her for over one hour, and then arrested a Latina woman who was also transgender and put her in the car with N.H.  N.H. learned from this woman that she had been arrested for loitering for the purpose of prostitution.

131.    At the 52nd precinct, Defendant Dawkins cut off the hood of N.H.'s sweatshirt and attempted to cut the laces out of her boots, permanently destroying both items of clothing and forcing her to remain in socks the entire time she was detained at the precinct.  Defendant Dawkins also forcefully pulled N.H.'s earrings out of her ears and attempted to remove N.H.'s wig.  Because the wig was attached to N.H.'s own hair, Defendant Dawkins pulled N.H.'s hair, causing her severe pain.

132.    Throughout the booking process, Defendant Dawkins and other non-party officers referred to N.H. as a man.  N.H. directed the officers to her identification, which identifies her as

38

female, but the officers, including Defendant Dawkins, persisted in referring to her as a boy or man.

133.   N.H. was kept in handcuffs throughout the booking process—a period of approximately one hour—until she was placed in a holding cell with approximately ten other transgender women who had also been arrested for loitering for the purpose of prostitution. The officers continued to refer to N.H. and the other transgender women in the cell as "boys" and "men."

134.   One of N.H.'s arresting officers told the women that the police had been conducting a sweep and that if they saw "girls like them" outside after midnight, they would arrest them. When N.H. stated that she lives in the area, the officer told her that she should not go out on Jerome Avenue.

135.   At the time of her arrest, N.H. had approximately $60 in her purse. Although the NYPD Patrol Guide requires arresting officers to return to arrestees all currency less than $100, N.H.'s arresting officers did not return these funds to her. Instead, she was forced to go through the arrest process without any money in violation of the arrest procedures established in the NYPD Patrol Guide.

136.   N.H. was taken into custody at 2:15 a.m. on June 6, 2015. She was detained for approximately 40 hours before she was arraigned on the evening of June 7. The court set bail at $50, which N.H. would have been able to post immediately had her arresting officers not denied her the return of her funds. As a result, she was forced to spend over 24 hours in detention at the Vernon C. Bain Correctional Center, a New York City Department of Correction facility for adult men. She was finally released in the early morning of June 9, 2015, three days after her arrest.

137.     Upon her release, N.H. went to the 52nd precinct to retrieve her personal property, including the keys to her apartment. At the precinct, she was told that the officer responsible for the property was not present and that she would need to return in the morning. Locked out of her own home, N.H. was forced to find another place to sleep that night. The next day, after returning to the precinct without her property, she learned that her keys had been there the whole time. Her jewelry and other personal possessions were never returned.

138.     In the supporting deposition accompanying the criminal court complaint charging N.H. with violating Section 240.37, Defendant Keane falsely alleged that, on June 6, 2015, he observed N.H. for five minutes, "during which time [N.H.] beckoned to passing traffic and stopped or attempted to stop 3 male passersby." He further alleged that N.H.'s purpose was prostitution because she was observed previously at a location "frequented by people engaged in prostitution" and was wearing a "blonde wig, tight pants and shirt." Defendant Keane also alleged that he knew that "other officers have previously arrested [N.H.] for prostitution-related offense(s)."

139.     Defendant McKenna failed to properly review, monitor and supervise Defendant Keane's, Defendant Dawkins's and Defendant Doe NYPD Officer #3's unlawful stop and seizure of N.H., and approved N.H.'s arrest.

140.     After her initial court appearance, N.H. was forced to return to court four additional times over nearly five months, under the threat of having the judge issue a bench warrant for her arrest. All criminal charges against N.H. were adjourned in contemplation of dismissal pursuant to C.P.L. § 170.55 on October 29, 2015. The charges were dismissed and sealed on April 28, 2016.

141.    Since her arrest, N.H. has tried to avoid going out late at night because the officers told her explicitly that she would be arrested if she did so.  She usually reserves for daylight hours even simple errands, such as going to a store, in order to reduce the risk that she will be improperly arrested.  As such, the acts of Defendants Dawkins, Keane, Doe NYPD Officer #3 and McKenna intimidated and threatened N.H.

142.    By the actions described above, Defendants Dawkins, Keane, Doe NYPD Officer #3 and McKenna targeted and/or sanctioned the targeting of N.H. for unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrest and detention under Section 240.37 based on her race, color, ethnicity, gender, gender identity and/or appearance.

143.    The actions of Defendants Dawkins, Keane, Doe NYPD Officer #3 and McKenna deprived N.H. of her liberty and caused her pain and suffering, as well as psychological and emotional harm.

3.    **Named Plaintiff K.H.**

144.    K.H. is a 32-year-old African-American woman who currently resides in Florida. At the time of her unlawful arrest under Section 240.37, she resided in the Bronx.

145.    K.H. is a transgender woman.  K.H. communicates and expresses her femininity through, among other means, her choices in hair, makeup, clothing and general appearance.

146.    In the early morning of June 13, 2015, K.H. was walking home to her apartment when she met another transgender woman and started a conversation.  As they walked together, K.H. and her friend spoke to only one other person, a woman.  As K.H. and her friend continued to walk, Defendants Imburgia, Doe NYPD Officer #4 and Doe NYPD Officer #5 jumped out of an unmarked police car and accosted them.  The officers arrested both women on the spot.

41

147.    At no time on June 13, 2015 did K.H. solicit or attempt to solicit money in exchange for sex, trespass onto private property or otherwise engage in any unlawful or criminal conduct related to prostitution.

148.    K.H. and her friend were placed in a van with two other women.  Over the course of the next five minutes, more women were arrested and loaded into the van.  The officers then brought all of the detained women to the 52nd precinct.  Throughout this ordeal, the handcuffs around K.H.'s wrists were pulled so tightly that they left indentation marks on her wrists and caused her pain.  Defendants Imburgia, Doe NYPD Officer #4 and Doe NYPD Officer #5 ignored K.H.'s repeated requests to loosen the handcuffs.

149.    At the precinct, K.H. was placed in a holding cell.  Once inside the cell, she and the other women with whom she was held were not permitted to use the bathroom.  Having no other choice, several women urinated on the floor or in bottles that had been left in the cell.

150.    At approximately 7 a.m., K.H. was taken to central booking for her arraignment. She was released at approximately 3 p.m.

151.    At the time of her arrest, K.H. had expensive make-up (primers, lipsticks and pencils) and other personal items in her purse.  When she returned to the precinct to recover her belongings, her personal items, including the make-up, were no longer in her purse.

152.    After her arrest, K.H. became estranged from her transgender friends, whom she believes are now afraid to associate with her because they perceive her to be under scrutiny by the police.  Fearing another false arrest, she also avoided leaving her house alone and went outside only with her husband.  K.H.'s false arrest was a motivating factor in her decision to move to Florida, as she worried about being unlawfully arrested again in another sweep if she

42

stayed in the Bronx and wished to end "living in fear." Even after moving, she still believes that she cannot trust the police.

153. In the supporting deposition accompanying the criminal court complaint charging K.H. with violating Section 240.37, Defendant Imburgia falsely alleged that, on June 13, 2015, she observed K.H. for a half hour "during which time [K.H.] beckoned to passing traffic and stopped or attempted to stop three male passersby and two male motorists." She further alleged that K.H.'s purpose was prostitution because she was at a location "frequented by people engaged in prostitution" and was wearing a "tight short black dress."

154. Defendant Maloney failed to properly review, monitor and supervise Defendant Imburgia's, Defendant Doe NYPD Officer #4's and Defendant Doe NYPD Officer #5's unlawful stop and seizure of K.H., and approved K.H.'s arrest.

155. After her initial court appearance, K.H. was forced to return to court five additional times, under the threat of having the judge issue a bench warrant for her arrest. All criminal charges against K.H. were adjourned in contemplation of dismissal pursuant to C.P.L. § 170.55 on November 12, 2015 and dismissed and sealed on May 11, 2016.

156. By the actions described above, Defendants Imburgia, Doe NYPD Officer #4, Doe NYPD Officer #5 and Maloney targeted and/or sanctioned the targeting of K.H. for unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrest and detention under Section 240.37 based on her race, color, ethnicity, gender, gender identity and/or appearance.

157. The actions of Defendants Imburgia, Doe NYPD Officer #4, Doe NYPD Officer #5 and Maloney intimidated and threatened K.H., deprived her of her liberty and caused her pain and suffering, as well as psychological and emotional harm.

4.      **Named Plaintiff Natasha Martin**

158.    Natasha Martin is a 38-year-old African-American woman who currently resides in Brooklyn.

159.    Ms. Martin is a transgender woman.  Ms. Martin communicates and expresses her femininity through, among other means, her choices in hair, makeup, clothing and general appearance.

160.    The night of February 2, 2016, Ms. Martin had visited a friend who lives in Brooklyn.  She stayed at her friend's house that evening.

161.    The next morning, February 3, 2016, Ms. Martin left her friend's house at approximately 6:30 a.m.  She left at the same time as her friend, who had to be at work by 7:00 or 7:30 a.m.

162.    Ms. Martin said goodbye to her friend and then walked on the sidewalk for about two blocks before stopping at the corner of Bushwick Avenue and Woodbine Street to smoke a cigarette.  She did not encounter or speak to anyone during that time.

163.    At no time on February 3, 2016 did Ms. Martin solicit or attempt to solicit money in exchange for sex, trespass onto private property or otherwise engage in any unlawful or criminal conduct related to prostitution.

164.    Ten minutes later, a marked police van pulled up next to her.  Three officers jumped out:  two male officers, Defendant Joel Allen and Defendant Doe NYPD Officer #6, both in plainclothes, and a female officer, Defendant Doe NYPD Officer #7, who was wearing a blue uniform.

165.    Defendant Doe NYPD Officer #6 asked Ms. Martin what she was doing, and she responded that she was "minding her own business."  After the officer told her that her answer

44

"wasn't good enough," Ms. Martin responded that she was coming from a friend's house.

