UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
D.H., N.H., K.H. f/k/a J.H., NATASHA MARTIN,
TIFFANEY GRISSOM, ROSA GONZALEZ,
ADRIENNE BANKSTON, and SARAH
MARCHANDO, individually and on behalf of a
class of all others similarly situated,

                              Plaintiffs,                              16 Civ. 7698 (PKC)(KNF)

            -against-

                                                                      MEMORANDUM
                                                                      AND ORDER

THE CITY OF NEW YORK, SEAN KINANE,
JOSEPH MCKENNA, KAYAN DAWKINS,
THOMAS KEANE, MARIA IMBURGIA, KEVIN
MALONEY, JOEL ALLEN, DAVE SIEV, BRYAN
POCALYKO, CHRISTOPHER SALAZAR, HENRY
DAVERIN, JOSEPH NICOSIA, KELLY QUINN,
ALEXIS YANEZ, MICHAEL DOYLE, and
JOHN/JANE DOE NYPD POLICE OFFICERS #1-14,

                              Defendants.
-------------------------------------------------------------x

CASTEL, U.S.D.J.

        D.H., N.H., K.H., Natasha Martin, and Tiffaney Grissom, who are transgender,

and Rosa Gonzalez, Adrienne Bankston, and Sarah Marchando, who are not, are eight women of

color who were arrested under New York's prohibition against loitering for the purpose of

prostitution, N.Y. Penal Law § 240.37(2). Each maintains that she was arrested for "doing

nothing more than walking down the street in the neighborhood[] where [she] live[s]." (Dkt. 93

at 1). The charges against plaintiffs were ultimately either dismissed or adjourned in

contemplation of dismissal. (Amended Complaint ("AC") ¶¶ 123, 140, 155, 175, 190, 203, 215,

237). They have filed suit against the City of New York ("City") and numerous officers in the

New York Police Department ("NYPD"), asserting twenty claims under federal and state law, thirteen of which are also raised on behalf of a putative class.  In the main, they challenge the constitutionality of New York's prohibition against loitering for the purpose of prostitution, the City's policies and customs concerning its implementation, and the legality of its enforcement against them.  (AC ¶¶ 240–337).

The key provision at issue on this motion is section 240.37 of the New York Penal Law, which provides, in relevant part, as follows:

> Any person who remains or wanders about in a public place and repeatedly beckons to, or repeatedly stops, or repeatedly attempts to stop, or repeatedly attempts to engage passers-by in conversation, or repeatedly stops or attempts to stop motor vehicles, or repeatedly interferes with the free passage of other persons, for the purpose of prostitution as that term is defined in article two hundred thirty of this part, shall be guilty of a violation and is guilty of a class B misdemeanor if such person has previously been convicted of a violation of this section or of section 230.00 of this part.

In their amended complaint, plaintiffs assert that section 240.37 is unconstitutionally vague and overbroad, resulting in "inconsistent and arbitrary enforcement." (AC ¶¶ 8, 240–251).  They also allege, among other things, that defendants subjected plaintiffs to intentional discrimination on the basis of race, gender, or gender identity, arrested them without probable cause, arrested them for activity protected by the First Amendment, infringed their liberty interests in "self-expression, bodily integrity and privacy," and engaged in unlawful, bias-based profiling.  (AC ¶¶ 252–319).  Plaintiffs further assert that the officers of the 52nd Precinct conspired to perform "sweeps" to arrest the transgender plaintiffs "for their status as transgender women."  (AC ¶¶ 280–83).  For these claims, plaintiffs request declaratory relief that

2

section 240.37 is void and that defendants have violated plaintiffs' rights.  (AC ¶¶ 339–40).

They also seek an injunction restraining the City from enforcing section 240.37, as well as

compensatory and punitive damages.  (AC ¶¶ 341–57).  In addition, plaintiffs raise five

individual claims against the individual defendants.  (AC ¶¶ 304–19).  D.H., who is deaf, also

asserts a claim against several of the individual defendants under the Americans with Disabilities

Act ("ADA"), 42 U.S.C. §§ 12101 et seq., and analogous state laws for actions occurring during

and after her arrest, (AC ¶¶ 320–33), and N.H. raises an excessive force claim under state and

federal law against defendant Dawkins for actions occurring after her arrest, (AC ¶¶ 334–37).

Defendants have moved for partial dismissal of the amended complaint.  (Dkt.

87).  On this motion, defendants do not challenge plaintiffs' section 1983 claims for damages

against the individual defendants for alleged violations of plaintiffs' rights to "self-expression,

bodily integrity and privacy," freedom of speech, and freedom from unreasonable seizures.  Nor

do they challenge D.H.'s claim for damages under the ADA, or N.H.'s section 1983 excessive

force damages claim.  They have, however, moved pursuant to Rule 12(b)(1), Fed. R. Civ. P., to

dismiss all of plaintiffs' claims insofar as they seek declaratory or injunctive relief.  They have

also moved under Rule 12(b)(6), Fed. R. Civ. P., to dismiss plaintiffs' claims challenging

section 240.37 on vagueness and overbreadth grounds and to dismiss plaintiffs' other claims on

various grounds that will be explained.  For the reasons to follow, defendants' motion is granted

in part and denied in part.

DISCUSSION

   I.   <u>Rule 12(b)(1)</u>

Defendants argue that plaintiffs lack standing to seek declaratory and injunctive

relief for two reasons.  First, they assert that plaintiffs have not established an injury in fact

"because [plaintiffs have] failed to plead a sufficient likelihood of future harm from[,] and the existence of an official policy or its equivalent regarding the NYPD's enforcement of[,] [section] 240.37." (Dkt. 89 at 6).  Second, defendants argue that plaintiffs have not adequately established that the requested declaratory or injunctive relief would likely redress the alleged injuries.  Although not raised by defendants, the Court will also address whether the alleged injuries are fairly traceable to the actions of defendants.  Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 198 (2d Cir. 2005) ("Because . . . standing . . . goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*.").

Dismissal of a suit under Rule 12(b)(1) is proper "when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  Article III of the United States Constitution predicates the federal courts' adjudicatory power on the presence of standing, an inherent element of the "case-or-controversy requirement." Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269, 273 (2008).  The "'irreducible constitutional minimum' of standing" requires that "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).

At the pleading stage, the Court's task is to determine whether a plaintiff has "allege[d] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." John v. Whole Foods Mkt. Grp., Inc., 858 F.3d 732, 736 (2d Cir. 2017) (second alteration in original) (quoting Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56 (2d Cir. 2016)).  Plaintiffs

4

must do so on their own; that is, they "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." Warth v. Seldin, 422 U.S. 490, 502 (1975). The Court "accept[s] as true all material allegations of the complaint . . . and construe[s] the complaint in favor of the complaining party." W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP, 549 F.3d 100, 106 (2d Cir. 2008) (quoting United States v. Vazquez, 145 F.3d 74, 81 (2d Cir. 1998)).

       a.  Injury in Fact

       "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, 136 S. Ct. at 1548 (quoting Lujan, 504 U.S. at 560). When the relief requested is prospective, such as a declaratory judgment or an injunction, a plaintiff must adequately allege "a sufficient likelihood that he [or she] will again be wronged in a similar way." Marcavage v. City of New York, 689 F.3d 98, 103 (2d Cir. 2012) (alteration in original) (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983)). To make this showing, it is not necessary for "a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." Knife Rights, Inc. v. Vance, 802 F.3d 377, 384 (2d Cir. 2015) (quoting MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128–29 (2007)). Rather, for preenforcement statutory challenges, it is sufficient to "allege[] 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute,'" so long as "there exists a credible threat of prosecution thereunder." Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2342 (2014) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)). "Put differently, . . . a plaintiff has standing to make a

5

preenforcement challenge 'when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative.'" Hedges v. Obama, 724 F.3d 170, 196 (2d Cir. 2013) (quoting Babbitt, 442 U.S. at 302).