166.    Defendant Doe NYPD Officer #6 then told Ms. Martin that his supervisor,

Defendant Dave Siev, had instructed him to arrest her and that the area in which she was

standing was a "hot" area for prostitution.  Ms. Martin asked him how she was supposed to know

that and further asked, "Is it a crime to be on the corner?"  Defendant Doe NYPD Officer #6 then

asked for her name.  When Ms. Martin responded that her name is Natasha, he asked whether

that was her "real name."  She responded "yes" and gave the officer her driver's license, which

says "Natasha Martin" and "female" on it.

167.    The officers arrested Ms. Martin and placed her in handcuffs about five minutes

after they had first pulled up to her.  Ms. Martin's arrest was one of several that were part of a

sweep of the neighborhood.

168.    As they drove her to the 83rd precinct, Defendant Allen made derogatory

comments such as, "which one of you is going to process the he/she?"

169.    When they arrived at the precinct, the officers put her in a cell with another

woman.  There was a third woman in the men's cell nearby.  Ms. Martin learned from these

women that they had also been arrested in the same sweep for loitering for the purpose of

prostitution.

170.    Ms. Martin was kept at the precinct for about four hours.  Along with the other

two women, she was released from the precinct with a desk appearance ticket.

171.    In the supporting deposition accompanying the criminal court complaint charging

Ms. Martin with violating Section 240.37, Defendant Siev falsely alleged that on February 3,

2016, he "observed [Ms. Martin] . . . remain or wander about in a public place for a period of . . .

8 minutes, during which [Ms. Martin] repeatedly beckoned to passers-by and stopped 3

45

passers[-]by, engaging in conversation with those passers-by." Ms. Martin did not in fact

encounter or speak to anyone after saying goodbye to her friend until she was confronted by

Defendants Allen, Doe NYPD Officer #6 and Doe NYPD Officer #7. Defendant Siev further

alleged that Ms. Martin's purpose was prostitution because she was at a location "frequented by

people engaging in promoting prostitution, patronizing a prostitute, and/or loitering for the

purpose of prostitution," was wearing a "white jacket with blue and white jump suit, tight," and

because he recovered "8 condoms" from her person.

172.    Defendant Siev also noted that his determination that Ms. Martin's purpose was to

engage in prostitution was based on the fact that he was "aware that [Ms. Martin] has previously

been arrested for violating Penal Law Section 240.37, 230.00, and/or 230.03." However, there

are no public records of any previous arrests related to those charges.

173.    Defendant Siev failed to properly review, monitor and supervise Defendant

Allen's, Defendant Doe NYPD Officer #6's and Defendant Doe NYPD Officer #7's unlawful

stop, questioning and seizure of Ms. Martin, and approved Ms. Martin's arrest.

174.    Since her arrest, Ms. Martin has been very nervous about going back to the

location of her arrest and fears that the police could "jump out at her" at any time. She recalls

that the whole experience felt like an "abduction." As such, the acts of Defendants Siev, Allen,

Doe NYPD Officer #6 and Doe NYPD Officer #7 intimidated and threatened Ms. Martin, and

left her traumatized.

175.    After her arrest, Ms. Martin was forced to return to court five additional times

under the threat of having the judge issue a bench warrant for her arrest. All criminal charges

against Ms. Martin were adjourned in contemplation of dismissal pursuant to C.P.L. § 170.55 on

June 1, 2016. The charges are calendared to be dismissed and sealed on December 1, 2016.

176.   By the actions described above, Defendants Siev, Allen, Doe NYPD Officer #6 and Doe NYPD Officer #7 targeted and/or sanctioned the targeting of Ms. Martin for unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrest and detention under Section 240.37 based on her race, color, ethnicity, gender, gender identity and/or appearance.

177.   The actions of Defendants Siev, Allen, Doe NYPD Officer #6 and Doe NYPD Officer #7 deprived Ms. Martin of her liberty and caused her pain and suffering, as well as psychological and emotional harm.

**B.      Named Plaintiffs Targeted for Arrest Under Other Circumstances**

178.   Defendants have also wrongfully arrested Plaintiffs as part of a general pattern and practice of arbitrary and discriminatory enforcement of Section 240.37.  These women were similarly engaging in constitutionally-protected activities or otherwise exercising their rights and not engaging in any prostitution-related activity at the time of their arrests.

**5.      Named Plaintiff Tiffaney Grissom**

179.   Tiffaney Grissom is a 30-year-old African-American woman who currently resides in New York City.

180.   Ms. Grissom is a transgender woman.  Ms. Grissom communicates and expresses her femininity through, among other means, her choices in hair, makeup, clothing and general appearance.

181.   Ms. Grissom has been repeatedly followed, stopped, questioned, arrested and detained for loitering for the purpose of prostitution.  The majority of her arrests have occurred in the West Village in Manhattan, primarily in the 6th precinct, and often by the same officers. Ms. Grissom has also been arrested in the 52nd precinct.

182.   On the night of October 3, 2013, Ms. Grissom was walking from Twin Donut on Fordham Road.  As she was walking, she spoke with a man for about 30 to 45 minutes, including

near the corner of West 192nd Street and Grand Avenue.  Ms. Grissom and the man then walked in opposite directions.  Shortly thereafter, an unmarked police car stopped beside her and Defendants Pocalyko and Savarese exited the car, ordered Ms. Grissom to stop and immediately placed her under arrest.  Defendants Pocalyko and Savarese did not stop the man with whom Ms. Grissom had spoken and allowed him to leave the scene without questioning him.

183.    At no time on October 3, 2013 did Ms. Grissom solicit or attempt to solicit money in exchange for sex, trespass onto private property or otherwise engage in any unlawful or criminal conduct related to prostitution.

184.    Ms. Grissom was handcuffed and taken to a police van where she was detained for approximately 30 minutes to an hour until the police arrived with another woman who—as Ms. Grissom later learned—had also been arrested for loitering for the purpose of prostitution.

185.    At the 52nd precinct, Defendant Pocalyko repeatedly probed Ms. Grissom with questions relating to her gender and her sex organs.  When Ms. Grissom answered Defendant Pocalyko's questions by maintaining that she was a woman, Defendant Pocalyko unlawfully ordered Ms. Grissom to be strip-searched by a female police officer even though she was not suspected of possessing any drugs or contraband.  The female officer took Ms. Grissom into a bathroom and ordered her to lift her shirt, shake out her bra and pull her shorts down.  This search was for the purpose of confirming whether or not she was female, as her identification indicated.  She was then put in a holding cell with three other women, including the woman from the police van.  She was detained at the precinct for an additional three to five hours.

186.    Ms. Grissom provided her address to the officers processing her arrest, making them aware that she was a resident of the neighborhood and lived about 10 blocks from where she was arrested.

48

187.    In the supporting deposition accompanying the criminal court complaint charging Ms. Grissom with violating Section 240.37, Defendant Pocalyko falsely alleged that, on October 3, 2013, he observed Ms. Grissom for twenty minutes "during which time [Ms. Grissom] beckoned to passing traffic and stopped or attempted to stop . . . 3 male motorists" from "the middle of the street." Pocalyko further alleged that Ms. Grissom's purpose was prostitution because she was observed at a location "frequented by people engaged in prostitution" and was wearing "tight short shorts [and a] tight tank top." Additionally, the complaint corresponding to Ms. Grissom's arrest indicated that Defendant Pocalyko believed Ms. Grissom's purpose was prostitution because she had been convicted of loitering for the purpose of prostitution five years earlier, although nothing in the supporting deposition suggests that Defendant Pocalyko knew this at the time of the arrest.

188.    Defendant Pocalyko failed to properly review, monitor and supervise Defendant Savarese's unlawful stop and seizure of Ms. Grissom, and approved Ms. Grissom's arrest.

189.    Ms. Grissom believes that the police targeted her because she is a transgender woman. She believes the police have imposed a "dress code" for her to be out in public. In addition to her arrests, she is frequently followed and/or stopped and questioned by police when walking or sitting in public areas. As a result of this harassment and her arrests, Ms. Grissom believes she must constantly be on "high alert" for any police presence and avoid the police. As a result of her arrest and after learning of the sweeps conducted by the police in June 2015, she became scared about socializing in her neighborhood with friends—mostly other transgender women of color—and left her house less often. When she did leave her house, she came home early out of fear that she would be arrested again. Ms. Grissom ultimately moved out of the neighborhood; even after moving, however, Ms. Grissom remains anxious about engaging in

conversation in public for more than brief periods of time and avoids speaking to men in the area

of the 52nd precinct and other neighborhoods where women of color and transgender women are

targeted by the police for arrest under Section 240.37.  As such, the acts of Defendants Pocalyko

and Savarese caused Ms. Grissom to feel extremely anxious and powerless.

190.    Ms. Grissom contested the Section 240.37 charge in Bronx Criminal Court and

was forced to return to court at least six additional times under the threat of having the judge

issue a bench warrant for her arrest.  On August 13, 2015, the Section 240.37 charge against

Ms. Grissom was dismissed on motion of the Bronx District Attorney's Office and sealed.

191.    By the actions described above, Defendants Pocalyko and Savarese targeted

and/or sanctioned the targeting of Ms. Grissom for unlawful surveillance, stops, questioning,

frisks, searches, seizures and/or arrest and detention under Section 240.37 based on her race,

color, ethnicity, gender, gender identity and/or appearance.

192.    The actions of Defendants Pocalyko and Savarese deprived Ms. Grissom of her

liberty and caused her pain and suffering, as well as psychological and emotional harm.

6.    **Named Plaintiff R.G.**

193.    R.G. is a 59-year-old Puerto Rican-American woman who lives in the Bronx.

R.G. lives with and cares for her 28-year-old daughter, who is disabled and unable to live or

travel by herself.  R.G. has previously been employed as a secretary in a variety of industries,

including for a police department in Florida and most recently for a large insurance company in

New York.