Nevertheless, "[t]he identification of a credible threat sufficient to satisfy the imminence requirement of injury in fact necessarily depends on the particular circumstances at issue," and "[a] credible threat of prosecution . . . cannot rest on fears that are 'imaginary or speculative.'" Knife Rights, 802 F.3d at 384 (quoting Babbitt, 442 U.S. at 298). Only one plaintiff needs to establish standing for any given claim, as "[i]t is well settled that where . . . multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 109 (2d Cir. 2017) (quoting Rumsfeld v. Forum of Acad. & Inst. Rights, Inc., 547 U.S. 47, 52 n.2 (2006)).

Plaintiffs contend that their past arrests under section 240.37 were "for doing nothing more than walking down the street in the neighborhoods where they live." (Dkt. 93 at 1). In other words, each plaintiff denies that she engaged in any activity prohibited under section 240.37. Instead, plaintiffs contend that defendants "falsely alleged" in documents supporting the arrests that they witnessed plaintiffs engage in conduct unlawful under the statute. (AC ¶¶ 121, 138, 153, 171, 187, 200, 213, 228, 234). Because plaintiffs deny having engaged in conduct prohibited by the statute, they do not allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute." Babbitt, 442 U.S. at 298. Rather, it is plaintiffs' status as women of color—and, for certain plaintiffs, transgender women of color—who have been arrested for prostitution-related offenses, not their planned course of conduct, that they say fuels their fears of criminal prosecution under

6

section 240.37.  As plaintiffs put it, "this is not a case in which [they] can minimize the likelihood of a future encounter simply by refraining from unlawful activity."  (Dkt. 93 at 5 n.4).

Plaintiffs assert that injury is nonetheless imminent.  In support, they principally rely on three allegations.  First, that "NYPD officers recognize Plaintiffs whom they have previously arrested for prostitution-related charges and arrest those women again without probable cause based merely on the prior arrest."  (AC ¶ 84).  Second, that plaintiff Marchando was arrested twice under section 240.37 in the span of eight days, that plaintiff Grissom "has been repeatedly followed, stopped, questioned, arrested and detained for loitering for the purpose of prostitution," and that this pattern of repeated arrests establishes that injury is imminent for them.  (AC ¶¶ 181, 219–39).  Third, that one defendant, after arresting N.H. during a "sweep," stated to N.H., who is transgender, and a group of other transgender arrestees that "if they saw 'girls like them' outside after midnight, they would arrest them."  (AC ¶ 134).  Plaintiffs argue that this statement evinces a credible threat of future harm because a week later, officers arrested K.H, who is also transgender, and another transgender woman walking with K.H. during another "sweep" even though the two women had purportedly not engaged in any conduct proscribed by the statute.  (AC ¶¶ 146, 153).

Allegations of past unlawful arrests alone do not suffice to allege an injury in fact.  Although past wrongs provide "evidence bearing on 'whether there is a real and immediate threat of repeated injury,'" they "do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy."  Lyons, 461 U.S. at 102, 103 (quoting O'Shea v. Littleton, 414 U.S. 488, 496 (1974)).  The allegation that officers have arrested plaintiffs based solely on previous arrests for prostitution offenses is too attenuated from the pivotal question—that is, the question of imminence.  The allegation requires the Court to

7

assume that an officer who sees a plaintiff will recognize the plaintiff, that the officer will know (and remember) that the plaintiff was previously arrested for prostitution-related charges, and that the officer will arrest the plaintiff under section 240.37 regardless of whether the plaintiff is engaged in any activity proscribed by the statute.  This chain of inferences is too weak to demonstrate standing.

But N.H. has plausibly alleged that injury is imminent for her.  She has alleged that she has received a specific threat by an officer that if "they," plausibly meaning officers from the 52nd Precinct, see "girls like [her]," plausibly meaning transgender women, out after midnight, the officers will arrest them.  (AC ¶ 134).  The alleged unlawful arrests under section 240.37 of K.H. and another transgender woman by other officers from the 52nd Precinct a week later "is good evidence that the threat of enforcement is not 'chimerical.'"  Susan B. Anthony List, 134 S. Ct. at 2345 (quoting Steffel v. Thompson, 415 U.S. 452, 459 (1974)).  Furthermore, the Court notes that "N.H. has tried to avoid going out late at night" and that "[s]he usually reserves for daylight hours even simple errands . . . to reduce the risk that she will be improperly arrested."  (AC ¶ 141).  These allegations support the inference that she has not ceased the course of conduct that falls within the threat of arrest.  (Id.) ("tried to avoid," "usually reserves").  N.H.'s "own action (or inaction)" reduced "the imminent threat of prosecution," but it did "not eliminate Article III jurisdiction."  MedImmune, 549 U.S. at 129.  Because N.H. has plausibly alleged a claim of imminent and unlawful action by officers of the 52nd Precinct, she may pursue declaratory and injunctive relief.  Such relief, if granted, may impact others, including plaintiffs and non-plaintiffs.

Defendants argue that plaintiffs lack standing to seek declaratory or injunctive relief even if injury is likely because plaintiffs have not established the existence of an official

policy or its equivalent.  In support, they rely on Shain v. Ellison, 356 F.3d 211 (2d Cir. 2004), which stated, in dicta, that a plaintiff seeking prospective relief "must demonstrate *both* a likelihood of future harm *and* the existence of an official policy or its equivalent." Id. at 216.  As discussed below, the Court agrees that plaintiffs have failed to demonstrate the existence of an official policy.

The Second Circuit has not revisited the issue of what constitutes the "equivalent" of an official policy.  District courts in this Circuit have generally construed the existence of an official policy or its equivalent as coextensive with the "policy" or "custom" requirement of municipal liability under 42 U.S.C. § 1983.  See An v. City of New York, No. 16 cv 5381 (LGS), 2017 WL 2376576, at *3 (S.D.N.Y. June 1, 2017) (collecting cases); see also City of Canton v. Harris, 489 U.S. 378, 385–92 (1989) (discussing the requirements of municipal liability).  The Second Circuit provided some insight in a non-precedential summary order, Peck v. Baldwinsville Cent. Sch. Dist., 351 F. App'x 477 (2d Cir. 2009) (summary order).  Citing Shain, it held that the plaintiff did not have standing to seek declaratory or injunctive relief in part because the plaintiff did not point to a "policy or custom (or an equivalent) suggesting that any defendant regularly violates [the plaintiff's] . . . rights." Id. at 479.

This Court concludes that a policy, custom, or its equivalent suffices under Shain and that the alleged threat made to N.H. coupled with the arrest of K.H. adequately alleges at least the equivalent of a policy or custom within the 52nd Precinct of unlawfully arresting transgender women on the street after midnight.  She has thus adequately and plausibly alleged the equivalent of an official policy sufficient to support her standing to seek declaratory and injunctive relief against the named officers of the 52nd Precinct and the City, which may be a necessary party to ensure meaningful relief.