194.    R.G. had never been arrested for any offense before she was unlawfully arrested

for loitering for the purpose of prostitution on March 28, 2014.

195.   During the afternoon of March 28, 2014, at approximately 2:00 p.m., R.G. was taking a walk less than one mile from her home, which is located in the 41st precinct.  As she walked on the sidewalk, smoking a cigarette, an unmarked police car passed her, slowed down to make a U-turn, and pulled up alongside her.  Defendants Diggs and Gomez asked her where she was going.  They said that they knew what she was doing and that they had seen her stop five cars.  R.G. explained to the officers that she was taking a walk and had not stopped any cars.  Defendant Diggs told her that if she denied attempting prostitution, he would arrest her for lying.  Defendants Diggs and Gomez then asked R.G. whether she had any drugs, and when she replied that she did not, they frisked her and searched her pockets.  They then seized R.G.'s purse and began to search its contents without her consent.  At the time of the search, R.G. had in her purse some condoms that she had recently obtained for free at her doctor's office.  After seeing the condoms, Defendants Diggs and Gomez handcuffed R.G. and placed her under arrest.

196.   At no time on March 28, 2014 did R.G. solicit or attempt to solicit money in exchange for sex,  trespass onto private property or otherwise engage in any unlawful or criminal conduct related to prostitution.

197.   Also during the arrest, and while still on the street, Defendants Diggs and Gomez asked R.G. for her address, which she provided.  R.G.'s apartment building is known to the police as a location for illegal narcotics activity.  As soon as Defendants Diggs and Gomez learned her address, they began pressuring her for information about drug sales in her building.  When R.G. declined, the officers put her in the patrol car and drove to the 41st precinct.  Defendants Diggs and Gomez continued to press R.G. to provide information about narcotics activity in her building while she was in the police car and later detained at the precinct.  At one point, Defendants Diggs and Gomez even offered to release her and pay her for information

51

about crime in her building.  R.G. declined and told the officers that she feared for her safety if she were to inform on anyone in her building.

198.   At the 41st precinct, R.G. was put on a bench directly next to a men's holding cell and handcuffed to the bench for approximately seven hours.  During that time, five or six men inside the cell harassed and taunted R.G. with lewd comments.  R.G. did not receive any food or water.  She was allowed to use the bathroom only once—under the supervision of an officer who stood in the bathroom stall with her and watched her urinate.  R.G. was humiliated and embarrassed by this experience.

199.   While processing R.G., Defendants Diggs and Gomez again attempted to solicit information about drug activity in her building.  She again refused.  In response, Defendant Diggs made offensive comments about her appearance.

200.   In the sworn criminal court complaint charging R.G. with violating Section 240.37, Defendant Gomez falsely alleged that, on March 28, 2014, he observed R.G. "beckon to passing motorists and attempt[] to stop five male motorists" and "approach a male motorist, lean her face into said motorist's vehicle and begin speaking to said motorist."  Defendant Gomez also falsely alleged that R.G. was wearing "a tight low cut shirt and mini skirt."  She was in fact wearing long pants and a long-sleeve blouse.  Defendant Gomez did not allege that he observed R.G. for any period of time before arresting her.  He further alleged that R.G.'s purpose was prostitution because she was at a location "frequented by people engaged in prostitution."

201.   Defendant Beddows failed to properly review, monitor and supervise Defendant Diggs's and Defendant Gomez's unlawful stop, questioning, search and seizure of R.G., and approved R.G.'s arrest.

202.   R.G. was eventually released from the precinct with a desk appearance ticket. Her period of unlawful detention left her demoralized, disoriented and worried about her disabled daughter.  She could not believe what had happened and thought that it felt like a nightmare.  R.G. was distraught and embarrassed by her experience.  The arrest had a very harmful impact on her:  she suffered depression, anxiety and humiliation that left her feeling helpless, with no energy to find work or even to leave her house much in the weeks after her arrest.  Since she was arrested so close to her home, she has also been afraid to leave her home. Approximately one year after her arrest, after the Section 240.37 charge against her stemming from the arrest was dismissed, R.G. saw Defendant Gomez, who indicated that he recognized her and was watching her.  R.G. no longer feels like she can trust the police or depend on them for help.  As such, the acts of Defendants Beddows, Diggs and Gomez intimidated and threatened R.G.

203.   As a result of her arrest, R.G. had to appear in Bronx Criminal Court five times over the course of six months.  Each time she was required to be in court, her anxiety and depression around the incident were exacerbated.  On November 6, 2014, over seven months after her arrest and after numerous court appearances, the accusatory instrument charging R.G. under Section 240.37 was finally dismissed as facially insufficient pursuant to C.P.L. §§ 100.15(3) and 100.40(1)(c), and R.G.'s case was sealed.

204.   By the actions described above, Defendants Beddows, Diggs and Gomez targeted and/or sanctioned the targeting of R.G. for unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrest and detention under Section 240.37 based on her race, color, ethnicity, gender, gender identity and/or appearance.

53

205.    The actions of Defendants Beddows, Diggs and Gomez deprived R.G. of her liberty and caused her pain and suffering, as well as psychological and emotional harm.

### 7.    Named Plaintiff A.B.

206.    A.B. is a 44-year-old African-American woman who currently resides in Brooklyn.

207.    On August 13, 2015, an acquaintance of A.B.'s picked her up at around 1:30 a.m. to attend a dance party.  The two drove to a local store to buy drinks to take to the party. Afterwards, they got back in the car and resumed driving.  Shortly afterward, an unmarked police car pulled them over and three uniformed police officers, Defendants Salazar, Doe NYPD Officer #8 and Doe NYPD Officer #9, approached the car in which A.B. was a passenger.

208.    The officers opened the passenger door to the car and forcefully removed A.B. from the vehicle by her arm.  They asked A.B. how she knew the man with her, and she replied that the man was her acquaintance.  The officers apparently did not believe A.B. and told her that he could arrest her for prostitution.

209.    The officers asked A.B. if she had ever been arrested.  When she replied that she had, the officers returned to their car, apparently to enter A.B.'s name into their computer. While the officers waited for the results, they began questioning A.B.'s acquaintance.  He confirmed that A.B. was his acquaintance and that they were going to a party.  The officers accused him of being A.B.'s pimp, but they did not arrest him.  Instead, they removed A.B.'s belongings from his car without her consent and placed them on the trunk of the police car.  A.B. asked the officers to look at the text messages in her phone, which would confirm that she and her acquaintance were planning to go to a party, but the officers ignored her.

210.    While A.B. was detained, the officers verbally abused her by using racial slurs and calling her a "prostitute" and a "hooker." A.B. felt emotionally battered, and she informed the officers of her intention to file an official complaint against them. They continued to taunt her.

211.    At that point, A.B. asked for the names and shield numbers of Defendants Salazar, Doe NYPD Officer #8 and Doe NYPD Officer #9. They laughed at her. The officers then handcuffed her, put her in the unmarked police car, and took her to the 75th precinct for further processing.

212.    At no time on August 13, 2015 did A.B. solicit or attempt to solicit money in exchange for sex, trespass onto private property or otherwise engage in any unlawful or criminal conduct related to prostitution.

213.    In the supporting deposition accompanying the criminal court complaint charging A.B. with violating Section 240.37, Defendant Christian Salazar falsely alleged that, on August 13, 2015, he observed A.B. at the corner of Flatlands Avenue and Alabama Avenue "[stopping] only male passers-by." He further alleged A.B.'s purpose was prostitution because she was at an "industrial location" and that he was "aware that the [NYPD] has made numerous arrests for violations of Penal Law Sections 240.37, 230.00 and/or 230.03 at [that] location."

214.    Defendant Daverin failed to properly review, monitor and supervise Defendant Salazar's, Defendant Doe NYPD Officer #8's and Defendant Doe NYPD Officer #9's unlawful arrest of A.B.

215.    After her initial court appearance, A.B. was forced to return to court two additional times under the threat of having the judge issue a bench warrant for her arrest. All criminal charges against A.B. were dismissed and sealed on September 16, 2015.

216.   Since her arrest, A.B. has stopped walking alone in East New York because she fears that she will be wrongfully arrested again.  She becomes very anxious whenever she sees police and will often cross to the other side of the street to avoid any contact with them.  As such, the acts of Defendants Daverin, Salazar, Doe NYPD Officer #8 and Doe NYPD Officer #9 intimidated and threatened A.B.

217.   By the actions described above, Defendants Daverin, Salazar, Doe NYPD Officer #8 and Doe NYPD Officer #9 targeted and/or sanctioned the targeting of A.B. for unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrest and detention under Section 240.37 based on her race, color, ethnicity, gender, gender identity and/or appearance.

218.   The actions of Defendants Daverin, Salazar, Doe NYPD Officer #8 and Doe NYPD Officer #9 deprived A.B. of her liberty and caused her pain and suffering, as well as psychological and emotional harm.

### 8.   Named Plaintiff Sarah Marchando

219.   Sarah Marchando is a 28-year-old Latina woman who currently resides in Queens, New York.

220.   Ms. Marchando has a long history of prostitution-related arrests, primarily in the East New York neighborhood in Brooklyn.  Because of her arrest record, police officers assigned to the 75th precinct, and the related satellite precinct of Police Service Area ("PSA") 2,  know Ms. Marchando by face and last name.  Because of her criminal record and previous proximity to the precinct, the police target Ms. Marchando for arrest when they see her outside, and she is often arrested for loitering for the purpose of prostitution when engaged in wholly innocent conduct.

*May 7, 2015 Arrest*

221.    For example, on the morning of May 7, 2015, Ms. Marchando met her boyfriend, who was coming home from work, at the BP car wash located on the corner of Flatlands Avenue between Pennsylvania Avenue and Sheffield Avenue. She was wearing a dress that stopped about an inch above her knee-high flat boots. Ms. Marchando and her boyfriend arrived at approximately 7:20 or 7:25 a.m. From there, Ms. Marchando's boyfriend left to run some errands and Ms. Marchando planned to take the bus back to his apartment.