9

Finally, the Court determines that D.H. does not have standing to seek declaratory or injunctive relief for her claim arising from the purported failure of some defendants to provide reasonable accommodations during her arrest, (AC ¶¶ 320–33), and that N.H. does not have standing to seek declaratory or injunctive relief for her claim for excessive force following her arrest, (AC ¶¶ 334–37). Plaintiffs have not alleged any facts to suggest that these purported violations will occur again and thus do not have standing to pursue declaratory or injunctive relief for these claims.

      b.   Traceability

A plaintiff lacks standing if the alleged injury is not fairly traceable "to the challenged action of the defendant." St. Pierre v. Dyer, 208 F.3d 394, 401 (2d Cir. 2000) (quoting Lujan, 504 U.S. at 560). That is, plaintiffs must plausibly allege that "the asserted injury was the consequence of the defendants' actions." Rothstein v. UBS AG, 708 F.3d 82, 91 (2d Cir. 2013) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 45 (1976)). Although the challenged actions need not be the proximate cause of the alleged injury, there must exist some "causal nexus between the defendant's conduct and the injury." Id. at 92 (quoting Heldman ex rel. T.H. v. Sobol, 962 F.2d 148, 156 (2d Cir. 1992)).

N.H., the only plaintiff to have alleged facts demonstrating an injury in fact, has not adequately alleged that her specific injury is fairly traceable to any defendant discriminating based on her gender, as distinguished from gender identity or race. N.H.'s claim is predicated on the officers of the 52nd Precinct targeting her because she is transgender. (AC ¶ 15). She has not plausibly alleged any facts from which the Court could infer a causal nexus between the threat of future arrest and discriminatory conduct on the basis of gender or race. Additionally, she has not plausibly alleged that her injury in fact could be traced to the conduct of any

defendant outside the 52nd Precinct. N.H.'s injury in fact is based on a threat; there is nothing comparable concerning the individual defendants in the other precincts from which the Court could infer that her injury could be traced to those defendants.

Finally, even if the Court assumes that all plaintiffs have alleged an injury in fact, no injury would be fairly traceable to the alleged vagueness or overbreadth of section 240.37. The Court accepts as true, as it must, that plaintiffs were arrested "for engaging in innocent activities such as walking down the street, sitting on a bench, riding on a public bus and speaking to other individuals on a public street." (AC ¶ 242). This conduct does not conceivably fall within the statute, and plaintiffs do not plead that uncertainty over the conduct prohibited by the statute resulted in their arrests. Rather, they plead that defendants, for each arrest, "falsely alleged" witnessing plaintiffs engage in conduct that section 240.37 prohibits. (AC ¶¶ 121, 138, 153, 171, 187, 200, 213, 228, 234). It is alleged dishonesty and discriminatory animus that underlie plaintiffs' allegations, not vagueness or overbreadth. The requisite causal nexus does not exist, and, thus, plaintiffs' vagueness and overbreadth claims will be dismissed.[1]

   c.  Redressability

Defendants contend that neither declaratory nor injunctive relief will redress plaintiffs' injuries. They reason that because plaintiffs have alleged that defendants "lied about what they observed," not that defendants "were unclear about what [section] 240.37 permitted," "the statutory construction of [section] 240.37 is irrelevant," and there is no need for training or declaratory relief regarding the correct interpretation of the statute. (Dkt. 89 at 13–14).

---

[1] Even though the Court concludes that plaintiffs, bound by their pleadings, do not have standing to raise a void-for-vagueness or overbreadth challenge, the Court will address in the context of the Rule 12(b)(6) motion the merits of the claim on a provisional basis.

Plaintiffs have requested an injunction against the enforcement of section 240.37. The Court concludes that N.H.'s injury would "likely . . . be redressed by a favorable judicial decision" that precluded defendants from the 52nd Precinct from enforcing the statute in a particular manner. Spokeo, 136 S. Ct. at 1547. To the extent plaintiffs have adequately alleged an injury in fact, it is because harm is imminent, and declaratory relief is likely to eliminate the prospect of that harm. The scope and nature of any injunctive relief is an issue to be resolved, if at all, down the road. It suffices to note that a court of equity may fashion injunctive relief appropriate to the circumstances.

For the reasons stated, plaintiffs' vagueness and overbreadth claims, D.H.'s claim under the ADA, and N.H.'s claim alleging excessive force claim will be dismissed under Rule 12(b)(1) insofar as these claims seek declaratory or injunctive relief. Plaintiffs' discrimination claims, insofar as they seek declaratory or injunctive relief, will also be dismissed under Rule 12(b)(1), with the exception that N.H. may seek declaratory and injunctive relief for discrimination on the basis of gender identity. All of plaintiffs' other claims, insofar as they seek declaratory or injunctive relief, will be dismissed under Rule 12(b)(1) against all defendants, except that N.H. may seek such relief from the City and individual defendants in the 52nd Precinct.

A plaintiff's lack of standing to assert a claim for declaratory or injunctive relief does not foreclose her ability to pursue claims in this action for money damages for actionable wrongs inflicted by a defendant. Nicosia v. Amazon.com, Inc., 834 F.3d 220, 239 (2d Cir. 2016) ("Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way.").

II.     Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In assessing such a motion, the Court disregards legal conclusions, examines only the well-pleaded factual allegations, which the Court accepts as true, and draws all reasonable inferences in plaintiffs' favor.  See id. at 678–79; Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 119 (2d Cir. 2012).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Austin v. Town of Farmington, 826 F.3d 622, 630 (2d Cir. 2016) (quoting Iqbal, 556 U.S. at 678).  "'[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,' however, dismissal is appropriate."  Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Iqbal, 556 U.S. at 679).

a.     Void for Vagueness

Plaintiffs allege that section 240.37 is unconstitutionally vague.  (AC ¶¶ 240–44).[2] Fundamental to due process of law is "the principle that '[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of . . . statutes.'"  Cunney v. Bd. of Trs., 660 F.3d 612, 620 (2d Cir. 2011) (alterations in original) (quoting Cramp v. Bd. of Pub. Instruction, 368 U.S. 278, 287 (1961)).  To that end, courts require "that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what

---

[2] The standing argument on the vagueness challenge bleeds into the question of whether a claim is plausibly alleged. As noted, the Court has concluded that no plaintiff has adequately alleged a causal nexus between the vagueness of the statute and their alleged injuries, and, thus, plaintiffs lack standing.  The Court addresses the vagueness claim on the merits in an abundance of caution.

conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983).   Thus, a penal statute cannot stand if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000).

In assessing vagueness, the Court "is relegated to the words of the law, the interpretations the relevant courts have given to analogous statutes, 'and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it.'" Commack Self-Serv. Kosher Meats, Inc. v. Hooker, 680 F.3d 194, 213 (2d Cir. 2012) (quoting Grayned v. City of Rockford, 408 U.S. 104, 110 (1972)).  The Court must also "take the statute as though it read precisely as the highest court of the State has interpreted it." Kolender, 461 U.S. at 357 n.4 (quoting Minnesota ex rel. Pearson v. Prob. Court, 309 U.S. 270, 273 (1940)).

This is not the first time section 240.37 has been challenged on vagueness grounds.  In People v. Smith, 378 N.E.2d 1032 (N.Y. 1978), the New York Court of Appeals held that section 240.37 is not unconstitutionally vague, reasoning that the statute does not grant officers "an impermissible measure of discretion." Id. at 1036.  The court noted that section 240.37 "explicitly limits its reach to loitering . . . for the purpose of committing a specific offense," a "distinctive characteristic" that the court concluded differentiated section 240.37 from statutes in other states held to be unconstitutionally vague. Id. at 1035.  It also observed that although "[t]here is . . . a remote possibility that a person involved in innocent conversation, such as a pollster or one seeking directions, might be arrested, . . . that is not envisioned by the statute and the mere fact that an officer in a particular case did not have probable cause to arrest that defendant would not warrant the invalidation of the statute." Id. at 1036.