222.    At around 7:30 a.m., Ms. Marchando boarded the B6 bus at the corner of Alabama Avenue and Cozine Avenue. Ms. Marchando remained on the bus for five or six stops until it arrived at Wortman Avenue and Ashford Street, approximately 11 blocks from where she had boarded. There, Defendants Nicosia and Doe NYPD Officer #10, dressed in plainclothes, rushed onto the bus. They ordered Ms. Marchando to put her hands behind her back and disembark. Ms. Marchando asked the officers what was happening. They did not answer. After a few seconds, Defendant Nicosia grabbed her by the arm and pulled her down the bus stairs. Ms. Marchando kept asking why she was being arrested but never got a response.

223.    At no time on May 7, 2015 did Ms. Marchando solicit or attempt to solicit money in exchange for sex, trespass onto private property or otherwise engage in any unlawful or criminal conduct related to prostitution.

224.    Once Defendant Nicosia dragged her off the bus, she tried to stop him from pulling on her arm. Defendants Nicosia and Doe NYPD Officer #10 restrained her. One of them put her in a chokehold, which exacerbated her asthma and caused her to vomit. Ms. Marchando repeatedly told the officers that she could not breathe, but they did not release her until two

bystanders who were watching the incident intervened. After she was finally released from the chokehold, her bra was ripped, and she was having trouble breathing and was in substantial pain.

225.   Additional police officers arrived at the scene. In total, there were at least six officers involved in Ms. Marchando's arrest, including Defendants Nicosia and Doe NYPD Officer #10 in plainclothes, Defendants Quinn, Doe NYPD Officer #11 and Doe NYPD Officer #12 in uniform, and their supervisor Defendant Doyle, who was dressed in plainclothes. Without telling Ms. Marchando why she was being arrested, the officers placed her in handcuffs and searched her purse. Ms. Marchando requested medical attention, but the officers refused to get her help. Instead Defendant Doyle remarked, "She's back" and "We got her."

226.   The officers brought Ms. Marchando to the 75th precinct around 7:45 a.m. where an officer performed a pocket search of Ms. Marchando. She was kept in handcuffs and placed in a holding cell. Still having difficulty breathing, Ms. Marchando asked for her asthma inhaler, but the officers refused to give it to her. At approximately 2:45 or 3:00 p.m., an officer returned and told Ms. Marchando for the first time that she had been arrested for loitering for the purpose of prostitution. She was arraigned around midnight and was finally released after spending approximately 16 hours in custody.

227.   After her arrest, Ms. Marchando suffered from ongoing breathing difficulties and pain and swelling in her arm and knee. In addition, the arrest caused Ms. Marchando emotional suffering in that she felt humiliated and unfairly treated. She worried that she would not be able to walk anywhere or utilize public transportation in that neighborhood without facing arrest. Her fears were and are justified, as officers from the 75th precinct arrested her again eight days after this incident, similarly without probable cause or justification.

228.     In the sworn criminal court complaint charging Ms. Marchando with violating Section 240.37 on May 7, 2015, Defendant Quinn falsely alleged that he observed Ms. Marchando for 40 minutes, during which time she "beckon[ed] to multiple vehicles passing by with male drivers[,]. . . approach[ed] a vehicle and . . . engage[d] in conversation with a male inside of said vehicle."

229.     Defendant Doyle failed to properly review, monitor and supervise Defendant Quinn's, Defendant Nicosia's, Defendant Doe NYPD Officer # 10's, Defendant Doe NYPD Officer #11's and Defendant Doe NYPD Officer #12's unlawful stop, seizure and assault of Ms. Marchando, and approved Ms. Marchando's arrest.

### May 15, 2015 Arrest

230.     In the early morning of May 15, 2015, Ms. Marchando was on Flatlands Avenue between Pennsylvania Avenue and Sheffield Avenue.  She had purchased juice from a nearby store and was listening to music, texting and playing a game on her phone.  Defendants Yanez and supervising Doe NYPD Officer #13 approached her and immediately asked if she had ever been arrested for prostitution.  When she responded affirmatively, they handcuffed and arrested her.

231.     At no time on May 15, 2015 did Ms. Marchando solicit or attempt to solicit money in exchange for sex, trespass onto private property or otherwise engage in any unlawful or criminal conduct related to prostitution.

232.     Defendants Yanez and Doe NYPD Officer #13 placed Ms. Marchando in a van with six male arrestees.  Ms. Marchando was the only female arrestee in the van and remained handcuffed.  She was kept in the van for over one hour.

233.    At the 75th precinct, Ms. Marchando was searched by a male officer and put in a holding cell.  She remained handcuffed in the cell for approximately two hours.  During that time, Ms. Marchando asked three different male police officers to remove her handcuffs because she had lost feeling in her right arm.  They told her that the handcuffs were necessary because there was no female officer available to search her, even though a male officer had already searched her when she arrived.  Approximately one hour after Ms. Marchando's request, a female officer came into the holding cell.  She seemed surprised that Ms. Marchando was still handcuffed and performed a search.  Ms. Marchando was finally arraigned and released around 11:30 p.m., after spending approximately 18 hours in custody.

234.    In the supporting deposition accompanying the criminal court complaint charging Ms. Marchando with violating Section 240.37 on May 15, 2015, Defendant Yanez falsely alleged that he observed Ms. Marchando for 120 minutes "during which time [Ms. Marchando] repeatedly beckoned to passers-by and stopped five-passers-by, engaging in conversation with said passers-by" and that she was "standing in the middle of the road."  Yanez further alleged that Ms. Marchando's purpose was prostitution because "the above area is an industrial location" "frequented by people engaging in promoting prostitution" and that he is "aware that [Ms. Marchando] has previously been arrested for violating Penal Law 240.37, 230.00 and/or 230.03" and because he recovered "10 unused condoms" from her person.

235.    Defendant Doe NYPD Officer #13 failed to properly review, monitor and supervise Defendant Yanez's unlawful stop and seizure of Ms. Marchando, and approved Ms. Marchando's arrest.

236.    After her arrest, Ms. Marchando continued to suffer pain and discomfort in her right arm and emotional harm.  As a result of the May 7 and May 15, 2015 arrests,

60

Ms. Marchando was afraid to go outside in Brooklyn and when there, tried to stay inside her boyfriend's apartment as much as possible to avoid arrest. Ms. Marchando suffers from an anxiety disorder, and her arrests exacerbated her condition. As a result of the harassment by Defendants Nicosia, Quinn, Doe NYPD Officer #10, Doe NYPD Officer #11, Doe NYPD Officer #12, Doyle, Yanez and Doe NYPD Officer #13 and other members of the 75th precinct, Ms. Marchando temporarily left New York City in September 2015. When she returned to New York in December 2015, she moved to Queens out of fear that she would be targeted for arrest by officers in the 75th precinct. As such, the acts of Defendants Nicosia, Quinn, Doe NYPD Officer #10, Doe NYPD Officer #11, Doe NYPD Officer #12, Doyle, Yanez and Doe NYPD Officer #13 intimidated and threatened Ms. Marchando.

237. After her arrests on May 7 and May 15, 2015, Ms. Marchando was forced to return to court two additional times, under the threat of having the judge issue a bench warrant for her arrest. All criminal charges against Ms. Marchando stemming from the two arrests were adjourned in contemplation of dismissal pursuant to C.P.L. § 170.55 on June 10, 2015. Both cases were dismissed and sealed on December 9, 2015.

238. By the actions described above, Defendants Nicosia, Quinn, Doe NYPD Officer #10, Doe NYPD Officer #11, Doe NYPD Officer #12, Doyle, Yanez and Doe NYPD Officer #13 targeted and/or sanctioned the targeting of Ms. Marchando for unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrest and detention under Section 240.37 based on her race, color, ethnicity, gender, gender identity and/or appearance.

239. The actions of Defendants Nicosia, Quinn, Doe NYPD Officer #10, Doe NYPD Officer #11, Doe NYPD Officer #12, Doyle, Yanez and Doe NYPD Officer #13 deprived

Ms. Marchando of her liberty and caused her pain and suffering, as well as psychological and emotional harm.

**CLAIMS FOR RELIEF**

**I.   CLASS CLAIMS**

**First Claim for Relief**

Section 240.37 Is Unconstitutionally Void for Vagueness in Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution[28]

240.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations in the preceding paragraphs.

241.    Section 240.37 does not provide citizens with adequate notice as to what type of behavior they must avoid in order to avoid arrest under the statute.

242.    Plaintiffs have been and continue to be unlawfully subjected to surveillance, stopped, questioned, frisked, searched, seized and/or arrested and detained for engaging in innocent activities such as walking down the street, sitting on a bench, riding on a public bus and speaking to other individuals on a public street.

243.    Section 240.37 lacks adequate guidelines for police, leading to inconsistent and arbitrary enforcement.  Neither New York State courts, the City, nor the NYPD have provided adequate guidance to officers as to what type of behavior is criminal under Section 240.37.

244.    Section 240.37 is unconstitutionally void for vagueness in violation of the Due Process Clause of the Fourteenth Amendment as applied to Plaintiffs because it provides insufficient notice to citizens of what constitutes illegal behavior under the statute and provides

---

[28] A copy of this Complaint & Demand for Jury Trial has been served on the New York State Attorney General's Office.

insufficient guidance to law enforcement, resulting in discriminatory and arbitrary enforcement

of the statute at the discretion of individual officers.

## Second Claim for Relief

Section 240.37 Is Unconstitutional Because It Is Overly Broad, Infringing on the Right to
Freedom of Expression Under the First Amendment to the United States Constitution and Article
I, § 8 of the New York Constitution, the Right to Due Process Under the Fourteenth Amendment
to the United States Constitution and the Right Against Unreasonable Searches and Seizures
Under the Fourth Amendment to the United States Constitution and Article I, § 12 of the New
York Constitution

245.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein

the allegations in the preceding paragraphs.