14

Consistent with the reasoning and conclusion of the New York Court of Appeals,[3] this Court concludes that section 240.37 is not "so vague that [people] of common intelligence must necessarily guess at its meaning and differ as to its application." United States v. Lanier, 520 U.S. 259, 266 (1997). It proscribes, "in words of common understanding," specific, repeated conduct occurring in specific places. Cameron v. Johnson, 390 U.S. 611, 616 (1968). Section 240.37 also limits its reach to conduct engaged in "for the purpose of prostitution," supplying the statute with a mens rea requirement, which "'alleviate[s] vagueness concerns,' 'narrow[s] the scope of [the statute's] prohibition[,] and limit[s] prosecutorial discretion." McFadden v. United States, 135 S. Ct. 2298, 2307 (2015) (third alteration not in original) (quoting Gonzales v. Carhart, 550 U.S. 124, 149, 150 (2007)); see also People v. Smith, 591 N.E.2d 1132, 1133 (N.Y. 1992) ("Logically, a defendant cannot act with a specified purpose unless an intent is formed to carry out that purpose."). This limiting language is significant, as it "has long [been] recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*." Colautti v. Franklin, 439 U.S. 379, 395 (1979) (second alteration in original).

These components of section 240.37 coalesce to provide fair notice of what the statute prohibits. It does not leave a person who, for example, "repeatedly beckons," or "repeatedly stops," or "repeatedly attempts . . . to engage,"§ 240.37(2), others in a public place for the purpose of "engag[ing] or agree[ing] or offer[ing] to engage in sexual conduct with another person in return for a fee," N.Y. Penal Law § 230.00, to wonder whether he or she has

---

[3] The New York Court of Appeals did not assess whether section 240.37 fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits because the defendant did "not declare that the statute fails to furnish adequate notice of the conduct declared to be criminal." Smith, 378 N.E.2d at 1035. The court's analysis in Smith, however, is at least relevant to both vagueness inquiries.

run afoul of the statute.  Nor must people of common intelligence "necessarily guess" as to whether repeatedly beckoning, stopping, or attempting to engage others in a public place for reasons other than to engage in sexual conduct in return for a fee is outside the strictures of section 240.37.  Lanier, 520 U.S. at 266.

Plaintiffs contend that the statute encourages arbitrary or discriminatory enforcement.  They argue that because the statute fails to define the word "purpose" or to provide any objective criteria through which an officer may discern that conduct covered by the statute is taken "for the purpose of prostitution," section 240.37 allows an arrest to "turn[] entirely on the subjective views of a police officer, who is left to decide whether innocent behavior is for the 'purpose' of prostitution based on a variety of reasons not enumerated in the statute."  (Dkt. 93 at 8).  But criminal statutes often contain a "purpose" requirement that requires inferences to be drawn as to a person's intent or state of mind.  For example, in Hill v. Colorado, the Supreme Court upheld against a vagueness challenge a statute that prohibited "any person to 'knowingly approach' within eight feet of another person, without that person's consent, 'for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person'" within 100 feet of the entrance of a health care facility.  530 U.S. at 707, 733 (quoting Colo. Rev. Stat. § 18-9-122(3)).  It did so even though the statute did not define the phrase "for the purpose of" and did not provide objective criteria for an officer to determine whether a person was "knowingly approach[ing]" within eight feet of another person or whether that person's approach was "for the purpose of," for example, educating or counseling others through oral communication, actions which the Supreme Court noted "are protected by the First Amendment."  Id. at 715.  As the Supreme Court recognized, enforcement of a criminal statute always "requires the exercise of some degree

16

of police judgment." <u>Id.</u> at 733.  What matters is whether the degree of police judgment is acceptable.  <u>Id.</u>  It is here.

The statute does not "confer[] on police a virtually unrestrained power to arrest and charge persons with a violation," nor does it "furnish[] a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure.'"  <u>Kolender</u>, 461 U.S. at 360 (quoting <u>Lewis v. City of New Orleans</u>, 415 U.S. 130, 135 (1974) (Powell, J., concurring); <u>Papachristou v. City of Jacksonville</u>, 405 U.S. 156, 170 (1972)).  Rather, it constrains police discretion by specifying certain conduct that an officer must observe—conduct which the statute requires to occur repeatedly—and by limiting its reach to conduct done for the purpose of prostitution.

Erroneous arrests are inherent in a criminal justice system in which arrests are predicated on probable cause, which requires only "a reasonable ground for belief of guilt" and "deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  <u>Maryland v. Pringle</u>, 540 U.S. 366, 370, 371 (2003) (quoting <u>Brinegar v. United States</u>, 338 U.S. 160, 175 (1949); <u>Illinois v. Gates</u>, 462 U.S. 213, 231 (1983)).  That officers might mistakenly determine that a person's conduct was "for the purpose of prostitution" does not mean that the legislature has not done what is required of it— that it has not "made the basic policy choices," "given fair warning as to what is prohibited," and "'define[d] boundaries sufficiently distinct' for citizens, policemen, juries, and appellate judges."  <u>Grayned</u>, 408 U.S. at 114 (quoting <u>City of Chicago v. Fort</u>, 262 N.E.2d 473, 476 (Ill. 1970)).

Finally, plaintiffs argue that officers will enforce, and have enforced, section 240.37 "based solely on a prior prostitution-related arrest, even if the charges were unsubstantiated and dismissed."  (Dkt. 93 at 8).  But a plain reading of the text of section 240.37

17

does not allow arrests based solely on a person's status.  The New York Court of Appeals has construed section 240.37 as "not authoriz[ing] an arrest or conviction based on simple loitering by a known prostitute or anyone else."  Smith, 378 N.E.2d at 1036.  "[I]t requires loitering plus additional objective conduct evincing that the observed activities are for the purpose of prostitution."  Id.  The statute plainly requires more than mere loitering by a prostitute, and the Court is bound to accept the New York Court of Appeals' construction of the statute.  Kolender, 461 U.S. at 357 n.4.  Plaintiffs have not plausibly alleged that section 240.37 is unconstitutionally vague.  The claim will be dismissed.

b.  Overbreadth

The overbreadth doctrine permits a party to claim "that although a statute did not violate his or her First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them."  Farrell v. Burke, 449 F.3d 470, 498 (2d Cir. 2006). "All overbreadth challenges are facial challenges," id., and a statute is facially invalid for overbreadth "if it prohibits a substantial amount of protected speech," United States v. Williams, 553 U.S. 285, 292 (2008).  "Invalidation for overbreadth is 'strong medicine' that is not to be 'casually employed.'"  Id. at 293 (quoting L.A. Police Dep't v. United Reporting Pub. Corp., 528 U.S. 32, 39 (1999)).