246.    A substantial number of law enforcement activities undertaken pursuant to

Section 240.37, including surveillance, stops, questioning, frisks, searches, seizures and arrests

and detention under Section 240.37 are unconstitutional.

247.    Plaintiffs maintain a liberty interest in self-expression and bodily integrity and

privacy.

248.    Plaintiffs exercise free speech, including the expression of gender identity through

choice of clothing, free movement and free association with other citizens.

249.    As a result of the unconstitutionally overbroad provisions of Section 240.37 that

implicate a substantial amount of constitutionally protected speech and other protected activity,

Plaintiffs are forced to live with a heightened risk of law enforcement encounters and experience

a real and substantial deterrent to the exercise of these freedoms.

250.    Plaintiffs have been deterred from exercising their rights under the First, Fourth

and Fourteenth Amendments by restricting their expression through clothing choices, restricting

their movement through public spaces and restricting their associations with other people out of

fear of future arrest.

251.    The substantial unconstitutional applications of Section 240.37 in unlawfully surveilling, stopping, questioning, frisking, searching, seizing and/or arresting and detaining Plaintiffs who are engaged in constitutionally protected speech and other protected activity outweigh any public policy goals of Section 240.37, which are already met through other provisions of New York's Penal Law.

### Third Claim for Relief

Municipal Liability for Violations of Plaintiffs' Due Process Rights Under the Fourteenth
Amendment to the United States Constitution
(Against the City)

252.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations in the preceding paragraphs.

253.    By consciously choosing to enforce Section 240.37, and adopting and implementing certain enforcement policies and widespread practices and/or customs, Defendants have chosen to enforce Section 240.37 in an unconstitutional manner in violation of Plaintiffs' liberty interests in self-expression, bodily integrity and privacy.  By unlawfully surveilling, stopping, questioning, frisking, searching, seizing and/or arresting and detaining Plaintiffs, including Named Plaintiffs, under Section 240.37 based in large part on Plaintiffs' appearance and their presence in public areas, Defendants, who are state actors, infringed on Plaintiffs' fundamental freedoms.

254.    The City has acted with deliberate indifference to Plaintiffs' Due Process rights under the Fourteenth Amendment in failing to adequately train, monitor, supervise or discipline NYPD officers, including Individual Defendants, involved in the enforcement of Section 240.37, leading to unlawful infringement of Plaintiffs' liberty interests in self-expression, bodily integrity and privacy.

255.    As a direct and proximate result of the City's policies, widespread practices and/or customs, Plaintiffs continue to face an imminent threat of being unlawfully surveilled, stopped, questioned, frisked, searched, seized and/or arrested and detained under Section 240.37 if they engage in constitutionally protected conduct in public areas, and their ability to self-determine their personal appearance in public continues to be chilled.

### Fourth Claim for Relief

Municipal Liability for Violations of Plaintiffs' Right to Freedom of Speech Under the First Amendment to the United States Constitution and Article I, § 8 of the New York Constitution
(Against the City)

256.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations in the preceding paragraphs.

257.    Plaintiffs have a constitutionally protected interest in the exercise of free speech, including the expression of gender identity through choice of clothing, conversations with individuals of any gender and gender identity, free movement and free association with other citizens.

258.    By consciously choosing to enforce Section 240.37, and adopting and implementing certain enforcement policies and widespread practices and/or customs, Defendants have chosen to enforce Section 240.37 in an unconstitutional manner in violation of the First Amendment to the United States Constitution and Article I, § 8 of the New York Constitution by unlawfully surveilling, stopping, questioning, frisking, searching, seizing and/or arresting and detaining Plaintiffs for Section 240.37 violations based in large part on protected conduct, *i.e.* their clothing, presence in public areas, conversations with others and/or other First Amendment activity, causing constitutional injury and chilling their First Amendment speech, expressive conduct and ability to freely utilize public space.

259.     The City has acted with deliberate indifference to Plaintiffs' rights under the First Amendment and Article I, § 8 of the New York Constitution in failing to adequately train, monitor, supervise or discipline NYPD officers, including Individual Defendants, involved in the enforcement of Section 240.37, leading to the unlawful infringement of Plaintiffs' right to engage in free speech and other protected First Amendment activity.

260.     As a direct and proximate result of the City's policies, widespread practices and/or customs, Plaintiffs continue to face an imminent threat of being unlawfully surveilled, stopped, questioned, frisked, searched, seized and/or arrested and detained under Section 240.37 if they engage in constitutionally protected speech in public areas, and their speech continues to be chilled.

### Fifth Claim for Relief

Municipal Liability for Violations of Plaintiffs' Right to Equal Protection of the Laws Under the Fourteenth Amendment to the United States Constitution and Article I, § 11 of the New York Constitution
(Against the City)

261.     Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations in the preceding paragraphs.

262.     By consciously choosing to enforce Section 240.37, and adopting and implementing certain enforcement policies, widespread practices and/or customs, Defendants have chosen to enforce Section 240.37 in an unconstitutional manner against women of color, some of whom are transgender, based on the race, color, ethnicity, gender, gender identity and/or appearance of Plaintiffs under circumstances in which Section 240.37 is not enforced against men or white women, causing constitutional injury by depriving Plaintiffs of equal protection of the laws under the Fourteenth Amendment to the United States Constitution and Article I, § 11

of the New York Constitution.  The City has no legitimate interest in enforcing Section 240.37 in this manner.

263.    The City has acted with deliberate indifference to Plaintiffs' right to equal protection of the laws under the Fourteenth Amendment and Article I, § 11 of the New York Constitution in failing to adequately train, monitor, supervise or discipline NYPD officers, including Individual Defendants, involved in the enforcement of Section 240.37, causing constitutional injury to Plaintiffs in that they have been, and continue to be, unlawfully subjected to law enforcement activities, including surveillance, stops, questioning, frisks, searches, seizures and/or arrests and detention based on race, color, ethnicity, gender, gender identity and/or appearance, under circumstances in which men or white women are not subjected to such law enforcement activities, in violation of the Fourteenth Amendment to the United States Constitution and Article I, § 11 of the New York Constitution.

264.    As a direct and proximate result of the City's policies, widespread practices and/or customs, Plaintiffs continue to face an imminent threat of being unlawfully surveilled, stopped, questioned, frisked, searched, seized and/or arrested and detained under Section 240.37 on the basis of race, color, ethnicity, gender, gender identity and/or appearance.

### Sixth Claim for Relief

Municipal Liability for Unlawful Discrimination Under 42 U.S.C. § 1981
(Against the City)

265.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations in the preceding paragraphs.

266.    Pursuant to certain enforcement policies, widespread practices and/or customs, the City has chosen to enforce Section 240.37 in a discriminatory manner, denying Plaintiffs the full and equal benefit of all laws and proceedings for the security of persons as is enjoyed by

67

white citizens of the United States, and subjecting them to disparate forms of punishment, pains, penalties and exactions as compared to white citizens, in violation of 42 U.S.C. § 1981.

267.   As a direct and proximate result of the City's policies, widespread practices and/or customs, Plaintiffs have suffered constitutional injury.

### Seventh Claim for Relief

Municipal Liability for Violation of Plaintiffs' Right Against Unreasonable Search and Seizures Under the Fourth Amendment to the United States Constitution and Article I, § 12 of the New York Constitution
(Against the City)

268.   Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations in the preceding paragraphs.

269.   By consciously choosing to enforce Section 240.37, and adopting and implementing certain enforcement policies, widespread practices and/or customs, Defendants have chosen to enforce Section 240.37 in an unconstitutional manner, seizing persons in violation of the Fourth Amendment to the United States Constitution and Article I, § 12 of the New York Constitution.  These actions have resulted in constitutional injury in that Plaintiffs have been unlawfully surveilled, stopped, questioned, frisked, searched, seized and/or arrested and detained under Section 240.37 without the requisite reasonable suspicion or probable cause to believe that a criminal offense has been or is being committed.

270.   The City has acted with deliberate indifference to Plaintiffs' right to be free from unreasonable searches and seizures in failing to adequately train, monitor, supervise or discipline NYPD officers, including Individual Defendants, involved in the enforcement of Section 240.37, causing Plaintiffs to be unlawfully subjected to surveillance, stops, questioning, frisks, searches, seizures and/or arrests and detention under Section 240.37 without reasonable suspicion or

probable cause in violation of the Fourth Amendment to the United States Constitution and Article I, § 12 of the New York Constitution.

271.   As a direct and proximate result of the City's policies, widespread practices and/or customs, Plaintiffs continue to face an imminent threat of being unlawfully surveilled, stopped, questioned, frisked, searched, seized and/or arrested and detained under Section 240.37 in violation of the Fourth Amendment to the United States Constitution and Article I, § 12 of the New York Constitution.

### Eighth Claim for Relief

Claims Under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.
(Against the City)

272.   Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations in the preceding paragraphs.

273.   The law enforcement services described in this complaint have been funded, in part, with federal funds.

274.   Plaintiffs were intended beneficiaries of these law enforcement services.

275.   Discrimination based on race in the law enforcement services and conduct described in this complaint is prohibited under 42 U.S.C. § 2000d et seq.  The acts and conduct complained of herein by the Defendants were motivated by racial animus and were intended to discriminate on the basis of race, particularly against Blacks and Latinos.

276.   As a direct and proximate result of the above-mentioned acts, Plaintiffs have suffered injuries and damages and have been deprived of their rights under the civil rights laws. Without appropriate injunctive relief, these violations will continue to occur.

**Ninth Claim for Relief**

Respondeat Superior Claim Under New York Common Law
(Against the City)

277.     Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein

the allegations in the preceding paragraphs.