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."  Id. at 293.  Section 240.37 reaches only conduct taken for the purpose of engaging in an illegal transaction—prostitution.  This statutory limitation is fatal to plaintiffs' overbreadth challenge, for "[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection."  Id. at 297.  Although plaintiffs have alleged that they were not engaged

18

in prostitution-related speech when they were arrested, the statute, by its terms, does not "prohibit[]" or "reach[]" such speech.  Id. at 292, 293.  Section 240.37, on its face, does not reach any protected speech, much less a substantial amount.  Plaintiffs have not plausibly alleged that the statute is overbroad, and the claim will be dismissed.[4]

     c.  Intentional Discrimination

Defendants have also moved to dismiss plaintiffs' discrimination claims, arguing that plaintiffs have not plausibly alleged intentional discrimination.[5]  For these claims, discriminatory intent must be at least a "motivating factor" for the challenged conduct.  Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 438 (2d Cir. 2009).  A discriminatory effect is not enough to support a claim of intentional discrimination; instead, a plaintiff must allege facts that allow a plausible inference that the defendant "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  Hayden v. Paterson, 594 F.3d 150, 163 (2d Cir. 2010).  "Because discriminatory intent is rarely susceptible to direct proof, litigants may make a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  Id.

Certain plaintiffs have adequately alleged that certain individual defendants have discriminated against them on the basis of gender, gender identity, or race.  For example, plaintiff Grissom has plausibly alleged that defendants Savarese and Pocalyko, both from the

---

[4] As with plaintiffs' vagueness claim, the Court has concluded that plaintiffs lack standing to challenge the statute for overbreadth.  The Court, however, similarly addresses the overbreadth claim on the merits in an abundance of caution.

[5] Defendants have not moved under Rule 12(b)(6) to dismiss claim thirteen, which asserts a violation of the City's Bias-Based Profiling Law, as it pertains to individual defendants.  N.Y.C. Admin. Code § 14-151.  Accordingly, the analysis in this section does not address this claim.

52nd Precinct, arrested her after she spoke with a man for around thirty to forty-five minutes. (AC ¶ 182). Savarese and Pocalyko did not, however, arrest the man despite the fact that he engaged in the same conduct as Grissom. (Id.) These allegations, along with the purported lack of probable cause and falsification of arrest paperwork, support a plausible inference that these defendants' actions were taken at least in part because of Grissom's gender or gender identity.

Similarly, plaintiff Bankston alleges that defendants Salazar, Doe NYPD Officer #8, and Doe NYPD Officer #9 stopped her when she was observed riding in a car with a man, who was driving the vehicle. (AC ¶ 207–09). The officers allegedly forcibly removed Bankston from the vehicle and accused her of being a prostitute and the man of being her pimp. (AC ¶¶ 208–09). The officers arrested Bankston but did not arrest the man. (AC ¶ 209). During the arrest, these defendants purportedly "verbally abused [Bankston] by using racial slurs." (AC ¶ 210). These allegations, in combination with the alleged facts that the defendants arrested Bankston without probable cause and predicated the arrest on events that did not happen, allow a plausible inference that these defendants intentionally discriminated against Bankston because of her gender or race.

Finally, plaintiffs D.H., N.H., and K.H. have alleged that they were arrested during "sweeps" to allegedly get "girls like them" who were outside after midnight.[6] (AC ¶¶ 112, 128, 134, 146). These allegations, along with the allegations that they were arrested

---

[6] Plaintiff D.H. was arrested by defendants Kinane, Doe NYPD Officer #1 and Doe NYPD Officer #2, plaintiff N.H. was arrested by defendants Dawkins, Keane, Doe NYPD Officer #3, and plaintiff K.H. was arrested by defendants Imburgia, Doe NYPD Officer #4, and Doe NYPD Officer #5. (AC ¶¶ 112, 128, 146).

without probable cause and then lied about what occurred, permit a plausible inference that their arresting officers intentionally discriminated against them because of their gender identity.[7]

Plaintiff Martin contends that defendants Siev, Allen, Doe NYPD Officer #6, and Doe NYPD Officer #7 arrested her, at least in part, because of her race, gender, or gender identity.  (AC ¶¶ 158–77).  But Martin has not alleged any facts to support a plausible inference that this arrest was motivated by discriminatory intent.  After the arrest, Allen purportedly asked "which one of you is going to process the he/she?" while he and the other officers drove Martin to the 83rd Precinct.  (AC ¶ 168).  Martin, however, states that Doe NYPD Officer #6 arrested her after Siev instructed to do so.  (AC ¶ 166).  Allen's comment, while rude, was made after the arrest by an officer that did not have any meaningful role in the allegedly unlawful arrest.  The comment does not support a plausible inference that Martin was "targeted" based on her race, gender, or gender identity.

Plaintiffs attempt to support an inference of intentional discrimination from allegations generally applicable to all individual defendants.  Plaintiffs rely on statistics, observing that women constitute eighty-one percent of arrestees under section 240.37 and that black and Hispanic individuals comprise eighty-five percent of arrestees, but they do not compare these percentages to any helpful baseline.  (AC ¶ 91 n.16; Dkt. 93 at 13).  Because the

---

[7] Defendants additionally move for qualified immunity for the claims alleging discrimination on the basis of gender identity.  Defendants argue, correctly, that the Second Circuit had not held when the actions at issue occurred that transgender plaintiffs are entitled to heightened scrutiny or that discrimination against transgender plaintiffs is a form a sex discrimination.  White v. City of New York, 206 F. Supp. 3d 920, 933 (S.D.N.Y. 2016).  But defendants have not articulated how any "reasonably competent officer" could believe that he or she would have a rational basis to arrest a person, without probable cause, solely because the person is transgender.  Dancy v. McGinley, 843 F.3d 93, 106 (2d Cir. 2016) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  They have thus not "met their required burden of demonstrating the nonexistence of a clearly established right," and qualified immunity is inappropriate at this juncture.  Tellier v. Fields, 280 F.3d 69, 84 (2d Cir. 2000).

usefulness of statistics "depends on all of the surrounding facts and circumstances," it is impossible to assess from these percentages alone—or in conjunction with the demographics of New York City, as plaintiffs have offered—whether there is even disparate treatment of individuals who are loitering for the purpose prostitution or who are arrested under the statute without probable cause, let alone discriminatory intent motivating any individual defendant. Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 340 (1977).  In any event, these statistics cannot plausibly support an intentional discrimination claim against the individual defendants, as "broad statistical evidence, without evidence of specific instances of discrimination, is not relevant to whether any specific individual acted with discriminatory intent or whether any specific individual was the target of discrimination."  Burgis v. N.Y.C. Dep't of Sanitation, 798 F.3d 63, 69 n.5 (2d Cir. 2015).

Plaintiffs also rely on a statement from a former NYPD officer, who is not a party in this case.  He is quoted in a news article as stating that arrest quotas put "pressure on" NYPD officers, causing them to "go for the most vulnerable," "the black, . . . Hispanic, . . . [and] LGBT communit[ies]."  (AC ¶ 78).  As with the statistical evidence, this evidence does not nudge the allegation that any particular defendant acted with discriminatory intent from possible to plausible.

Nor are the allegations that defendants arrested plaintiffs without probable cause and then falsified the arrest paper work indicative of discriminatory intent.  Conduct of this sort is both unlawful and a criminal act, but it does not alone evidence a discriminatory motivation. Without some additional, non-conclusory factual allegation to suggest that the arrests were motivated by discriminatory intent, these events do not "raise a right to relief above the

speculative level," suggesting instead only the "possibility" of discriminatory intent.  Starr, 592

F.3d at 321 (quoting Twombly, 550 U.S. at 555; Iqbal, 556 U.S. at 679).