278.     The conduct of Individual Defendants occurred while they were on duty, acting

under the color of law, in and during the course and scope of their duties and functions as NYPD

officers and while they were acting as agents and employees of the City.

279.     As a result, the City is liable to Plaintiffs for the claims against Individual

Defendants under the doctrine of respondeat superior.

**Tenth Claim for Relief**

Conspiracy to Violate Plaintiffs' Civil Rights Under 42 U.S.C. § 1985
(Against All Defendants)

280.     Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein

the allegations in the preceding paragraphs.

281.     Defendants from the 52nd precinct agreed to violate certain Plaintiffs' rights by

planning and performing sweeps, see supra ¶ 73, during which they planned to arrest certain

Plaintiffs for their status as transgender women and deprive them of equal protection under the

law.  Defendants planned to arrest these Plaintiffs without probable cause to believe they

committed a crime, in violation of their First, Fourth and Fourteenth Amendment rights.

Defendants from the 52nd precinct took action in furtherance of violating certain Plaintiffs' rights

by actually arresting multiple Named Plaintiffs and Plaintiff Class members, as described above,

on June 6, 2015 and June 13, 2015, under Section 240.37, and telling them that they were

arrested because they were transgender women out in public at night.  In taking these actions,

70

Defendants from the 52nd precinct were motivated by their discriminatory attitudes towards and unlawful bias against transgender women.

282.    Unknown high-ranking officers in the NYPD and/or other supervising officers and police officers of other precincts have similar policies, widespread practices and/or customs motivated by discriminatory attitudes and unlawful bias against transgender women of planning and performing sweeps to effectuate Section 240.37 arrests pursuant to which they have agreed to violate transgender Plaintiffs' rights under the First, Fourth and Fourteenth Amendments due to the fact that they are transgender women.

283.    As a result of these arrests, Plaintiff Class Members and Named Plaintiffs suffered constitutional injury; were harmed and suffered emotional and psychological distress, deprivation of liberty, embarrassment and shame.

**Eleventh Claim for Relief**

Violation of the N.Y. Civ. Rights Law §§ 40-c, 40-d and 79-n
(Against All Defendants)

284.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations in the preceding paragraphs.

285.    Defendants' prior and continuing acts of discrimination against Plaintiffs, including Defendants' unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrests and detention of Plaintiffs under Section 240.37, and/or the sanctioning of those law enforcement acts, were carried out on the basis of Plaintiffs' race, color, ethnicity, gender, gender identity and/or appearance, under circumstances in which men or white women are not subjected to such law enforcement activities, and therefore subjected Plaintiffs to discrimination in violation of their civil rights, including their right to equal protection of the laws, in violation of New York State Civil Rights Law §§ 40-c and 40-d.

71

286.    Further, Defendants' prior and continuing acts of discrimination against Plaintiffs, including Defendants' unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrests and detention of Plaintiffs under Section 240.37, and/or the sanctioning of those law enforcement acts, constituted the intentional selection of Plaintiffs for harm in whole or substantial part because of Defendants' beliefs or perceptions regarding Plaintiffs' gender, including their actual or perceived sex, gender identity or expression, race and color, in violation of New York State Civil Rights Law § 79-n.  Further, Defendants' sanctioning or acts of unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrests and detention of Plaintiffs under Section 240.37 constituted intimidation of Plaintiffs on the basis of their gender, including their actual or perceived sex, gender identity or expression, race and color.

287.    In addition, Defendants have aided and incited others to unlawfully surveil, stop, question, frisk, search, seize and/or arrest and detain Plaintiffs under Section 240.37 on the basis of Plaintiffs' race, color, ethnicity, gender, gender identity and/or appearance, under circumstances in which men or white women are not subjected to such law enforcement activities, in violation of New York State Civil Rights Law §§ 40-c, 40-d and 79-n.  Defendants' violations of Plaintiffs' civil rights under the New York State Civil Rights Law are the actual, direct and proximate cause of injuries suffered by Plaintiffs, as alleged herein, and Plaintiffs continue to be harmed by Defendants' violations of the New York State Civil Rights Law.

288.    Plaintiffs have complied with the procedural requirements of New York State Civil Rights Law § 40-d by serving notice upon the state Attorney General at or before the commencement of the action.

**Twelfth Claim for Relief**

Violation of the New York State Human Rights Law, New York State Rules and Regulations and New York City Human Rights Law Through Discriminatory Refusal, Withholding and Denial of Public Accommodations, Disparate Impact and Aiding and Abetting Unlawful Discriminatory Practices
N.Y. Exec. Law §§ 296(2), 296(6), 297(9)
N.Y. Comp. Codes R. & Regs. Tit. 9, § 466.13
N.Y.C. Admin. Code §§ 8-107(4)(a), 8-107(6), 8-107(17), 8-502(a)
(Against All Defendants)

289.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations in the preceding paragraphs.

290.    The NYPD is a place or provider of public accommodation because it provides services, facilities, accommodations, advantages and privileges through acting in its investigative and custodial capacities, including the supervision and execution of surveillance, stops, questioning, frisks, searches, seizures and/or arrests and detention pursuant to Section 240.37. The New York City Commission on Human Rights has not granted the NYPD an exemption to § 8-107(4) based on bona fide considerations of public policy.

291.    By sanctioning and/or engaging in sweeps and targeting Plaintiffs for unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrest and detention pursuant to Section 240.37 on the basis of Plaintiffs' actual and/or perceived race, color, ethnicity and/or gender, including their gender identity, self-image, appearance, behavior, expression and/or transgender status, and/or by aiding, abetting, inciting or compelling such conduct, Defendants have refused, denied and withheld from Plaintiffs the accommodations, advantages, facilities and privileges of the NYPD's investigative and custodial services.  Therefore, the acts of Defendants, who are owners, proprietors, managers, superintendents, agents and/or employees of the NYPD and the City, violated Plaintiffs' rights under the NYHRL, N.Y. Exec. Law §§ 296(2) and

296(6), the N.Y. Comp. Codes R. & Regs. Tit. 9, § 466.13 and the NYCHRL, N.Y.C. Admin.

Code §§ 8-107(4)(a) and 8-107(6).

292.    Defendants have also violated the NYCHRL, N.Y.C. Admin. Code §§ 8-107(17),

because their actions, policies, practices or customs, or a group thereof, have a disparate impact

on women of color, including transgender women of color, who are protected under the

NYCHRL. By targeting Plaintiffs for unlawful surveillance, stops, questioning, frisks, searches,

seizures and/or arrest and detention under Section 240.37 on the basis of Plaintiffs' actual or

perceived race, color, ethnicity, gender and/or gender identity, including self-image, appearance,

behavior, expression and/or transgender status, Defendants' actions, policies, practices or

customs, or a group thereof, result in the refusal, denial and withholding from Plaintiffs of the

accommodations, advantages, facilities and privileges of the NYPD's investigative and custodial

services on the same terms as non-transgender, male and/or white individuals. Therefore,

women of color, including transgender women, are disparately impacted to their detriment by

Defendants' actions, policies, practices or customs, or a group thereof.

293.    The disparate impact of Defendants' actions, policies, practices or customs, or a

group thereof, which bear no relationship to a significant business objective of the NYPD,

exceeds the mere existence of a statistical imbalance between women of color and transgender

women, and the general population.

294.    Plaintiffs have not filed a complaint with the New York City Commission on

Human Rights, the State Division on Human Rights, any other court of competent jurisdiction, or

any other administrative agency based upon the unlawful discriminatory practices alleged herein.

74

295.    Defendants' violations of Plaintiffs' rights under the NYHRL and NYCHRL are the actual, direct and proximate cause of injuries suffered by Plaintiffs, as alleged herein, and Plaintiffs continue to be harmed by Defendants' violations of the NYHRL and NYCHRL.

296.    Plaintiffs have served a copy of the complaint upon the authorized representatives of the New York City Commission on Human Rights and Corporation Counsel.

## Thirteenth Claim for Relief

Violation of the New York City Bias-Based Profiling Law, N.Y.C. Admin. Code § 14-151
(Against All Defendants)

297.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations in the preceding paragraphs.

298.    The City and Individual Defendants who are members of the NYPD police force have engaged, are engaging and continue to engage in bias-based profiling by initiating law enforcement actions against Plaintiffs, including the sanctioning and/or execution of unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrests and detention of Plaintiffs under Section 240.37, on the basis of and in reliance on Plaintiffs' actual or perceived race, color, gender and/or gender identity as the determinative factor.  Therefore, Defendants have engaged and continue to engage in the above-described intentional bias-based profiling of Plaintiffs, in violation of the New York City Bias-Based Profiling Law, N.Y.C. Admin. Code § 14-151.

299.    Defendants have intentionally engaged in the above-described bias-based profiling of Plaintiffs.  Such bias-based profiling is not justified by factors unrelated to unlawful discrimination, and is instead based on Plaintiffs' actual or perceived race, color, gender and/or gender identity.  Defendants' above-described bias-based profiling is neither necessary to

75

achieve a compelling governmental interest nor narrowly tailored to achieve any compelling governmental interest.

300.    In addition, Defendants' actions, policies, practices, or customs, or a group thereof, which result in the above-described bias-based profiling of Plaintiffs by Defendants, have a disparate impact on Plaintiffs, based on Plaintiffs' actual or perceived race, color and/or gender.

301.    Further, the disparate impact of Defendants' actions, policies, practices or customs, or a group thereof, exceed the mere existence of a statistical imbalance between women of color and transgender women, and the general population.  Defendants' actions, policies, practices or customs, or a group thereof, bear no significant relationship to advancing a significant law enforcement objective.

302.    Defendants' violations of Plaintiffs' rights under the New York City Bias-Based Profiling Law are the actual, direct and proximate cause of injuries suffered by Plaintiffs, as alleged herein, and Plaintiffs continue to be harmed by Defendants' violations of the New York City Bias-Based Profiling Law.