Finally, plaintiffs argue that defendants discriminated on the basis of gender by

predicating arrests under section 240.37 on whether the arrestee's clothing conformed to gender

stereotypes.  Specifically, they maintain that "officers target women for arrest who wear

stereotypically feminine 'provocative' or 'revealing' clothing" and "police expressions of gender

identity and sexuality by targeting and/or arresting transgender women whose clothing and

appearance do not conform to officers' own subjective notions of gender conforming attire."

(Dkt. 93 at 13–14).  The "obvious alternative explanation" for considering clothing as a part of

the totality of the circumstances giving rise to probable cause for an arrest for loitering for the

purpose of prostitution is that the experience of a reasonable police officer may be that a person

seeking to make known to passers-by their willingness to engage in an act of prostitution will

wear certain types of clothing.  Iqbal, 556 U.S. at 682 (quoting Twombly, 550 U.S. at 567).  "As

between that 'obvious alternative explanation' . . . and the purposeful, invidious discrimination

[plaintiffs] asks [the Court] to infer, discrimination is not a plausible conclusion."  Id. (citation

omitted) (quoting Twombly, 550 U.S. at 567).

      d.  Conspiracy Claim

Defendants have moved to dismiss plaintiffs' federal conspiracy claim.  To state a

claim under 42 U.S.C. § 1985(3), a plaintiff must plausibly allege, among other things, a

conspiracy between "two or more persons" to deprive another of her rights.  As an initial matter,

the amended complaint does not contain any non-conclusory allegation that any defendants

outside the 52nd Precinct engaged in a conspiracy.  The conspiracy claim will therefore be

dismissed against all defendants that were not members of the 52nd Precinct when the allegedly unlawful conduct occurred.

Defendants argue that there was no conspiracy between defendants in the 52nd Precinct because "officers, agents and employees of a single corporate entity," including municipal entities, "are legally incapable of conspiring together." Hartline v. Gallo, 546 F.3d 95, 99 n.3 (2d Cir. 2008). As plaintiffs observe, there is an exception to this general rule. A conspiracy may nevertheless exist between persons within the same entity if they are "motivated by any independent personal stake in achieving the corporation's objective." De Litta v. Village of Mamaroneck, 166 F. App'x 497, 498 (2d Cir. 2005) (summary order) (quoting Girard v. 94th St. & Fifth Ave. Corp., 530 F.2d 66, 71–72 (2d Cir. 1976)). Plaintiffs contend that performance goals and arrest quotas motivated officers to "come up with numbers." (Dkt. 93 at 22). Even if these motives constitute the requisite independent personal stake, the amended complaint is devoid of any allegation that any of these defendants possessed such a motive. That is, plaintiffs have not alleged that one of these defendants needed to make these arrests to meet his or her performance goals and arrest quotas, assuming such goals and quotas existed. Plaintiffs have not plausibly alleged the existence of a conspiracy, and this claim will be dismissed.

e. Municipal Liability

Defendants contend that plaintiffs have not adequately alleged a basis for municipal liability. Under sections 1981 and 1983, a municipality is responsible for only "their own illegal acts" and "cannot be held 'vicariously liable . . . for their employees' actions." Cash v. County of Erie, 654 F.3d 324, 333 (2d Cir. 2011) (quoting Connick v. Thompson, 563 U.S. 51, 60 (2011)); accord Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978) ("[T]he language of § 1983, read against the background of the same legislative history, compels the

24

conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."); see also Patterson v. County of Oneida, 375 F.3d 206, 226 (2d Cir. 2004) ("[W]hen the defendant sued for discrimination under § 1981 or § 1983 is a municipality[,] . . . the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom."). The illegal acts for which the City may be held liable are "the decisions of a [its] lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick, 563 U.S. at 61. When the actions of subordinate employees are at issue, the municipality may be held liable only if the actions are "so manifest as to imply the constructive acquiescence of senior policy-making officials." Littlejohn v. City of New York, 795 F.3d 297, 315 (2d Cir. 2015) (quoting Patterson, 375 F.3d at 226).

Plaintiffs argue that the City may be held liable for several of its municipal acts. They cite the NYPD Patrol Guide, which states that an arresting officer, in addition to drafting a complaint detailing the behavior of the arrestee, should "[i]nform [the] assistant district attorney of actions or any additional pertinent information," including whether the arrestee is a "known prostitute" or "[c]onsorts with known prostitutes or pimps." (AC ¶ 83). They allege that this policy has resulted in officers arresting women without probable cause based merely on a prior prostitution-related arrest. (AC ¶ 84). They also allege that officers, in documenting the arrests, use pre-printed affidavits provided by prosecutors and check a box on the affidavit that indicates that the arrestee was "dressed in provocative or revealing clothing" but that the officers often do so merely as pretext. (AC ¶ 86). Finally, they claim that the City has implemented performance goals and arrest quotas and that its decision to do so has resulted in unlawful arrests under section 240.37. (AC ¶¶ 70, 76–79).

25

To establish municipal liability on the basis of these acts, plaintiffs must "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 407 (1997) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)). "'Deliberate indifference' is a stringent standard of fault" that requires "a plaintiff [to] show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights." Jones v. Town of E. Haven, 691 F.3d 72, 81 (2d Cir. 2012) (quoting Brown, 520 U.S. at 410).

In an attempt to establish the City's awareness of the purported unlawful enforcement of section 240.37, the amended complaint references three lawsuits since 2008 in which the plaintiffs in those lawsuits alleged that NYPD officers effected unlawful arrests under section 240.37, none of which resulted in a finding of liability or an admission of liability. (AC ¶ 101 n.26; Dkt. 88 ¶¶ 3–5). Three allegations of wrongdoing over the course of eight years in a police department with more than 35,000 officers do not indicate that that unlawful enforcement of the statute is a known or obvious result. See An v. City of New York, 230 F. Supp. 3d 224, 231 (S.D.N.Y. 2017) (stating that "six lawsuits and one newspaper article over the span of four years is insufficient" to plead deliberate indifference). Further, plaintiffs have not asserted that any of these alleged unlawful arrests were related to the challenged municipal acts, nor have they indicated that the City failed to take any remedial action after the lawsuits were initiated. See id. (holding that the plaintiffs did not adequately state a claim that the City was deliberately indifferent to the risk of constitutional injury because they did not allege "specific facts regarding whether the City investigated or disciplined" the officers in the suits allegedly providing notice of a constitutional injury); Walker v. City of New York, No. 14 Civ. 808 (ER), 2015 WL

26

4254026, at *11 (S.D.N.Y. July 14, 2015) (same); Calderon v. City of New York, 138 F. Supp. 3d 593, 614 (S.D.N.Y. 2015) (same).

Additionally, plaintiffs present a statement from a former NYPD officer that performance goals and arrest quotas cause officers to target the black, Hispanic, and LGBT communities.  (AC ¶ 78).  This statement was made on March 1, 2016—after each of the alleged violations.  (AC ¶¶ 78 n.13, 110, 128, 146, 160, 183, 195, 207, 221, 230).  Even if the Court assumes that a statement by a single officer in a department with over 35,000 officers would suffice to establish that unlawful enforcement is a known or obvious result of performance goals and arrest quotas, the City would not have known, based on that statement, until after the alleged the violations occurred, meaning that deliberate indifference in light of this allegation could not have caused plaintiffs' injuries.  Plaintiffs have not adequately alleged that the City was deliberately indifferent.