## II.    CLAIMS BY NAMED PLAINTIFFS

303.    With respect to each of the following claims, the conduct of Individual Defendants constituted outrageous and reckless conduct and demonstrated a callous indifference to and willful disregard of Named Plaintiffs' federal and state constitutional rights.  Their conduct caused Named Plaintiffs pain and suffering, as well as psychological and emotional harm.

## Fourteenth Claim for Relief

Violations of Plaintiffs' Due Process Rights Under the Fourteenth Amendment to the United
States Constitution, Article I, § 8 of the New York Constitution and 42 U.S.C. § 1983
(Against Individual Defendants)

304.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein

the allegations in the preceding paragraphs.

305.    Individual Defendants unlawfully surveilled, stopped, questioned, frisked,

searched, seized and/or arrested and detained Named Plaintiffs in violation of their Due Process

rights under the Fourteenth Amendment to the United States Constitution, Article I, § 8 of the

New York Constitution and 42 U.S.C. § 1983.  Individual Defendants arrested Named Plaintiffs

in violation of their constitutionally protected liberty interest in self-expression and bodily

integrity and privacy.

306.    The conduct of Individual Defendants deprived Named Plaintiffs of their liberty

and caused Named Plaintiffs pain and suffering, as well as psychological and emotional harm.

## Fifteenth Claim for Relief

Violations of Plaintiffs' Right to Freedom of Speech Under the First Amendment to the United
States Constitution, Article I, § 8 of the New York Constitution and 42 U.S.C. § 1983
(Against Individual Defendants)

307.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein

the allegations in the preceding paragraphs.

308.    The Individual Defendants unlawfully surveilled, stopped, questioned, frisked,

searched, seized and/or arrested and detained Named Plaintiffs in violation of their rights under

the First Amendment to the United States Constitution, Article I, § 8 of the New York

Constitution and 42 U.S.C. § 1983.  The Individual Defendants arrested Named Plaintiffs for

engaging in constitutionally protected expressive conduct, including communicating with others

in public and/or expressing their gender identity in a public place through their choice of clothing.

309.     The conduct of Individual Defendants deprived Named Plaintiffs of their liberty and caused Named Plaintiffs pain and suffering, as well as psychological and emotional harm.

**Sixteenth Claim for Relief**

Violation of Plaintiffs' Right to Equal Protection of the Laws Under the Fourteenth Amendment
to the United States Constitution, Article I, § 11 of the New York Constitution and
42 U.S.C. § 1983
(Against Individual Defendants)

310.     Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations in the preceding paragraphs.

311.     Acting under color of state law, Individual Defendants targeted and/or sanctioned the targeting of Named Plaintiffs for unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrest and detention under Section 240.37 based on their race, color, ethnicity, gender, gender identity and/or appearance, under circumstances in which men or white women are not subjected to such law enforcement activities.  The Individual Defendants had no legitimate interest in targeting Named Plaintiffs in this manner.

312.     As a direct and proximate result of such Individual Defendants' law enforcement actions, such Named Plaintiffs have been deprived of their right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution and Article I, § 11 of the New York Constitution in violation of 42 U.S.C. § 1983.

313.     The conduct of Individual Defendants deprived Named Plaintiffs of their liberty and caused Named Plaintiffs pain and suffering, as well as psychological and emotional harm.

## Seventeenth Claim for Relief

Violation of Plaintiffs' Right Against Unreasonable Search and Seizures Under the Fourth Amendment to the United States Constitution, Article I, § 12 of the New York Constitution and 42 U.S.C. § 1983
(Against Individual Defendants)

314.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations in the preceding paragraphs.

315.    The Individual Defendants intentionally and under color of state law have unlawfully surveilled, stopped, questioned, frisked, searched, seized and/or arrested and detained Named Plaintiffs under Section 240.37 without reasonable suspicion or probable cause in violation of the Fourth Amendment to the United States Constitution and Article I, § 12 of the New York Constitution.

316.    As a direct and proximate result of the acts and omissions of Individual Defendants, Named Plaintiffs have been unlawfully surveilled, stopped, questioned, frisked, searched, seized and/or arrested and detained, and deprived of their rights under the Fourth Amendment to the United States Constitution and Article I, § 12 of the New York Constitution in violation of 42 U.S.C. § 1983.

317.    The conduct of Individual Defendants deprived Named Plaintiffs of their liberty and caused Named Plaintiffs pain and suffering, as well as psychological and emotional harm.

## Eighteenth Claim for Relief

Unlawful Discrimination Under 42 U.S.C. § 1981
(Against Individual Defendants)

318.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations in the preceding paragraphs.

319.    By their above-described actions pertaining to the sanctioning and/or execution of unlawful surveillance, stops, questioning, frisks, searches, seizures and/or arrest and detention of

Plaintiffs under Section 240.37, Individual Defendants denied Named Plaintiffs the full and

equal benefit of all laws and proceedings for the security of persons as is enjoyed by white

citizens of the United States, and subjected them to disparate forms of punishment, pains,

penalties and exactions as compared to white citizens, in violation of 42 U.S.C. § 1981.

### Nineteenth Claim for Relief

Violation of the Americans with Disabilities Act, the New York State Human Rights Law and
the New York City Human Rights Law Through Unlawful Discriminatory Practices on the Basis
of Disability, 42 U.S.C. § 12132,
N.Y. Exec. Law §§ 296(2), 296(6), 297(9),
N.Y.C. Admin. Code §§ 8-107(4)(a), 8-107(6), 8-107(15)(a), 8-502(a)
(D.H. Against Defendants Kinane, McKenna, Doe NYPD Officer #1, Doe NYPD Officer # 2,
Doe NYPD Officer #14 and the City)

320.    Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein

the allegations in the preceding paragraphs.

321.    As stated in paragraphs 290-291 above, the NYPD provides services, facilities,

accommodations, advantages and privileges by acting in its investigative and custodial

capacities.  Defendants are managers, proprietors, superintendents, agents and/or employees of

the City and the NYPD, a department of local government and a place and provider of public

accommodation.  As such, Defendants are prohibited from discriminating on the basis of

disability under 42 U.S.C. § 12132, N.Y. Exec. Law §§ 296(2)(a), 296(6), 297(9), and N.Y.C.

Admin. Code § 8-107(4)(a), 8-107(6), 8-107(15)(a) and 8-502(a).

322.    The New York City Commission on Human Rights has not granted Defendants an

exemption based on bona fide considerations of public policy.

323.    Plaintiff D.H. has not filed a complaint with the New York City Commission on

Human Rights, the State Division on Human Rights, any other court of competent jurisdiction, or

any other administrative agency based upon the unlawful discriminatory practices alleged herein.

80

324.   D.H., who is deaf and communicates by sign language, writing or text message on her phone, suffers from a physical and medical impairment that substantially limits one or more major life activities, including her ability to hear, and therefore qualifies as a disability.

325.   The City and Defendants McKenna, Kinane, Doe NYPD Officer #1, Doe NYPD Officer #2 and Doe NYPD Officer #14 were therefore required to make a reasonable accommodation to enable D.H. to enjoy the rights or privileges of access to the investigative and custodial services provided by the NYPD during D.H.'s arrest.

326.   The City and Defendants McKenna, Kinane, Doe NYPD Officer #1 and Doe NYPD Officer #2 knew or should have known that D.H. was deaf at the time of her arrest, based in part on the fact that D.H. gestured to indicate that she was deaf when Defendants Kinane, Doe NYPD Officer #1 and Doe NYPD Officer #2 approached her during her arrest.  Defendant Doe NYPD Officer #14 knew or should have known that D.H. was deaf during her pre-arraignment detention based on the fact that D.H. stated in writing that she needed a sign language interpreter.

327.   The City and Defendants McKenna, Kinane, Doe NYPD Officer #1, Doe NYPD Officer #2 and Doe NYPD Officer #14, at the time of D.H.'s arrest and throughout her pre-arraignment detention, intentionally and/or with deliberate indifference failed to provide D.H. with a reasonable accommodation, reasonable modification and/or auxiliary aid and service for communicating, insofar as the City and Defendants McKenna, Kinane, Doe NYPD Officer #1, Doe NYPD Officer #2 and Doe NYPD Officer #14 denied D.H. a sign language interpreter, denied D.H. the ability to communicate through a writing or texting instrument and prevented D.H. from communicating with her hands by cuffing them behind her back.  As a result of her inability to communicate, D.H. was not able to learn of the reason for her arrest until the day after her arrest, when she was brought to central booking.  By intentionally denying D.H. any

81

means of communication during her arrest and detention, the City and Defendants McKenna, Kinane, Doe NYPD Officer #1, Doe NYPD Officer #2 and Doe NYPD Officer #14 intentionally and/or with deliberate indifference, discriminated against D.H. on the basis of her disability and denied her the benefit of the services, programs or activities of the NYPD.

328.    In addition, by denying D.H. a reasonable accommodation, reasonable modification and/or auxiliary aid and service for communicating with the police during her arrest, the City and Defendants McKenna, Kinane, Doe NYPD Officer #1, Doe NYPD Officer #2 and Doe NYPD Officer #14 denied, refused and withheld from D.H. access to the accommodations, advantages, facilities and privileges of the NYPD's investigative and custodial services on the same terms as individuals without disabilities.

329.    By denying D.H. a reasonable accommodation, reasonable modification and/or auxiliary aid and service for communicating with the police during her arrest, the City and Defendants McKenna, Kinane, Doe NYPD Officer #1, Doe NYPD Officer #2 and Doe NYPD Officer #14 refused, denied and withheld from D.H. her right to the accommodations, advantages, facilities and privileges of the NYPD's investigative and custodial services under N.Y.C. Admin. Code § 8-107(4)(a) and N.Y. Exec. Law §§ 296(2), as well as D.H.'s right to a reasonable accommodation, reasonable modification and/or auxiliary aid and service under N.Y.C. Admin. Code §§ 8-107(15)(a) and N.Y. Exec. Law §§ 296(2). The City and Defendants McKenna, Kinane, Doe NYPD Officer #1, Doe NYPD Officer #2 and Doe NYPD Officer #14 have also violated N.Y.C. Admin. Code § 8-107(6) and N.Y. Exec. Law § 296(6) by aiding, abetting and inciting others' acts of denying D.H. a reasonable accommodation, reasonable modification and/or auxiliary aid for communicating with police during her arrest, and of

denying, refusing and withholding from D.H. access to the accommodations, advantages, facilities and privileges of the NYPD's investigative and custodial services.