For this reason, plaintiffs' failure-to-train and Title VI arguments also fail. Connick, 563 U.S. at 61 ("[A] municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'"  (quoting Harris, 489 U.S. at 388) (second alteration in original)); cf. Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 666 (2d Cir. 2012) (holding that a school district cannot be held liable under Title VI unless it had actual knowledge of discrimination and was deliberately indifferent to it); see also Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 287–88 (1998) (rejecting respondeat superior liability under Title IX); Goonewardena v. New York, 475 F. Supp. 2d 310, 328 (S.D.N.Y. 2007) ("Liability under Title VI, which parallels that of Title IX, cannot be imputed to institutions based on the actions of their employees.").  Although the amended complaint lists lawsuits in which five of the

27

defendants "allegedly abused their discretion while carrying out" stops or arrests unrelated to section 240.37, plaintiffs have not alleged what steps the City did or did not take after learning of the lawsuits.  (AC ¶ 100 & n.25).  Moreover, they have "not identified a specific deficiency in the training program that accounts for [an] unlawful arrest."  Jenkins v. City of New York, 478 F.3d 76, 95 (2d Cir. 2007).

Plaintiffs also contend that constitutional deprivations under section 240.37 are so widespread as to amount to an actionable custom, relying heavily on the facts underlying the arrests in this case.  A handful of arrests over three years does not plausibly evince a problem "so manifest as to imply the constructive acquiescence of senior policy-making officials." Littlejohn, 795 F.3d at 315 (quoting Patterson, 375 F.3d at 226).   A claim solely premised upon the percentage of women and black and Hispanic individuals arrested under the statute fails to plausibly allege widespread intentional discrimination.  The Second Circuit has explained that "to show discriminatory intent in a § 1981 or Equal Protection case based on statistics alone, the statistics must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible non-discriminatory explanations very unlikely."  Burgis, 798 F.3d at 69.  Plaintiffs have not alleged, nor could the Court conclude from the amended complaint, that these statistics are statistically significant, and these statistics do not render other non-discriminatory explanations very unlikely.  It is not plausible to infer from the amended complaint that there is a widespread practice of intentional discrimination in the enforcement of section 240.37.

Finally, plaintiffs have alleged violations of the City's Bias-Based Profiling Law, N.Y.C. Admin. Code § 14-151, which allows declaratory and injunctive relief if "a policy or practice within the police department or a group of policies or practices within the police

department regarding the initiation of law enforcement action has had a disparate impact on the subjects of law enforcement action on the basis of," among other things, gender, race, or gender identity, "such that the policy or practice on the subjects of law enforcement action has the effect of bias-based profiling."  Id. § 14-151(c)(2)(i).  The only methods plaintiffs have used to show disparate impact is the statement by the former police officer and the statistical imbalance between those arrested under section 240.37 and the general population of New York City. Section 14-151, however, explicitly states that

> the mere existence of a statistical imbalance between the demographic composition of the subjects of the challenged law enforcement action and the general population is not alone sufficient to establish a prima facie case of disparate impact violation unless the general population is shown to be the relevant pool for comparison, the imbalance is shown to be statistically significant and there is an identifiable policy or practice or group of policies or practices that allegedly causes the imbalance.  Id. § 14-151(c)(2)(iii).

For the reasons previously stated, the general population is not the relevant pool for comparison. The statement by the former police officer does not transform this insufficient claim into an actionable claim against the City.  The federal claims against the City and all state law claims against the City, except those that are based on the theory of respondeat superior, will be dismissed.

     f.   <u>Supervisory Liability</u>

Defendants have moved to dismiss the claims against defendants McKenna, Maloney, Daverin, and Beddows.  Plaintiffs argue that dismissal of these defendants is not warranted because they directly participated in the alleged violations by approving the purportedly unlawful arrests, failed to remedy the misconduct of defendants under their supervision, and failed to monitor and supervise defendants under their supervision

29

appropriately, "permit[ing] the NYPD's discriminatory enforcement of 240.37 to continue unchecked." (Dkt. 93 at 25).  As with municipal liability, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct," Iqbal, 556 U.S. at 677, and may be held liable under section 1981 or 1983 only if the official causes a deprivation of rights, see Taylor v. Brentwood Union Free Sch. Dist., 143 F.3d 679, 686 (2d Cir. 1998); Patterson, 375 F.3d at 229 ("In order to make out a claim for individual liability under § 1981, 'a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action . . . . [P]ersonal liability under section 1981 must be predicated on the actor's personal involvement.'" (alterations in original) (quoting Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000))).  Plaintiffs have not plausibly alleged that these defendants did so.

Although supervisor defendants approved the arrests, there is no indication that they should have known that defendants under their supervision had violated plaintiffs' rights. Nor is there any fact-based allegation that they had actual knowledge that defendants effecting the arrests had lied about what they witnessed.  Thus, it is not plausibly alleged that these defendants intentionally discriminated against plaintiffs in approving plaintiffs' arrests, acted unreasonably in doing so, were motivated to approve the arrests by plaintiffs' engagement in constitutionally protected expressive conduct, or deliberately deprived plaintiffs, whether directly or through indifference, of a protected liberty interest.  See Iqbal, 556 U.S. at 677 (intentional discrimination); O'Connor v. Pierson, 426 F.3d 187, 203 (2d Cir. 2005) (due process); Caldarola v. Calabrese, 298 F.3d 156, 161 (2d Cir. 2002) (arrest without probable cause); Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2001) (retaliatory arrest for speech).

In support of their other theories, plaintiffs propose only "[t]hreadbare recitals of the elements . . . supported by mere conclusory statements," which do not suffice to state a plausible claim.  Iqbal, 556 U.S. at 678.  Plaintiffs simply allege that these defendants "failed to properly review, monitor and supervise" defendants under their supervision and "participated in planning, ordering, staffing, supervising and/or approving" the alleged unlawful conduct by those under their supervision.  (AC ¶¶ 35, 36, 122, 139, 154, 201, 214).  And for McKenna, plaintiffs also state that he "intentionally and/or with deliberate indifference failed to provide D.H. with a reasonable accommodation."  (AC ¶ 327).  They do not supplement these "naked assertions" with "further factual enhancement" describing what these supervisory defendants did or did not do that caused plaintiffs' injuries.  Balintulo v. Ford Motor Co., 796 F.3d 160, 170 (2d Cir. 2015) (quoting Iqbal, 556 U.S. at 678).  The claims asserted against defendants McKenna, Maloney, Daverin, and Beddows will be dismissed.

g.  Public Accommodation Claim

Defendants have also moved to dismiss plaintiffs' Twelfth Claim, which alleges that defendants violated the New York Human Rights Law ("NYHRL") and the New York City Human Rights Law ("NYCHRL") by discriminating against plaintiffs' during plaintiffs' arrests.  For the NYHRL to apply, the defendant at issue must be part of a "place of public accommodation."  N.Y. Exec. Law § 296(2)(a).  Similarly, the NYCHRL is inapplicable unless the defendant at issue is part of a "place or provider of public accommodation."  N.Y.C. Admin. Code § 8-107(4).  Defendants argue that the NYPD, when its officers make an arrest, is not acting as a place or provider of public accommodation.

The NYHRL and the NYCHRL are statutorily defined to encompass a broad range of entities.  The NYHRL defines "place of public accommodation" to include

"establishments dealing with goods or services of any kind," and it applies, with limited

exception not relevant here, "regardless of whether the owner or operator of such place is a state

or local government entity or a private individual or entity." N.Y. Exec. Law § 292(9). The

New York Court of Appeals has instructed that this definition "should be interpreted liberally."