330.   By their above-described actions, the City and Defendants McKenna, Kinane, Doe NYPD Officer #1, Doe NYPD Officer #2 and Doe NYPD Officer #14 also violated D.H.'s right to the benefit of the services, programs or activities of the NYPD, as well as her right to be free from discrimination by Defendants on the basis of disability under 42 U.S.C. § 12132.

331.   The City, as the employer of McKenna, Kinane, Doe NYPD Officer #1, Doe NYPD Officer #2 and Doe NYPD Officer #14 is also liable for those Individual Defendants' unlawful discriminatory practices under 42 U.S.C. § 12132, N.Y. Exec. Law §§ 296(2) and 296(6) and N.Y.C. Admin. Code. §§ 8-107(4)(a), 8-107(6) and 8-107(15)(a), as alleged herein.

332.   The City and Defendant McKenna's, Defendant Kinane's, Defendant Doe NYPD Officer #1's, Defendant Doe NYPD Officer #2's and Defendant Doe NYPD Officer #14's violations of D.H.'s rights under the NYHRL, NYCHRL and 42 U.S.C. § 12132 are the actual, direct and proximate cause of injuries suffered by D.H., as alleged herein.

333.   Plaintiffs have served a copy of the complaint upon the authorized representatives of the New York City Commission on Human Rights and Corporation Counsel.

## Twentieth Claim for Relief

Violation of the Right to Be Free from the Use of Excessive Force Under the Fourth Amendment to the United States Constitution, Article I, § 12 of the New York Constitution and 42 U.S.C. § 1983
(N.H. against Defendant Dawkins)

334.   Plaintiffs hereby reallege and incorporate by reference as if fully set forth herein the allegations in the preceding paragraphs.

335.   By pulling N.H.'s earrings and jewelry off of her person, forcibly pulling on her wig and verbally abusing her, Defendant Dawkins used excessive force against Plaintiff N.H.

and deprived her of her rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. §1983, including, but not limited to rights guaranteed by the Fourth Amendment to the United States Constitution and Article I, § 12 of the New York Constitution.

336.    In so doing, Defendant Dawkins acted intentionally and under color of state law.

337.    The conduct of Defendant Dawkins caused N.H. pain and suffering, as well as psychological and emotional harm.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

338.    Certify this action as a class action on behalf of the proposed Plaintiff Class pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure:  all women of color who have been and/or will be surveilled, stopped, questioned, frisked, searched, seized and/or arrested and detained pursuant to Section 240.37 between September 30, 2013 and the present and the date on which the City is enjoined from or otherwise ceases to enforce Section 240.37.

339.    Declare that Defendants' acts, practices, policies, customs and/or omissions have deprived Plaintiffs of their rights under the First, Fourth and Fourteenth Amendments to the United States Constitution; 42 U.S.C. §§ 1983, 1981; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132; the Constitution of the State of New York; the New York State Civil Rights Law; the New York State Human Rights Law; the New York City Bias-Based Profiling Law and the New York City Human Rights Law.

340.    Declare that Section 240.37 violates the United States Constitution and the New York Constitution on its face and as applied;

341.    Issue preliminary and permanent injunctions restraining the City and its employees, agents and successors from enforcing Section 240.37;

342.    Award compensatory damages for economic harm, pain and suffering and emotional and mental distress to D.H. in an amount to be determined at trial against the City and Defendants Kinane, McKenna, Doe NYPD Officer #1, Doe NYPD Officer #2 and Doe NYPD Officer #14 jointly and severally, together with interest and costs;

343.    Award compensatory damages for economic harm, pain and suffering and emotional and mental distress to N.H. in an amount to be determined at trial against the City and Defendants Dawkins, Keane, McKenna and Doe NYPD Officer #3, jointly and severally, together with interest and costs;

344.    Award compensatory damages for economic harm, pain and suffering and emotional and mental distress to K.H. in an amount to be determined at trial against the City and Defendants Imburgia, Maloney, Doe NYPD Officer #4 and Doe NYPD Officer #5, jointly and severally, together with interest and costs;

345.    Award compensatory damages for economic harm, pain and suffering and emotional and mental distress to Natasha Martin in an amount to be determined at trial against the City and Defendants Allen, Siev, Doe NYPD Officer #6 and Doe NYPD Officer #7, jointly and severally, together with interest and costs;

346.    Award compensatory damages for economic harm, pain and suffering and emotional and mental distress to Tiffaney Grissom in an amount to be determined at trial against the City and Defendants Savarese and Pocalyko jointly and severally, together with interest and costs;

347.    Award compensatory damages for economic harm, pain and suffering and emotional and mental distress to R.G. in an amount to be determined at trial against the City and Defendants Diggs, Gomez and Beddows, jointly and severally, together with interest and costs;

85

348.    Award compensatory damages for economic harm, pain and suffering and emotional and mental distress to A.B. in an amount to be determined at trial against the City and Defendants Salazar, Daverin, Doe NYPD Officer #8 and Doe NYPD Officer #9, jointly and severally, together with interest and costs;

349.    Award compensatory damages for economic harm, pain and suffering and emotional and mental distress to Sarah Marchando in an amount to be determined at trial against the City and Defendants Nicosia, Quinn, Doe NYPD Officer #10, Doe NYPD Officer #11, Doe NYPD Officer #12, Doyle, Yanez and Doe NYPD Officer #13, jointly and severally, together with interest and costs;

350.    Award punitive damages to D.H. in an amount to be determined at trial against Defendants Kinane, McKenna, Doe NYPD Officer #1, Doe NYPD Officer #2 and Doe NYPD Officer #14, whose actions constituted outrageous conduct, were reckless and showed a callous indifference to and willful disregard of D.H.'s rights as set forth above;

351.    Award punitive damages to N.H. in an amount to be determined at trial against Defendants Dawkins, Keane, McKenna and Doe NYPD Officer #3, whose actions constituted outrageous conduct, were reckless and showed a callous indifference to and willful disregard of N.H.'s rights as set forth above;

352.    Award punitive damages to K.H. in an amount to be determined at trial against Defendants Imburgia, Maloney, Doe NYPD Officer #4 and Doe NYPD Officer #5, whose actions constituted outrageous conduct, were reckless and showed a callous indifference to and willful disregard of K.H.'s rights as set forth above;

353.    Award punitive damages to Natasha Martin in an amount to be determined at trial against Defendants Allen, Siev, Doe NYPD Officer #6 and Doe NYPD Officer #7, whose

86

actions constituted outrageous conduct, were reckless and showed a callous indifference to and willful disregard of Ms. Martin's rights as set forth above;

354. Award punitive damages to Tiffaney Grissom in an amount to be determined at trial against Defendants Savarese and Pocalyko, whose actions constituted outrageous conduct, were reckless and showed a callous indifference to and willful disregard of Ms. Grissom's rights as set forth above;

355. Award punitive damages to R.G. in an amount to be determined at trial against Defendants Diggs, Gomez and Beddows, whose actions constituted outrageous conduct, were reckless and showed a callous indifference to and willful disregard of R.G.'s rights as set forth above;

356. Award punitive damages to A.B. in an amount to be determined at trial against Defendants Salazar, Daverin, Doe NYPD Officer #8 and Doe NYPD Officer #9, whose actions constituted outrageous conduct, were reckless and showed a callous indifference to and willful disregard of A.B.'s rights as set forth above;

357. Award punitive damages to Sarah Marchando in an amount to be determined at trial against Defendants Nicosia, Quinn, Doe NYPD Officer #10, Doe NYPD Officer #11, Doe NYPD Officer #12, Doyle, Yanez and Doe NYPD Officer #13, whose actions constituted outrageous conduct, were reckless and showed a callous indifference to and willful disregard of Ms. Marchando's rights as set forth above;

358. Order reasonable attorneys' fees and costs to be paid by Defendants pursuant to 28 U.S.C. § 2414; 42 U.S.C. § 1988; the Americans with Disabilities Act, 42 U.S.C. § 12133; the N.Y. Civ. Rights Law § 79-n(4); the New York City Bias-Based Profiling Law, N.Y.C. Admin.

Code § 14-151(d)(3) and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-502(g); and

359.    Grant such other and further relief as the Court deems just and equitable.

Dated: New York, New York
         September 30, 2016

                      Respectfully submitted,

                      **THE LEGAL AID SOCIETY**

                      By:

                      Seymour W. James
                      *swjames@legal-aid.org*
                      William D. Gibney
                      *wdgibney@legal-aid.org*
                      Kimberly Forte
                      *kforte@legal-aid.org*
                      Kate Mogulescu
                      *kamogulescu@legal-aid.org*
                      Cynthia H. Conti-Cook
                      *cconti-cook@legal-aid.org*

                      199 Water Street, 6th Fl.
                      New York, NY 10038
                      Tel: (212) 577-3300

                      **CLEARY GOTTLIEB STEEN & HAMILTON LLP**

                      By:

                      Lawrence B. Friedman
                      *lfriedman@cgsh.com*
                      Rishi N. Zutshi
                      *rzutshi@cgsh.com*
                      Anna F. Connolly
                      *aconnolly@cgsh.com*

                      One Liberty Plaza
                      New York, NY 10006
                      Tel: (212) 225-2000
                      Fax: (212) 225-3999

                      *Attorneys for Plaintiffs*