Cahill v. Rosa, 674 N.E.2d 274, 276 (N.Y. 1996). The NYHRL counterpart in the NYCHRL is

similar, defining "place or provider of public accommodation" to reach "providers" of

"services . . . of any kind." N.Y.C. Admin. Code § 8-102(9). The NYCHRL instructs courts that

its provisions "shall be construed liberally for the accomplishment of [its] uniquely broad and

remedial purposes." Id. § 8-130(a).

   The Court assumes for present purposes that the NYPD provides a service to the

public in the course of law enforcement activities. A plaintiff states a claim under the NYHRL

and NYCHRL, however, only if a defendant's actions are directed towards a plaintiff because of

the plaintiff's gender, gender identity, or race and amount to "refus[ing], withhold[ing] from or

deny[ing] to such person any of the accommodations, advantages, facilities or privileges" of the

place of public accommodation, N.Y. Exec. Law § 296(2)(a), or to "refus[ing], withhold[ing]

from or deny[ing] to such person the full and equal enjoyment, on equal terms and conditions, of

any of the accommodations, advantages, services, facilities or privileges of the place or provider

of public accommodation," N.Y.C. Admin. Code § 8-107(4)(1)(a). The Court assumes for the

purpose of this motion that the NYPD, its precinct houses, and the services offered by its officers

qualify as a public accommodation and that the NYHRL and the NYCHRL are broad enough to

reach such services. But the determination by a police officer that there is probable cause, based

upon the totality of the circumstances, to arrest a person for a violation of New York's Penal

Law is neither a service, nor an accommodation, nor any other act covered by the NYHRL or the

NYCHRL.  It is a power bestowed by statute to police and peace officers that is held in check by two centuries of established judicial precedent.  New York Criminal Procedure Sections 140.05, et seq., delineate the circumstances under which an arrest without a warrant may be made by police and peace officers, who are also subject to well-developed state and federal constitutional restraints.  The motion to dismiss this claim will be granted.

> h.  Notice-of-Claim Requirement

Defendants move to dismiss various state law claims for failure to comply with the notice-of-claim requirement for those claims.  In general terms, the requirement applies to torts, including constitutional torts, asserted against the City.  See N.Y. Gen. Mun. Law §§ 50-e(1)(a); 50-i(1); 50-k(6); 423 S. Salina St., Inc. v. City of Syracuse, 503 N.E.2d 63, 71 n.5 (N.Y. 1986).  It does not apply to statutory claims.  See Barella v. Village of Freeport, 16 F. Supp. 3d 144, 156 (E.D.N.Y. 2014); Felmine v. City of New York, No. 09 Civ. 3768 (CBA) (JO), 2012 WL 1999863, at *7 (E.D.N.Y. June 4, 2012); Pratt v. Indian River Cent. Sch. Dist., 803 F. Supp. 2d 135, 146 (N.D.N.Y. 2011); Polvino v. Island Grp. Admin., Inc., 694 N.Y.S.2d 728, 730 (App. Div. 1999).  With regards to constitutional tort claims asserted against the City under a respondeat superior theory, the notice-of-claim requirement would apply absent an applicable exception.  E.g. Anderson v. City of New York, 817 F. Supp. 2d 77, 99 (E.D.N.Y. 2011); Folmar v. Lewiston-Porter Cent. Sch. Dist., 925 N.Y.S.2d 730, 732 (App. Div. 2011).

Whether the notice-of-claim requirement applies to claims against the individual defendants generally turns on whether the City has a statutory obligation to indemnify the defendants.  See N.Y. Gen. Mun. Law §§ 50-e(1)(b); 50-i; 50-k(3); Taylor v. Mayone, 626 F.2d 247, 252 (2d Cir. 1980) (noting that section 50-i, "has been said to be applicable whenever such individuals have a right to indemnity from the municipality"); Vesterhalt v. City of New York,

667 F. Supp. 2d 292, 300–01 (S.D.N.Y. 2009); Int'l Shared Servs., Inc. v. County of Nassau, 634 N.Y.S.2d 722, 724 (App. Div. 1995).  Generally, the City would not have to indemnify a defendant for intentional or reckless conduct.  § 50-k(3); Hardee v. City of New York, No. 10 Civ. 7743 (PAE), 2014 WL 4058065, at *8 (S.D.N.Y. Aug. 14, 2014); Vesterhalt, 667 F. Supp. 2d at 300–01.

The briefing by the parties is inadequate for the Court to assess the notice-of-claim requirement.  The Court will deny defendants' motion on this ground without prejudice to the filing of a motion for judgment on the pleadings under Rule 12(c), Fed. R. Civ. P., within 21 days addressing the application of the notice-of-claim requirement to the surviving claims.  Plaintiffs may respond 14 days thereafter, and defendants may reply 7 days after plaintiffs' response.

CONCLUSION

For the foregoing reasons, defendants' motion is GRANTED IN PART and DENIED IN PART.  The First, Second, Sixth, Eighth, Eighteenth, Nineteenth, and Twentieth Claims are dismissed under Rule 12(b)(1) insofar as any plaintiff seeks declaratory or injunctive relief against any defendant.  The Fifth, Tenth, Eleventh, Twelfth, Thirteenth, and Sixteenth Claims are dismissed under Rule 12(b)(1) insofar as any plaintiff seeks declaratory or injunctive relief against any defendant, except that N.H. may seek declaratory and injunctive relief under those claims for discrimination on the basis of gender identity against the City and individual defendants in the 52nd Precinct.  The Third, Fourth, Seventh, Ninth, Fourteenth, Fifteenth, and Seventeenth Claims are dismissed under Rule 12(b)(1) insofar as any plaintiff seeks declaratory or injunctive relief against any defendant, except that N.H. may seek such relief against the City and individual defendants in the 52nd Precinct.

34

All claims asserted against the City, except for the Ninth Claim, which asserts respondeat superior liability, are dismissed for failure to state a claim under Rule 12(b)(6). The Tenth and Twelfth Claims are dismissed for failure to state a claim under Rule 12(b)(6). Plaintiffs' Eleventh and Sixteenth Claims are dismissed against all defendants for failure to state a claim under Rule 12(b)(6) except for plaintiff Grissom's claims against defendants Savarese and Pocalyko, plaintiff Bankston's claims against defendants Salazar, Doe NYPD Officer #8, and Doe NYPD Officer #9, plaintiff D.H.'s claims against defendants Kinane, Doe NYPD Officer #1 and Doe NYPD Officer #2, plaintiff N.H.'s claims against defendants Dawkins, Keane, Doe NYPD Officer #3, and plaintiff K.H.'s claims against defendants Imburgia, Doe NYPD Officer #4, and Doe NYPD Officer #5. Plaintiffs' Eighteenth Claim is dismissed against all defendants under Rule 12(b)(6) except for plaintiff Bankston's claim against defendants Salazar, Doe NYPD Officer #8, and Doe NYPD Officer #9 for racial discrimination. All claims asserted against defendants McKenna, Maloney, Daverin, and Beddows by all plaintiffs are dismissed for failure to state a claim under Rule 12(b)(6). Defendants' motion to dismiss plaintiffs' remaining state law claims under New York's notice-of-claim provision, § 50-e, is denied without prejudice to the filing of a motion under Rule 12(c) within 21 days addressing the application of the notice-of-claim requirement to the surviving claims. Plaintiffs may respond 14 days thereafter, and defendants may reply 7 days after plaintiffs' response.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
        January 9, 2018

35